**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ENVISION HEALTHCARE CORPORATION** | ) ) ) ) | |
| | ) | **Civil Action No.** |
| **Plaintiff,** | ) ) ) | |
| **v.** | ) ) ) | **JURY TRIAL DEMANDED** |
| **UNITED HEALTHCARE SERVICES, INC. and UNITED HEALTHCARE INSURANCE COMPANY** | ) ) ) ) | |
| **Defendants.** | ) ) | |

_____

## COMPLAINT
_____

Envision Healthcare Corporation ("Envision") brings this action against United HealthCare Services, Inc. and UnitedHealthcare Insurance Company (collectively, "United" or "Defendants") and further alleges as follows:

## I.  NATURE AND STATUTORY BASIS OF ACTION

This case is about the world's largest insurer, United, which continuously demonstrates by its actions that it will stop at nothing to refuse payment to front-line medical care providers to enrich its overflowing coffers and drive up its stock price. United is a profit hungry organization and the less United pays to medical providers, the more it makes. For decades, United has intentionally acted wrongfully to withhold reimbursement due to medical providers, attempted to coerce providers like Envision into participation agreements with unconscionably low reimbursement rates, and even employed shadow public relations campaigns designed to paint

1

Envision and other medical providers in a false light. United has gone so far as to secretly stage an academic study designed to smear an Envision affiliate, and to pass off that study to an unwitting media and even to the United States Congress, in service of its business interests.

Envision participated in United's provider networks until January 2021, when the contract between the Parties expired after Envision refused to accede to United's unconscionable reimbursement rates. As soon as Envision took that stand and went "out-of-network," United punished Envision by systematically withholding reimbursement payments without justification, literally paying Envision's emergency medical providers nothing for services the clinicians provided to high acuity emergency room patients—those with the most serious medical problems. This systematic and fraudulent scheme, employed in part through United's Emergency Management policy (the "Policy"), is designed to spike United's profits by improperly withholding payment on legitimate claims from the very front-line providers that treated its member patients. This fraudulent scheme employed by United to financially strangle providers such as Envision serves United's economic interests in at least three ways: (1) each dollar that United does not pay to medical providers goes to its bottom-line profits and, ultimately, to its stock price and executive compensation; (2) each time United withholds reimbursement payments it punishes Envision in an effort to coerce it back to the negotiating table, where United is offering unconscionably low in-network reimbursement rates; and (3) it furthers the interests of United's subsidiary, Optum, Inc., which owns certain medical practices that compete with Envision, who United sees as a threat to Optum's business. These are the tactics of a multi-billion-dollar, multi-national corporation that cares about one thing only—juicing their return to shareholders even if it involves defrauding America's front line healthcare workers.

2

United's systematic and unjustified denial of claims for high acuity patients evidences a long-running practice of racketeering and civil conspiracy among United and its affiliates to line its pockets at the cost and expense of providers across the country, including Envision, which ultimately drives up the cost of healthcare services nationwide. United's conduct is fraudulent, is in violation of Tennessee's Unfair Trade Practices and Unfair Claims Settlement Act of 2009, is a breach of an implied-in-fact contract, and unjustly enriches United.

## II.  PARTIES

1.      Plaintiff Envision Healthcare Corporation is a corporation organized and existing under the laws of Delaware, with its principal place of business at 1A Burton Hills Boulevard, Nashville, Tennessee 37215. It offers healthcare-related services to consumers, hospitals, healthcare systems, health plans, and local, state, and federal governmental entities.

2.      Defendant United HealthCare Services, Inc. is a corporation organized under the laws of the State of Minnesota, with its principal place of business in the State of Minnesota. United HealthCare Services, Inc. is a claim administrator for health plans offered by employers.

3.      Defendant UnitedHealthcare Insurance Company is a corporation organized under the laws of the State of Connecticut, with its principal place of business in the State of Connecticut. UnitedHealthcare Insurance Company insures and administers health plans for employers.

## III.  JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under federal law—specifically, Envision brings claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *et seq*. The Court further has subject matter jurisdiction over Envision's state and common law claims under 28 U.S.C. §

1367, as those claims are so related to the federal claim that they form part of the same case or controversy.

5.     This Court also has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity among the parties and the matter in controversy exceeds the sum or value of $75,000, excluding interest and costs.

6.     This Court has personal jurisdiction over each of the Defendants and the claims asserted in the Complaint pursuant to Defendants' continuous and systematic contacts with the State of Tennessee, including the systematic denial of claims for health care services provided in the State of Tennessee, which claims arise out of and relate to such contacts.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

### IV.  FACTUAL BACKGROUND

#### A.  United's History of Improper and Unlawful Conduct to Drive Up Profits at All Costs

8.     United is the largest health insurance company in the world. It has more than 300,000 employees and insures more than 45 million people worldwide. It is currently ranked 5th in the 2022 Fortune 500 list.

9.     In 2019, United had record profits of more than $14 billion. In the second quarter of 2020, during the height of the COVID-19 pandemic—while Envision's ER physicians were working on the front lines to save lives—United recorded its then-highest-ever quarterly profits. United's year-over-year increase in profits continues to this day.

10.     In 2021, United achieved $17.3 billion in profits—more than double that of the next-most-profitable health insurer.

4

11.     United generates these enormous profits through corrupt and unethical schemes that deny fair and timely reimbursement to the medical providers who render medical services to its covered patients ("Patients").

12.     United's profits do not translate into reduced premiums or other benefits for the Patients. Rather, those record profits benefit its executives and shareholders.

13.     Since 2010, the stock of United's parent company, UnitedHealth Group Inc., has increased by approximately 1,000%.

14.     United's recently departed CEO, David Wichmann, received more than *$142 million* as compensation in his final year as CEO.[1]

15.     United has a long-running, public history of scheming to engage in improper and unlawful conduct aimed at maximizing its profits at the expense of physicians and patients. For example,

    a.  In 2009, United agreed to pay $350 million to patients and physicians to settle claims that it systematically underpaid "usual and customary" charges.[2]

    b.  In May 2015, United agreed to pay $11.5 million to settle claims relating to its scheme to deprive providers in North Carolina, Tennessee, Connecticut, and New York millions in reimbursement using software and other processes aimed to reduce, deny, and impede claims.[3]

---

[1]  *See Former UnitedHealth CEO made $142.2M last year*, StarTribune, *available at* https://www.startribune.com/former-unitedhealth-ceo-made-142-2m-last-year/600171979/?refresh=true (last accessed September 7, 2022). A true and correct copy is attached as Exhibit 1 and incorporated as though fully set forth herein.

[2]  *See United agreed to pay $350 million, scrap system that undercut fees,* American Medical News, *available at* https://amednews.com/article/20090126/business/301269997/1/ (last accessed September 7, 2022). A true and correct copy is attached as Exhibit 2 and incorporated as though fully set forth herein.

[3]  *See UnitedHealth Group agrees to $11.5 million settlement,* MDedge, *available at* https://www.mdedge.com/chestphysician/article/99718/practice-management/unitedhealth-group-agrees-115-

c. In September 2015, United agreed to pay $9.5 million to settle claims alleging that it systematically underpaid California medical providers.[4]

d. Within the last year, in November 2021, a Nevada jury found by clear and convincing evidence that United was guilty of oppression, fraud, and malice in systematically denying and down coding claims submitted by TeamHealth and its affiliates—highly similar to the claims alleged herein. As a result, the jury awarded the Plaintiffs compensatory damages, and punitive damages in the amount of $60 million.

16. In recent years, United's improper and unlawful conduct has been specifically aimed at Envision.

17. Envision is a leading national medical group that delivers physician and advanced practice provider services, primarily in the areas of emergency and hospitalist medicine, anesthesiology, radiology/teleradiology, and neonatology, to more than 1,800 clinical departments in healthcare facilities in 45 states and the District of Columbia.

18. Envision provides these services through affiliates including an emergency medicine practice group that has staffed emergency rooms in Tennessee hospitals for many years.

**B. United's Targeting of Envision Through its Concealed Involvement of the Yale Study**

19. In furtherance of its decades-long scheme to maximize profits through improper and unlawful conduct, beginning in or about May 2016, United embarked on a pressure campaign

---

million-settlement (last accessed September 7, 2022). A true and correct copy is attached as Exhibit 3 and incorporated as though fully set forth herein.

[4] *See UHG to Pay California ASCs $9.5M for ERISA Violations*, American Academy of Professional Coders, *available at* https://www.aapc.com/blog/32122-uhg-to-pay-california-ascs-9-5m-for-erisa-violations/ (last accessed September 7, 2022). A true and correct copy is attached as Exhibit 4 and incorporated as though fully set forth herein.

6

to force Envision and providers like it into participation agreements that contain unconscionably low reimbursement rates.

20. A key element of United's pressure campaign was its negotiation of an agreement with Yale University (the "Research Agreement") whereby United would disclose certain claims data for use in a research study (the "Yale Study") and, in exchange, United was granted editorial control and authority to review, revise, and even veto altogether public disclosure if it disapproved of the outcome of that study.[5]

21. The focus of the Yale Study was so-called "balance" or "surprise" billing, which may result when a patient receives emergency room care by a physician who does not have a participation agreement with the patient's insurer; that is, an "out-of-network" physician. While in the past insurers may have covered such treatment as an "in-network" benefit, insurers like United have over time reduced out-of-network coverage to unsustainably low levels to reduce their costs and increase profits. In that scenario, the patient may have received a bill from the provider for the denied portion, or "balance," of the bill and often would seek recourse with the insurer.

22. United, prior to granting its approval, worked hand-in-glove with Yale researchers to dictate content and conclusions of the Yale Study, and to falsely paint Envision as the culprit in the balance billing issue, in furtherance of United's own economic interests and to Envision's detriment, to wit:

    a. On February 13, 2017, Dan Rosenthal, then President of UnitedHealthcare Networks, reviewed a "Confidential" draft of the study and informed his staff "I'd like to see some solutions in addition to the problem – like maybe suggest that

---

[5] *See Study Addendum No. 2 to Master Research Agreement*, *available at* https://www.documentcloud.org/documents/21040014-ys_oon_paper- at Bates No. DEF102980-82 (last accessed September 7, 2022). A true and correct copy is attached as Exhibit 5 and incorporated as though fully set forth herein.

hospitals should bundle their hospital based physicians into their contracts with insurers."[6] Consistent with the Research Agreement, a 2018 version of the Yale Study concluded with a policy proposal "to require that hospitals to sell an 'ED package' to insurers that include both physician and hospital services" that would compel staffing companies and hospitals to "bundle" services in their contracts with insurers.[7]

b. On March 9, 2017, Sam Ho, M.D., UnitedHealthcare's Executive VP and Chief Medical Officer authorized his staff to inform Yale to identify by name "EmCare" (an Envision affiliate), and TeamHealth (another provider group), which were then labeled in the draft study as "Firm 1 and 2."[8] On March 20, 2017, Rosenthal asked his staff, "I wonder if the report could include a table of the largest firms to create a logic flow to why firm 1 & 2 are highlighted in this report. I assume they were because there are the two largest firms in the space, representing at least x% of the market. . . . ."[9] Consistent with the Research Agreement, the researchers added Ho's and Rosenthal's revisions, and changed the introduction of the Yale Study to implicate Envision affiliate EmCare, and another provider, TeamHealth, as follows:

---

[6]   *See*   February   13,   2017,   email   from   Dan   Rosenthal,   *available   at* https://www.documentcloud.org/documents/21039505-ys_oon_paper-copy-3 at Bates No. DEF108734 (last accessed September 7, 2022).  A true and correct copy is attached as Exhibit 6 and incorporated as though fully set forth herein.

[7] *See SURPRISE! OUT-OF-NETWORK BILLING FOR EMERGENCY CARE IN THE UNITED STATES* at p. 37, NBER Working Paper Series, Working Paper 23623, July 2017 (Revised January 2018) *available at* https://www.nber.org/system/files/working_papers/w23623/w23623.pdf (last accessed September 7, 2022).

[8] *See* March 9, 2017, email from Sam Ho, M.D., available at https://www.documentcloud.org/documents/21039505-ys_oon_paper-copy-3 at Bates No. DEF108732-33 (last accessed September 7, 2022).  A true and correct copy is attached as Exhibit 7 and incorporated as though fully set forth herein.

[9] *See* March 20, 2017, email from Dan Rosenthal, *available at* https://www.documentcloud.org/documents/21039505-ys_oon_paper-copy-3 at Bates No. DEF108730 (last accessed September 7, 2022).  A true and correct copy is attached as Exhibit 8 and incorporated as though fully set forth herein.

"[t]here are two leading national outsourcing firm – EmCare and TeamHealth – that collectively capture approximately 30% of the physician outsourcing market."[10]

    c. In a March 13, 2017, email, United's Deputy General Counsel, Andrea M. Boado, Esq., in considering the benefits to United of publicly implicating EmCare as a culprit in the balance billing issue, stated "public shaming comes to mind," and "with costs on the rise, throwing heat and light on them may not be a bad thing," but that, "[u]ltimately, it's a business decision."[11] Upon information and belief, Boado was referring to using the Yale Study to "public[ly] shame" and "cast heat" on Envision and another provider as a "business decision" to help United drive its own costs still lower, and its profits still higher.

23.    At the same time, United executives actively concealed its involvement in the Yale Study to its own economic benefit, and to Envision's detriment, to wit:

    a. On May 19, 2016, Brenda Perez, a United communications employee, stated in an email to United VP Tyler Mason that "we have been providing data to Yale since March [2016]," and that the Yale Study was expected to result in publications by the New York Times and the *New England Journal of Medicine*.[12] Perez assured that United "will be referred to in the piece simply as 'a large carrier.'" and that "our support of [the lead Yale researcher] is expected to remain 'behind-the-

---

[10] *See Surprise! Out-of-Network Billing for Emergency Care in the United States*, Yale Institution for Social and Policy Studies, July 2017, *available at* https://isps.yale.edu/sites/default/files/publication/2017/07/surpriseoutofnetwrokbilling_isps17-22.pdf (last accessed September 7, 2022).

[11] *See* March 13, 2017 email from Andrea Boado, *available at* https://www.documentcloud.org/documents/21039505-ys_oon_paper-copy-3 at Bates No. DEF108731 (last accessed September 7, 2022). A true and correct copy is attached as Exhibit 9 and incorporated as though fully set forth herein.

[12] *See* May 19, 2016 email from Brenda Perez *available at* https://www.documentcloud.org/documents/21040014-ys_oon_paper- at Bates No. DEF102978 (last accessed September 7, 2022). A true and correct copy is attached as Exhibit 10 and incorporated as though fully set forth herein.

scenes.'"[13] Perez warned, however, that "we'll have to look into the possibility of further distancing ourselves from the piece and messaging in anticipation of media inquiries."[14]

b. On March 9, 2017, Sam Ho, M.D., sent an email that, while endorsing that public naming of providers such as Envision in the Yale Study, specifically directed his staff to conceal United's involvement in the Yale Study, stating that United "should not be identified as the data source."[15] Upon information and belief, United was the sole source of data for the Yale Study.

### C. United Shops the Yale Study

24.     After United approved the release of the Yale Study, Yale released a version of the study in July 2017, but neither the fact nor the extent of United's influence and editorial control over the content of that study was disclosed. News outlets, including The New York Times, NBC Nightly News, The Wall Street Journal, The Washington Post, NPR, ABC World News, and others reported on the Yale Study under the false pretense that it was prepared without economic bias and within academic norms, rather than one reviewed, revised and approved—essentially bought and paid-for—by a large, publicly-traded insurance company to drive profits.

25.     Beyond media outlets, United also passed off the Yale Study as an independent study free from corporate influence to the United States Congress, which relied on the study in the closing days of 2020 when it enacted, and the President signed into law, the "No Surprises Act." Envision fully supported and continues to support the No Surprises Act's important patient protections. Upon information and belief, however, United has used those protections to position

---

[13] *Id.*

[14] *Id.*

[15] *See* Exhibit 7.

itself as the sole payment source for medical treatment that providers like Envision are legally required to provide, and then United has systematically and wrongfully withheld payment for such treatment to increase its own profits.

26.     United's concealed involvement in the Yale Study broke[16] on or about August 10, 2021, after a Clark County, Nevada judge, in a case captioned *Fremont Emergency Services (Mandavia), Ltd., et al. v. United Healthcare Insurance Co.* ("*Fremont*")—a case brought by a TeamHealth asserting fraudulent billing practices claims against United like those that Envision asserts here—ordered United to produce certain emails related to its involvement in the Yale Study.

27.     Based in part on evidence of United's concealed influence over the Yale Study, the jury in *Fremont* found "clear and convincing evidence" that United were guilty of oppression, fraud, and malice in unfairly denying claims submitted by TeamHealth (the other provider named of the Yale Study) and its affiliates.[17] For its malicious, fraudulent, and oppressive denial of claims in that case, the jury awarded TeamHealth $60 million in punitive damages.[18]

**D. Envision's Recent Contractual Turmoil with United**

28.     Envision worked hard to remain part of United's national network until January 2021 when its latest two-year contract with United expired after Envision refused to accede to the

---

[16] *See Unitedhealthcare Guided Yale's Groundbreaking Surprise Billing Study*, *available at* https://theintercept.com/2021/08/10/unitedhealthcare-yale-surprise-billing-study/ (last accessed September 7, 2022). A true and correct copy is attached as Exhibit 11 and incorporated as though fully set forth herein.

[17] *See* Special Verdict Form, *Fremont Emerg. Servs. (Mandavia) Ltd. v. United Healthcare Ins. Co.,* No. A-19-792978-B (Nev. Dist. Ct., Clark Co. Nov. 29, 2021). A true and correct copy is attached as Exhibit 12 and incorporated as though fully set forth herein.

[18] *See* Special Verdict Form, *Fremont Emerg. Servs. (Mandavia) Ltd. v. United Healthcare Ins. Co.,* No. A-19-792978-B (Nev. Dist. Ct., Clark Co. Dec. 7, 2021). A true and correct copy is attached as Exhibit 13 and incorporated as though fully set forth herein.

latest round of United's unconscionable take-it-or-leave-it reimbursement offer. Historically, United's tortious behavior would intensify around the time the negotiation of Envision's biennial participation agreement. For example:

a. **The Contract Ending December 31, 2018.** In anticipation of negotiating Envision's agreement that expired December 31, 2018, United engaged in a rash of improper, unlawful, and knowingly tortious acts aimed at Envision and its affiliates and designed to gain an unfair advantage in the negotiations, including dispatching its wholly-owned subsidiary, Optum, to obtain commercially sensitive confidential information, under the pretext of a bogus overture to purchase an Envision business line, that United could leak to its advantage in ongoing negotiations of Envision's in-network agreement. United also sent false, disparaging, communications to the public and to Envision's hospital clients, in violation of a non-disclosure agreement, to gain leverage in its in-network agreement negotiations.

b. **The Contract Ending December 31, 2020.** In a virtual repeat of its 2018 tactics, United again defamed Envision and violated an existing NDA to gain advantage in its negotiations. For example, on November 20, 2020, United issued a letter to Envision's health care facility partners falsely stating, *inter alia*, that Envision "expects to be paid nearly double the median rate [United] pay[s] other anesthesiologists and more than triple the median rate [United] pay[s] other ER physicians at participating hospitals"; and that Envision would engage in "surprise" balance billing if the parties were unable to reach an agreement on a new in-network contract, despite the fact that Envision had implemented a policy prohibiting balance billing, and states such as New Jersey and New York had enacted

legislation to prevent "surprise" billing. United further refused to negotiate a new in-network agreement unless Envision agreed to forfeit its $100 million+ in claims currently pending in an AAA Arbitration, which are legitimate claims currently pending for damages that Envision sustained by United.

29.     As a result, Envision could not contract with United and, as of December 31, 2020, Envision medical groups were out-of-network *vis-a-vis* United.  The Parties have yet to reach a new agreement. When Envision stood up to United by not acceding to its pressure campaign to enter into a participation agreement with unconscionably low reimbursement rates, United's pressure and punishment against Envision hit a fever pitch, and crossed the line into fraudulent conduct.

## C. United's Continued Targeting of Envision Through its Fraudulent Policy and Practice of Systematically Withholding Reimbursement

30.     Immediately after the expiration of Envision's network contract on December 31, 2020, United began to routinely and systematically deny claims related to emergency room treatment for its highest acuity Patients.

31.     In short, United's systematic and wrongful scheme takes the following form:

a.  After health care services are provided to a patient, Envision's providers electronically submit, through facilities in interstate commerce, a claim for reimbursement.

b.  United then fails to timely adjudicate Envision's claims for emergency services within 30 days as required by federal law.[19]

---

[19] As will be further pled herein, the failure to adjudicate within 30 days likewise results in violation of Tennessee's Timely Reimbursement of Health Insurance Claims Act which requires the payment of clean, electronically submitted, claims within 21 days. *See* Tenn. Code Ann. § 56-7-109(b)(1)(B).

c. After wrongfully delaying adjudication through a sham records review process, United withholds reimbursement and makes no payment on claims for emergency services, using facilities in interstate commerce, though it does not actually dispute the services were provided and payable emergency services.

d. United bases its denials, on information and belief, on an initial algorithmic review of the claim forms whereby an algorithm flags Envision's claims based on the diagnosis codes on the claim form—again, in violation of federal law—and then after a sham medical record review process the reimbursements are delayed and withheld.

(The foregoing scheme is identified herein as the "Policy").

32. United's Policy is not something Envision can just choose to ignore. Rather, Envision's providers are required by federal law to examine and provide stabilizing treatment to all individuals who present at the emergency departments they staff, regardless of those individuals' insurance coverage or ability to pay for medical care.

33. Similarly, United is obligated to provide coverage for the emergency care without requiring any prior approval for the care.

34. United must provide such coverage regardless of whether or not the emergency provider participates in United's network. *See* 42 U.S.C. § 300gg-19a(b)(1); 42 U.S.C. § 18022.

**i. The Claims Process and Coding**

35. After Envision's providers render services to Patients, Envision electronically submits a claim to United for reimbursement for those services, with data compliant with the industry standard CMS 1500 claim form.

14

36.     Envision is neither required nor expected to submit medical records with their claims.

37.     The CMS 1500 claim form contains all the information United needs to process and pay Envision's claims.

38.     Envision completes the CMS 1500 claim form in accordance with the instructions set forth by the National Uniform Claim Committee ("NUCC"), which developed the CMS 1500.

39.     The NUCC instructions require Envision to identify the services rendered by listing the corresponding code found in the Current Procedural Terminology ("CPT") codebook, published by the American Medical Association ("AMA"). The services Envision's providers render in an emergency department typically constitute evaluation and management ("E/M") services.

40.     The corresponding CPT codes for E/M services in the emergency department generally range from 99281 to 99285.

41.     CPT codes 99281 through 99285 correspond to Emergency Department "Levels" 1-5, in ascending order of the complexity of the decision-making required and the extensiveness of the physician's history and physical examination.

42.     Given that higher CPT codes correspond with higher acuity patients, it follows that insurers like United reimburse providers for services utilizing CPT codes 99285 and 99284 at higher rates than those utilizing CPT codes 99281 through 99283.

43.     CPT codes 99285 and 99284 denote treatment of serious presentation, typically requiring the physician's immediate attention.

44.     The American Medical Association (the "AMA") provides the following definition of CPT Code 99285:

15

Emergency department visit for the evaluation and management of a patient, which requires these 3 key components within the constraints imposed by the urgency of the patient's clinical condition and/or mental status: A comprehensive history; A comprehensive examination; and Medical decision making of high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

45.     The AMA provides the following definition of CPT Code 99284:

Emergency department visit for the evaluation and management of a patient, which requires these 3 key components: A detailed history; A detailed examination; and Medical decision making of moderate complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of high severity, and require urgent evaluation by the physician, or other qualified health care professionals but do not pose an immediate significant threat to life or physiologic function.

46.     Despite meeting the above criteria for claims submitted to United, United has routinely and systematically delayed and withheld reimbursement on claims submitted by Envision.

47.     At all times material to this Complaint, the claims Envision submitted to United for reimbursement for emergency medical services provided to Patients were submitted in a manner consistent with applicable law and governing industry standards.

48.     United may not deny claims solely based on diagnosis codes. Nor may United, as an insurer, wade into medical decision-making, or elevate cost over care.

**ii.     United's Systematic Withholding of Reimbursement as Part of the Policy.**

49.     Under the Policy, United consistently and routinely fails to either (a) make an initial payment or (b) deny Envision's claims within 30 days of their receipt for the highest acuity patients.

16

50.     Rather, on information and belief, United improperly uses an algorithm and list of diagnosis codes, including CPT Code 99285, to improperly target Envision's claims and delay or deny payment.

51.     In furtherance of this scheme, United requests medical records that it claims it will use to conduct a pre-payment audit of the claims.

52.     This forces Envision to file additional documentation starting a pseudo-appellate process with United. But, providing United with the requested documentation which supports Envision's claims makes no difference.

53.     Instead, United "pends" adjudication of the claims—often well past the maximum 30-day timeframe—even though the claim forms contain all the information necessary for United to adjudicate the claim upon receipt.

54.     Moreover, under its Policy, after wrongfully delaying the adjudication of Envision's claims, United then consistently withholds payment on Envision's claims for emergency services even when United does not actually dispute that the services were performed and are payable emergency services.

55.     United typically withholds payment on the claims by stating, without explanation: "Payer deems the information submitted does not support this level of service."

56.     What is more, United does not pay the portion of the claims that United does not dispute.

57.     Formally appealing the claims is futile, as United's decisions do not change. Instead, United compels Envision to guess whether United considers a claim payable and then to submit a new claim at a Level that Envision hypothesizes United might agree is appropriate.

17

58.     This creates a punishing claims experience designed to deter clinicians from pursuing their right to payment, and leaving United in possession of the clinician's money.

59.     Faced with significant administrative burdens and impeded cash flow, clinicians, under duress, must choose between receiving no reimbursement at all and re-submitting legitimate Level 5 claims under protest as lower-level claims.

60.     Indeed, United's systematic zero-pay policy for an exceedingly high percentage of high-acuity claims—those using CPT code 99285, which garner the highest reimbursement—has forced Envision to re-submit those legitimate claims under a lower reimbursement level under a reservation of rights to seek legal redress for United's unlawful and fraudulent refusal to appropriately pay the claims.

61.     United's Policy is the vessel for its overall strategy to pad its own pockets and wrongfully create year over year record profits which result in nine figure executive salaries and 1000% stock price increases for its owners.

62.     Upon information and belief, United has also implemented the Policy in an effort to coerce and force Envision to accept unconscionable terms to be in-network and to send a message to the medical provider community at large that one must "play ball" with United or suffer the consequences.

63.     Indeed, the rapid spike in denials began in January 2021, immediately after Envision's in-network contract with United expired.

64.     From January 2020 through October 2020, United initially withheld payment on approximately 18-20% of claims submitted by Envision.

65.     That number began to rise in October 2020 as the negotiations between the Parties began to break down, upon information and belief, as a tactic to force Envision to accept

unfavorable terms and remain in-network such that the denial percentage would decline, and therefore Envision would receive more of the funds it was owed.

66.     On December 31, 2020, the in-network contract between Envision and United terminated.

67.     Immediately, the denials began to spike. In January 2021 the United denial rate rose to approximately 42% for all claims submitted by Envision.

68.     By November 2021 that number rose to approximately 48% of all submitted claims.

69.     The following line graph comparing United (shown in orange) to all other commercial payors (shown in blue) clearly shows the spike in denials which perfectly corresponds with Envision's exit from the United network:



70.     The denial of Level 5 claims—those using CPT code 99285 which garner the highest reimbursement—spiked to a 60% denial rate.

71.     United's spike of denials in January 2021 is unique to United—upon information and belief, no other insurer billed by Envision exercised the same behavior.

19

72.    United's motive is clear—increase denials and refuse payment so that Envision will agree to unconscionable in-network rates so that it would recoup *something* over *nothing.*

73.    United also employs its predatory and anticompetitive tactics to, upon information and belief, stifle Envision, which is a direct competitor to certain affiliates of the United conglomerate that act, in various circumstances, not only as an insurer and third-party administrator, but also as a provider of medical services.

74.    For these reasons, United has withheld payments to Envision without any meaningful explanation.

75.    At a basic level, United made false representations and operated under the false pretense that it would make payment to providers for medically necessary treatment provided to its Patients.

76.    Contrary to such false representations and pretenses, United employs the Policy to deny the highest acuity claims systematically and wrongfully for the sole purpose of its own enrichment.

77.    These false representations and pretenses were false when made, as United has employed a Policy and practice of systematically withholding payment for the highest acuity patients, upon information and belief, based not on any meaningful review of medical records that United required and that Envision provided, but rather on an algorithmic review.

iii.    **Representative Examples of United' Egregious Denials Under the Policy.**

78.    United applied the unlawful Policy to claims Envision submitted with respect to each of the Patients below (the "Patients"), as well as others similarly situated.[20]

---

[20] Envision will identify additional members and claims following the entry of a HIPAA-qualified protective order.

79.     **Patient 1**, a 31-year-old man presented at the emergency department at Tristar Summit Medical Center in Hermitage, Tennessee on March 1, 2021, complaining of severe abdominal pain and vomiting.

80.     Following a comprehensive history and physical exam, a CT scan revealed the patient was suffering from acute appendicitis and he was immediately transferred from the emergency department to surgery.

81.     Acute appendicitis is a condition, which, if left untreated, often results in death.

82.     After submitting the claim (Claim ID Number 210694035832) for payment under CPT code 99285, United initially pended the claim and requested production of medical records on May 27, 2021, so that it could allegedly conduct a pre-payment review. Envision produced the relevant records which, upon information and belief, were either not reviewed by United or formed no basis in United's reimbursement decision. United communicated to Envision on August 25, 2021, that it would not pay because, according to it, the "information submitted does not support the level of service."

83.     This case meets the AMA's criteria for a Level 5 acuity patient that the treatment consisted of an emergency department visit that included (1) a comprehensive history; (2) a comprehensive examination; (3) medical decision making of high complexity; (4) counseling and/or coordination of care with other physicians (the surgical team); and (5) that the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

84.     On information and belief, the claim was initially flagged based on an algorithmic review of the diagnoses on the claim form.

85.     On information and belief, United's denial of the claim was not based on any meaningful review of the medical records that United required and that Envision provided, but rather on United's systematic and fraudulent denial of Envisions highest acuity claims to enhance its bottom line.

86.     United did not pay a penny for the emergency treatment provided to Patient 1 by Envision.

87.     **Patient 2** (the "Baby") is a 2-month-old baby who was brought to an Envision emergency department by her parents on January 31, 2021, due to several unexplained episodes of vomiting, choking, and turning blue.

88.     The Baby was born 11-weeks prematurely, was in the NICU for an extended period following birth and had surgically corrected spina bifida.

89.     The clinician performed a comprehensive history and physical exam. The Baby was ultimately admitted from the emergency department to the pediatric intensive care unit for further evaluation and treatment.

90.     After submitting the claim (Claim ID Number 210414045618) for payment under CPT code 99285, United initially pended the claim and requested production of medical records on April 26, 2021, so that it could allegedly conduct a pre-payment review. Envision produced the relevant records which, upon information and belief, were either not reviewed by United or formed no basis in United's reimbursement decision. United communicated to Envision on August 17, 2021, that it would not pay because, according to it, the "medical records submitted don't support medical decision making of high complexity."

91.     It strains credulity to suggest that a two-month-old unexplainably choking, vomiting, and turning blue—who was ultimately admitted to the pediatric ICU—is not a case that supports "medical decision making of high complexity."

92.     Moreover, the case meets the AMA's criteria for a Level 5 acuity patient that the treatment consisted of an emergency department visit that included (1) a comprehensive history; (2) a comprehensive examination (3) medical decision making of high complexity; (4) counseling and/or coordination of care with other physicians (the pediatric NICU) and (5) that the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

93.     On information and belief, the claim was initially flagged based on an algorithmic review of the diagnoses on the claim form.

94.     On information and belief, United's denial of the claim was not based on any meaningful review of the medical records that United required and that Envision provided, but rather on United's systematic and fraudulent denial of Envisions highest acuity claims to enhance its bottom line.

95.     United did not pay a penny for the emergency treatment provided to the Baby by Envision.

96.     **Patient 3**, a 17-year-old boy came to an Envision emergency department on May 29, 2021, complaining of severe abdominal pain, high fever, nausea, and headache.

97.     Following a comprehensive history and physical exam, a CT scan revealed the patient was suffering from acute appendicitis and he was immediately transferred from the emergency department to surgery.

23

98.     After submitting the claim (Claim ID Number 211544007926) for payment under CPT code 99285, United initially pended the claim and requested production of medical records on June 28, 2021, so that it could allegedly conduct a pre-payment review. Envision produced the relevant records which, upon information and belief, were either not reviewed by United or formed no basis in United's reimbursement decision. United communicated to Envision on November 11, 2021, that it would not pay because, according to it, the "medical records submitted don't support medical decision making of high complexity."

99.     Again, this case meets the AMA's criteria for a Level 5 acuity patient that the treatment consisted of an emergency department visit that included (1) a comprehensive history; (2) a comprehensive examination (3) medical decision making of high complexity; (4) counseling and/or coordination of care with other physicians (the surgical team) and (5) that the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

100.    On information and belief, the claim was initially flagged on an algorithmic review of the diagnoses on the claim form.

101.    On information and belief, United's denial of the claim was not based on any meaningful review of the medical records that United required and that Envision provided, but rather on United's systematic and fraudulent denial of Envisions highest acuity claims to enhance its bottom line.

102.    United did not pay a penny for the emergency treatment provided to Patient 3 by Envision.

103.    **Patient 4**, a 20-year-old man came to an Envision emergency department on July 27, 2021, a week after a tonsillectomy, complaining of heavy bleeding in his throat.

104. The clinician performed a comprehensive history and physical exam and determined that the patient would need to be immediately transferred to surgery.

105. Post-tonsillectomy bleeding can be severe enough to result in death if left untreated.[21]

106. After submitting the claim (Claim ID Number 212164064591) for payment under CPT code 99285, United initially pended the claim and requested production of medical records on October 15, 2021, so that it could allegedly conduct a pre-payment review. Envision produced the relevant records which, upon information and belief, were either not reviewed by United or formed no basis in United's reimbursement decision. United communicated to Envision on December 17, 2021, that it would not pay because, according to it, the "medical records submitted don't support medical decision making of high complexity."

107. This case, like the others, meets the AMA's criteria for a Level 5 acuity patient that the treatment consisted of an emergency department visit that included (1) a comprehensive history; (2) a comprehensive examination (3) medical decision making of high complexity; (4) counseling and/or coordination of care with other physicians (the surgical team) and (5) that the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

108. On information and belief, the claim was initially flagged based on an algorithmic review of the diagnoses on the claim form.

---

[21] *See Tonsillectomy Bleed Rates across the CHEER Practice Research Network: Pursuing Guideline Adherence and Quality Improvement*, National Library of Medicine, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5322801/#R4 (last accessed September 5, 2022) (stating that "Although rare, post-tonsillectomy bleeding can be severe enough to result in death"). A true and correct copy is attached as Exhibit 14 and incorporated as though fully set forth herein.

109.    On information and belief, United's denial of the claim was not based on any meaningful review of the medical records that United required and that Envision provided, but rather on United's systematic and fraudulent denial of Envisions highest acuity claims to enhance its bottom line.

110.    United did not pay a penny for the emergency treatment provided to Patient 4 by Envision.

## COUNT I - VIOLATION OF CIVIL RICO, 18 U.S.C. § 1962(c)

111.    Envision incorporates each of the foregoing paragraphs as if fully restated herein.

112.    United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, and their nominally independent affiliates are "persons" within the meaning of 18 U.S.C. § 1961(3) that conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

113.    United HealthCare Services, Inc. and UnitedHealthcare Insurance Company entered into an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4) among themselves and with their interested affiliates throughout the United States. The Enterprise was an ongoing organization that functioned as a continuing unit. The Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity, and the Enterprise had the common purpose of doing the same. United HealthCare Services, Inc. and UnitedHealthcare Insurance Company are each "persons" distinct from the Enterprise.

114.    United HealthCare Services, Inc. and UnitedHealthcare Insurance Company established the Enterprise to reap windfall profits in part through a Policy of systematically refusing to reimburse the highest acuity claims for emergency medical care. The Enterprise

systematically withheld payment without basis—padding its own pockets as a result—through use of the wires or by mail.

115.     Each participant in the Enterprise played a distinct and indispensable role, and the participants joined as a group to execute the scheme and further the Enterprise's goals. United HealthCare Services, Inc. and UnitedHealthcare Insurance Company set the Policy of withholding payment on high acuity claims without basis. On information and belief, United and its affiliates carried out the Policy by use of an algorithm to flag and deny claims without any review.

116.     All members of the Enterprise benefitted financially from the Enterprise. United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, by way of the systematic denials and withholding of payment, retained money that was due and owing to Envision as a result of the provision of emergency medical care to Patients and on information and belief, passed along some of the proceeds to their affiliated medical groups.

117.     The Enterprise could not have succeeded, and its members could not have enjoyed the substantial financial benefits described above, absent their coordinated efforts. The members of the Enterprise functioned as a unit in pursuit of their common purpose.

118.     The relationships between the members of the Enterprise extended beyond the unlawful predicate acts at issue in this case. In particular, some portion of the claims Envision— particularly those for lower acuity patients—submitted to United were accepted and paid. The illegal scheme at issue in this litigation was and is distinct from any legitimate business activities undertaken by the members of the Enterprise.

119.     Each participant in the Enterprise, and in particular United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, knew their scheme violated federal and state laws, and acted with the specific intent to defraud Envision and other providers.

120.    The Enterprise engaged in and affected interstate commerce because, among other things, it systematically denied reimbursement claims arising out of emergency medical services provided to Patients nationwide to support its scheme.

121.    United HealthCare Services, Inc. and UnitedHealthcare Insurance Company conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity).

122.    Predicate acts of racketeering that United HealthCare Services, Inc. and UnitedHealthcare Insurance Company engaged in include, but are not limited to:

    a.   The use of wires and facilities in interstate commerce and mails to systematically and improperly deny clean reimbursement claims for high acuity patients treated at emergency departments operated by Envision and other providers;

    b.   The use of wires and facilities in interstate commerce and mails to coordinate the unlawful activities of the Enterprise, including the dissemination of relevant policies and the transmission of information to coding and payment staff necessary to carry out the payment denials and withholdings; and

    c.   The use of the wires and facilities in interstate commerce and mails to systematically withhold payment due and owing to Envision and thereafter distribute the windfall resulting from the implementation of the Policy amongst their interested affiliates.

123.    The above-described acts reveal a sustained pattern of racketeering activity, in addition to the threat of continued racketeering activity.

a. The racketeering activity at issue commenced, at the latest, on January 1, 2021, and has continued to the present. As discussed above, Envision experienced a dramatic spike in denied and unpaid claims beginning in January 2021 when Envision refused to meet United's unconscionable rate demands and became an out-of-network provider. There is further substantial evidence that the Enterprise commenced its unlawful conduct as to other providers much earlier, including the November 2021 jury verdict and punitive damages award from a jury convened in Clark County, Nevada based on the same pattern and Policy of systematically denying high acuity claims. During this period, the Enterprise has operated continuously, systematically denying claims daily.

b. The pattern and policy of systematically withholding payment for high acuity claims for emergency services has become the regular manner in which United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, among themselves and with their interested affiliates, conduct their business, and this unlawful behavior will continue indefinitely.

124. The purpose and effect of the Enterprise's racketeering activity was to defraud Envision and other providers out of substantial sums of money by deceiving them into believing that treatment of Patients would result in reimbursement as required by State and Federal law. The Enterprise caused this result by systematically denying and refusing to pay claims for emergency room services for treatment provided to Patients and that were medically necessary and appropriately billed and coded.

29

125.    Envision suffered injuries when it was refused reimbursement after providing emergency medical services to Patients, losing millions of dollars as a result of the Enterprise's racketeering activity.

126.    Envision's injuries were directly and proximately caused by the racketeering activities as described above.

127.    By virtue of these violations of 18 U.S.C. § 1962(c), United HealthCare Services, Inc. and UnitedHealthcare Insurance Company are jointly and severally liable to Envision for three times the damages Envision has sustained in an amount to be determined at trial, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT II - CONSPIRACY TO VIOLATE CIVIL RICO, 18 U.S.C. § 1962(d)**

128.    Envision incorporates each of the foregoing paragraphs as if fully restated herein.

129.    18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

130.    United HealthCare Services, Inc. and UnitedHealthcare Insurance Company have violated 18 U.S.C. § 1962(d) by conspiring with their interested affiliates to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise described herein through a pattern of racketeering activity.

131.    United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, among themselves and with their interested affiliates, have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy.

132.    The nature of the above acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective

of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also that they were aware that their ongoing acts have been and are part of an overall pattern of racketeering activity.

133.    Envision has been injured in its business and property as set forth more fully above as a direct and proximate result of United HealthCare Services, Inc. and UnitedHealthcare Insurance Company's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

134.    The purpose and effect of the conspiracy was to defraud Envision and other providers out of substantial sums of money by deceiving them into believing that treatment of Patients would result in reimbursement as required by State and Federal law. The Enterprise caused this result by systematically denying and refusing to pay claims for emergency room services for treatment provided to Patients and that were medically necessary and appropriately billed and coded.

135.    Envision suffered injuries as a result of United's improper denial of, and refusal to pay, claims for emergency room services.

136.    By virtue of these violations of 18 U.S.C. § 1962(d), United HealthCare Services, Inc. and UnitedHealthcare Insurance Company are jointly and severally liable to Envision for three times the damages Envision has sustained in an amount to be determined at trial, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT III – FRAUD

137.    Envision incorporates each of the foregoing paragraphs as if fully restated herein.

138.    United's deliberate and systematic denial of high acuity claims by implementation of the Policy evidences its longstanding fraudulent reimbursement and payment practices.

139.     At a basic level, United made false representations and operated under the false pretense that it would make payment to providers for medically necessary treatment provided to its Patients.

140.     Contrary to such false representations and pretenses, United employs the Policy to deny the highest acuity claims systematically and wrongfully for the sole purpose of its own enrichment.

141.     These false representations and pretenses were false when made, as United has employed a Policy and practice of systematically withholding payment for the highest acuity patients, upon information and belief, based not on any meaningful review of medical records that United required and that Envision provided, but rather on an algorithmic review.

142.     United further falsely certifies each time that it denies a claim and withholds payment that it has conducted a good faith review of the claim and that the denial is made in good faith.

143.     Yet, United systematically and continually relies on denials of Level 5 claims stating that the "medical records submitted don't support medical decision making of high complexity."

144.     But, upon information and belief, conducted no meaningful review of the medical records that United required and that Envision provided, and did not base the withholding of payment on such a review. Instead, upon information and belief, United denies the highest acuity claims for the sole purpose of padding its bottom line.

145.     In each representative case included herein, and those similarly situated which will be further disclosed once a HIPAA-complaint protective order is entered, each of the Level 5 codes were appropriately applied.

146.    United knew and intended for Envision to rely upon United's representations that it would pay properly submitted reimbursement claims for treatment provided to its Patients.

147.    United further knew and intended for Envision to rely upon United's requests for medical records associated with certain high acuity claims that the provision of records justifying the use of CPT code 99285 would result in prompt payment of the claim.

148.    Envision justifiably relied upon the representations made by United and the expectation that reimbursement payments would be made by United for the provision of emergency medical services to Patients.

149.    But, instead, United has implemented the fraudulent Policy to systematically deny high acuity claims and withhold payment to further bolster its profit margin.

150.    United's intentional conduct, by implementation of the Policy, defrauds providers like Envision, and leaves the providers holding the proverbial bag for the costs associated with treatment of Patients.

151.    Alternatively, United acted recklessly in failing to properly review, approve, and make payment for appropriately coded claims.

152.    Envision has been damaged as a result of United's fraudulent Policy, as United has withheld significant sums of money owed to Envision in an amount to be proven at trial, but in excess of $1,000,000.

## COUNT IV – VIOLATION OF TENNESSEE'S TIMELY REIMBURSEMENT OF HEALTH INSURANCE CLAIMS ACT

153.    Envision incorporates each of the foregoing paragraphs as if fully restated herein.

154.    Tennessee's Timely Reimbursement of Health Insurance Claims Act (the "Prompt Pay Act") is intended to guarantee the prompt and accurate payment of *all provider claims* for covered services delivered to eligible health insured patients.

155.     Pursuant to Tenn. Code Ann. § 56-7-109(b)(1), "clean claims" submitted in paper form must be paid within 30 days, and electronic claims must be paid within 21 days.

156.     Any health insurance entity that does not comply with subdivision (b)(1) shall pay one percent (1%) interest per month, accruing from the day after the payment was due, on that amount of the claim that remains unpaid.

157.     Since January 1, 2021, Envision has routinely submitted high acuity claims to United for reimbursement related to emergency medical services provided to Patients.

158.     Envision submits its claims to United electronically.

159.     In each representative case included herein, and those similarly situated which will be further disclosed once a HIPAA-complaint protective order is entered, each of the Level 5 codes were appropriately applied and the claims were "clean" as that term is defined under the Prompt Pay Act.

160.     Yet, United has implemented a Policy of systematic denial of, and withholding payment for, high acuity claims submitted by Envision.

161.     What is more, United does not pay the portion of the claims that it does not dispute.

162.     Since January 2021, United has denied and refused to make payment on 60% of the Level 5 claims—those using CPT code 99285 which garner the highest reimbursement—without justification.

163.     United's implementation of the Policy to systematically withhold reimbursement for high acuity claims without justification is in violation of the Prompt Pay Act, as payments have not been made to Envision within 21 days of their submission.

164.     As a result, United is liable to Envision for the amount of the unpaid claims and 1% interest per month on each unpaid claims pursuant to the Prompt Pay Act.

## COUNT V - CIVIL CONSPIRACY

165.    Envision incorporates each of the foregoing paragraphs as if fully restated herein.

166.    The elements of a civil conspiracy are: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) resulting injury.  *B&L Mgmt. Grp., LLC v. Adair*, No. 17-2197, 2019 WL 3459244, at *10 (W.D. Tenn. July 31, 2019) (citing *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006)).

167.    United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, among themselves and with their interested affiliates, are "persons" for the purpose of a civil conspiracy claim under Tennessee law.

168.    United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, among themselves and with their interested affiliates, agreed to implement the Policy which systematically denies and withholds reimbursement for high acuity claims without justification. The purpose of the Policy is to drive up profits for those involved in the conspiracy by reducing the amounts paid to providers such as Envision.

169.    United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, themselves and with their interested affiliates, knew at the time they agreed to implement the Policy that the Policy and its systematic denials of properly coded claims was fraudulent. Yet, the fraudulent nature of the Policy was of no concern to United, as its sole purpose and goal was to inflate its profits.

170.    United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, among themselves and with their interested affiliates took overt acts to further their conspiracy to defraud providers such as Envision including establishing and implementing the Policy to reap

35

windfall profits by systematically denying and not paying the highest acuity claims for emergency medical care. Through the Policy, United systematically withheld reimbursement without basis— padding its own pockets as a result.

171.    Each participant in the conspiracy played a distinct and indispensable role, and the participants joined as a group to execute the scheme and further the conspiracy's goals. United HealthCare Services, Inc. and UnitedHealthcare Insurance Company set the Policy of denying high acuity claims without basis. On information and belief, United and its affiliates carried out the Policy by use of an algorithm to flag, delay, and later deny claims without any meaningful review of medical records provided by Envision.

172.    All members of the conspiracy benefitted financially from the conspiracy. United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, by way of the systematic denials, retained money that was due and owing to Envision as a result of the provision of emergency medical care to Patients and on information and belief, passed along some of the proceeds to their affiliated medical groups.

173.    The conspiracy could not have succeeded, and its members could not have enjoyed the substantial financial benefits described above, absent their coordinated efforts. The members of the conspiracy functioned as a unit in pursuit of their common purpose.

174.    Each participant in the conspiracy, and in particular United HealthCare Services, Inc. and UnitedHealthcare Insurance Company knew their scheme was fraudulent, violated federal and state laws, and acted with the specific intent to defraud Envision and other providers and to enrich United.

175.     The underlying fraud and violation of State law that United HealthCare Services, Inc., and UnitedHealthcare Insurance Company engaged in include, but are not limited to, the fraud alleged in Count III and violation of the Prompt Pay Act alleged in Count IV of this Complaint.

176.     The above-described acts reveal a sustained pattern of fraud, in addition to the threat of continued fraudulent activity.

   a.  The fraudulent activity at issue commenced, at the latest, on January 1, 2021, and has continued to the present. As discussed above, Envision experienced a dramatic spike in denied and unpaid claims beginning in January 2021 when Envision refused to meet United's unconscionable rate demands and became an out-of-network provider. There is further substantial evidence that the conspiracy commenced its unlawful conduct as to other providers much earlier, including the November 2021 jury verdict and December 2021 punitive damages award from a jury convened in Clark County, Nevada based on the same pattern and Policy of systematically denying high acuity claims. During this period, the conspiracy has operated continuously, systematically denying claims on a daily basis.

   b.  The pattern and policy of systematically withholding payment for high acuity claims for emergency services has become the regular manner in which United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, among themselves and with their interested affiliates, conduct their business, and this unlawful behavior will continue indefinitely.

177.     The purpose and effect of the conspiracy was to defraud Envision and other providers out of substantial sums of money by deceiving them into believing that treatment of

Patients would result in reimbursement as represented by United and as required by State and Federal law.

178.     The conspiracy achieved its end goal of dramatically increasing its profits at Envision's expense by systematically denying and refusing to pay claims for emergency room services for treatment provided to Patients and that were medically necessary and appropriately billed and coded.

179.     Envision suffered injuries when it provided emergency medical services to Patients and was refused reimbursement, losing millions of dollars as a result of the Enterprise's fraudulent activity.

180.     As a result of the conspiracy between the United Defendants, Envision suffered millions of dollars in damages in an amount to be proven at trial.

181.     As members of the civil conspiracy, the United Defendants are jointly and severally liable for Envision's damages.

182.     Because United acted with reckless disregard of the wellbeing of others, punitive damages are appropriate.

## COUNT VI – UNJUST ENRICHMENT

183.     Envision incorporates each of the foregoing paragraphs as if fully restated herein.

184.     On December 31, 2020, the in-network agreement between Envision and United expired.

185.     From January 1, 2021, to present, Envision has billed United on an out-of-network basis for reimbursement for emergency medical services provided to Patients—this is, there is no operative participant contract between Envision and United.

38

186. United has recognized a benefit and been unjustly enriched by way of the Policy by retaining money rightfully due and owing to Envision for the provision of emergency medical services to Patients.

187. As a result of retaining funds that should have been paid to Envision, United has reaped a windfall, and has retained payments rightfully owed to Envision.

188. United has retained funds rightfully owed to Envision, and it would be unjust to permit United to retain those funds. United has acted inequitably in refusing to make payments without any justification.

189. Envision has been damaged as a result in an amount to be proven at trial, but no less than $1,000,000.

## COUNT VII – BREACH OF IMPLIED-IN-FACT CONTRACT

190. Envision incorporates each of the foregoing paragraphs as if fully restated herein.

191. At all material times, Envision was obligated under federal and Tennessee law to provide emergency medical services to all patients presenting at the emergency departments it staffs, including United Patients.

192. At all material times, United knew that Envision's affiliates were out-of-network emergency medicine groups that provided emergency medical services to patients including Patients.

193. From January 1, 2021, to the present, Envision has undertaken to provide emergency medical services to Patients, and United has undertaken to pay for such services provided to its Patients.

194.     But, United has systematically refused to make payments for the highest acuity claims associated with emergency medical services rendered to United's most critically ill and/or injured Patients.

195.     At all material times, United was aware that Envision was entitled to and expected to be reimbursed for all emergency medical services provided—including high acuity claims—in accordance with the standards established under Tennessee law.

196.     At all material times, United has received Envision's bills for the emergency medical services Envision has provided and continues to provide to Patients, and United has adjudicated and paid, and continues to adjudicate and pay, Envision directly for some, but not all, of the out-of-network claims submitted to it by Envision—primarily the low acuity claims.

197.     Through the parties' conduct and respective undertaking of obligations concerning emergency medical services provided by Envision to Patients, the parties implicitly agreed, and Envision had a reasonable expectation and understanding, that United would reimburse Envision for out-of-network claims at rates in accordance with the standards acceptable under Tennessee law and in accordance with rates the United pays for other substantially identical claims also submitted by Envision and by other providers.

198.     Under Tennessee common law United, by undertaking responsibility for payment to Envision for the services rendered to Patients, impliedly agreed to reimburse Envision at rates, at a minimum, equivalent to the reasonable value of the professional emergency medical services provided by Envision.

199.     United, by undertaking responsibility for payment to Envision for the services rendered to its Patients, impliedly agreed to reimburse Envision at rates, at a minimum, equivalent

to the usual and customary rate or alternatively for the reasonable value of the professional emergency medical services provided by Envision.

200.    In breach of its implied contract with Envision, United has and continues to systemically deny Envision's highest acuity claims, thus depriving Envision of the reasonable value of the professional emergency medical services provided by Envision to Patients.

201.    Envision has performed all obligations under its implied contract with United concerning emergency medical services to be performed for Patients.

202.    At all material times, all conditions precedent have occurred that were necessary for United to perform its obligations under its implied contract to pay Envision for the out-of-network claims, at a minimum, based upon the "usual and customary fees in that locality" or the reasonable value of Envision's professional emergency medical services.

203.    Envision did not agree to provide emergency medical services to Patients without reimbursement.

204.    Envision has suffered damages in an amount to be proven at trial, but in excess of $1,000,000.

205.    Envision has been forced to retain counsel to prosecute this action and is entitled to receive its costs and attorneys' fees incurred herein.

## COUNT VIII – QUANTUM MERUIT

206.    Envision incorporates each of the foregoing paragraphs as if fully restated herein.

207.    On December 31, 2020, the in-network agreement between Envision and United expired.

208.    From January 1, 2021, to present, Envision has billed United on an out-of-network basis for reimbursement for emergency medical services provided to Patients—this is, there is no operative contract between Envision and United.

209.    United knows that Envision expected to be compensated by United as a result of its provision of care to Patients.

210.    United has enriched itself by way of the Policy by retaining money rightfully due and owing to Envision for the provision of emergency medical services to Patients.

211.    As a result of retaining funds that should have been paid to Envision, United has reaped a windfall, and has retained payments rightfully owed to Envision.

212.    United has retained funds rightfully owed to Envision, and it would be unjust to permit United to retain those funds. United has acted inequitably in refusing to make payments without any justification.

213.    Envision has been damaged as a result in an amount to be proven at trial, but no less than $1,000,000.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment as follows:

    A.    An award of actual and consequential damages in an amount to be determined at trial;

    B.    Equitable and injunctive relief;

    C.    An award of punitive damages;

    D.    Treble damages as permitted under RICO and any other applicable state statutes;

    E.    An award of prejudgment interest at the applicable rate;

    F.    An award of costs and reasonable attorneys' fees;

    G.    An award of post judgment interest at the maximum rate permitted by law; and

H.  Provide such other relief as the Court deems to be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


                                       Respectfully Submitted,

Dated: September 8, 2022         s/ Kevin T. Elkins
                                       Kevin T. Elkins (TN BPR No. 033280)
EPSTEIN BECKER & GREEN P.C.
1222 Demonbreun St., Suite 1400
Nashville, TN 37203
(615)-564-6060
kelkins@ebglaw.com

Anthony Argiropoulos (*Pro Hac Vice* forthcoming)
Thomas Kane (*Pro Hac Vice* forthcoming)
Eric W. Moran (*Pro Hac Vice* forthcoming)
William Gibson (*Pro Hac Vice* forthcoming)
EPSTEIN BECKER & GREEN P.C.
150 College Road West, Suite 301
Princeton, New Jersey 08540
(609) 455-1540 (Phone)
(609) 228-5318 (Facsimile)
AArgiropoulos@ebglaw.com
TKane@ebglaw.com
EMoran@ebglaw.com
WGibson@ebglaw.com