# EXHIBIT 11

# UNITEDHEALTHCARE GUIDED YALE'S GROUNDBREAKING SURPRISE BILLING STUDY

The findings sparked a media sensation and led to a change in federal law. The insurance giant's role was surprisingly common.

Rose Adams

August 10 2021, 3:02 p.m.

DONATE →



A logo sign outside of the headquarters of UnitedHealthcare in Minnetonka, Minn., on Oct. 25, 2015. Photo: Kristoffer Tripplaar/Alamy

**IN 2016,** an academic study from some of the most respected scholars in health care economics prompted a national outcry. The study, published in the New England Journal of Medicine by Yale University researchers, found that 22 percent of the time someone goes to an emergency room in a hospital covered by their insurance, they still receive costly bills after being treated by an out-of-network doctor. The practice, known as "surprise billing," saddles Americans with thousands of dollars in debt per year.

The researchers went on to find that surprise billing was not only relatively common, but also a tactic that private equity-owned hospital staffing companies had employed to increase revenue. According to their findings, when either of the country's two largest staffing companies took over a hospital's emergency department, out-of-network charges soared.



## Join Our Newsletter
### Original reporting. Fearless journalism. Delivered to you.

| Email address | I'm in → |

By signing up, I agree to receive emails from The Intercept and to the Privacy Policy and Terms of Use.

The research was based on data from more than 2 million claims provided by UnitedHealthcare, the largest private health insurance company in the United States, under a data sharing agreement with Yale. As stipulated in contracts between the two entities, United was not named in the study. In the Yale paper and its subsequent media coverage — by the New York Times, the Wall Street Journal, and the Washington Post, among others — the data is attributed to an unnamed insurance company.

But internal emails between executives at UnitedHealthcare provided to The Intercept reveal that the insurance giant provided its data while working behind the scenes to influence the paper and a 2017 follow-up — not necessarily their statistical conclusions, but their narrative framing. The latter paper portrays private equity-run hospital staffing companies, which are perpetually at odds with insurers over physician compensation, in a negative light for using surprise billing as a negotiating tool to hike up in-network rates.

TeamHealth, one of the two staffing agencies named in the study, alleges in a civil lawsuit that the insurer and its subsidiaries had lowered out-of-network reimbursement rates for their own benefit, forcing staffing companies to hike their own rates to make up the difference. Arguing that this practice qualifies as racketeering, the staffing company filed a civil suit against United in May 2020 on behalf of three emergency departments, and a Nevada district court compelled United to turn over its executives' emails with the Yale researchers during discovery. After months of litigation, the court held that the communications could be released to the public. TeamHealth representatives sent them to The Intercept.

The emails do not invalidate the Yale study's conclusions. Since its publication, other research has replicated its findings using different datasets, and TeamHealth admitted to saddling patients with unexpected bills in 2017. But the emails do show frequent contact between United officials and the researchers over a period of nearly two years. They offer an instructive look into the ways corporations can shape the framing and media coverage of academic research.

"As a researcher, it is ideal to have a data use agreement that has no restriction on what you write or what you find," said Genevieve Kanter, an assistant professor of medical ethics and health policy at the University of Pennsylvania. But in a field like health care economics, where most of the data belongs to private organizations, a company's data cache becomes its leverage. Even agreements that give a company the power to veto a study's publication or sway its media spin aren't unheard of, Kanter said.

"If this is the only way to get this kind of data, researchers feel they are not in a strong enough bargaining position to push back on these restrictions."

[Image of email shown]

> Thanks.
> Tom
>
> **From:** Prospect, Theodore A
> **Sent:** Thursday, April 13, 2017 2:33 PM
> **To:** Ho, Sam; Rosenthal, Daniel I; Lucht, Jeffrey D; Ullsperger, Dewayne E
> **Cc:** Beauregard, Tom
> **Subject:** FW: OON Manuscript draft and feedback from NYTimes: LOOKING FOR INPUT
>
> Sam/Dan/Jeff/Dewayne:
>
> Following our last discussion, we shared our collective feedback with Zack which was primarily to ensure the OON billing issue would be viewed as broad as possible in both the manuscript and any associated media reporting (most notably the NY Times). To accomplish this, we were OK with naming Emcare and TeamHealth as two of the leading physician outsourcing firms in the ED space, but asked that they not be tied directly to their specific firm by firm results shown in
>
> Zack pulled together an early draft of the paper and also had an initial discussion with the NY Times (see note below and attached). As you'll see, the good news is that we were successful in that they are very interested in broadening the

👁 United emails 1
  10 pages

**THE 2017 YALE PAPER** was the first major study to pin surprise billing on private equity-owned staffing companies, effectively letting insurers off the hook. The paper's prestigious marquee and thorough dataset propelled the findings to the national stage, and the onslaught of media coverage soon caught attention on Capitol Hill. In 2020, Congress passed bipartisan legislation to ban surprise billing, citing the Yale study in its effort to investigate the practice. The bill, the No Surprises Act, was universally lauded as a necessary step to protect patients.

"There is no blameless actor in this scenario, except maybe the patient," said Erin Fuse Brown, the director of the Center for Law, Health & Society at Georgia State College of Law. Like many health care experts, she views surprise billing as one of the many ways patients get caught between two for-profit entities: insurers and physician staffing companies. Insurers say that staffing companies charge unreasonable out-of-network rates that they can't reimburse, and staffing companies argue that insurers use low out-of-network reimbursement to force providers into their networks. "But more of the blame tends to fall at the feet of these private equity-backed providers."

The study and the subsequent frenzy were to United's benefit. The public outrage toward TeamHealth and EmCare pressured the staffing companies to knock down their high out-of-network prices and bring their providers into an insurance company's network.

In an email UnitedHealthcare executive Ted Prospect wrote to other executives in February 2017, Prospect celebrated the impact of Yale's first paper in 2016 and asked his colleagues to give their feedback to the second paper's results.

"As you know, the first round of the release of this research … has had a tremendous impact (media coverage and interest from others in Congress and the FTC)," wrote Prospect. "The results are stunning and likely to generate significant media and other attention when they go public (which is probably not for a couple more months as they are in the peer review process of the results right now. Once this is done, they will draft the article)," Prospect went on. "Please take a look and let me know your thoughts."

It's not uncommon for a private company to give researchers nonbinding suggestions to their drafts, as United's data use agreement with Yale stipulated. It's also not uncommon for companies to request anonymity, arguing that full transparency could reveal trade secrets to competitors. But the fact that companies are unlikely to hand over their data for projects that portray them unflatteringly or conflict with their business interests creates tension for researchers: They can only examine the data if companies want them to.

"It is not ideal, and research ethics tells us there shouldn't be these kinds of restrictions on research agreements," Kanter said.

In one email sent in February 2016, before the study began, United's actuary sent other top executives his edits to an agreement that described the scope of the project and United's expected role. The version of the agreement unsealed by the court — an addendum to the data use agreement — explains United's role in the two Yale papers later published in 2016 and 2017.

According to the addendum, if the paper did not suit the United executives' liking, they could oppose its publication.

**MOST READ**



**Donald Trump's "Better Call Saul" Performance Isn't Going Well**
James Risen



**After Refusing Loan Forgiveness, Bank of America Hits PPP Borrowers With Inscrutable "Finance Charges"**
Bryce Covert



**The Origin of Student Debt: Reagan Adviser Warned Free College Would Create a Dangerous "Educated Proletariat"**
Jon Schwarz

**According to the addendum, if the paper did not suit the United executives' liking, they could oppose its publication.**

United also had the ability to edit and suggest changes to the paper's drafts, and executives were kept up to date on the researchers' goals and progress, the emails show. In one internal United email, President Dan Rosenthal suggested an addition to the paper.

"I'd like to see some solutions in addition to the problem – like maybe suggest that hospitals should bundle their hospital based physicians into their contracts with insurers," Rosenthal wrote to Prospect in an email with the subject "RE: OON–Confidential – DRAFT of Phase 2 Research Results" in February 2017, before the second paper's publication. "Im also interested in knowing if the pattern in the report exists with other hospital based physicians or with certain types of non-hospital based specialities such as neurosurgery."

Prospect responded the next day. "Thanks, Dan. Very helpful. They are thinking through possible solutions to recommend (one of the reasons they were looking at the impact of the NY law) and I'm sure they'll appreciate this feedback."

Rosenthal's request was a surprising one; insurers tend to advocate for price regulation rather than bundling. But the suggestion made it into the study. A 2018 version of the paper concluded with a "policy proposal to require hospitals to sell 'ED packages' [emergency department packages] to insurers that include both physician and hospital services," which would compel staffing companies and hospitals to "bundle" their services in their contracts with insurers.

Other emails confirm that United sent the researchers suggestions before supporting the second paper's publication. In May 2017, United's general counsel asked Rosenthal if he had reviewed and "approved Phase 2 of the Yale study." Before approving the paper, Rosenthal sent a list of suggested edits. In one, he asked the researchers to emphasize the size of EmCare and TeamHealth, which the paper referred to at that point as "firm 1" and "firm 2."

"I wonder if the report could include a table of the largest firms to create a logic flow to why firm 1 & 2 are highlighted in this report. I assume they were because they are the two largest firms in the space, representing at least x% of the market but it is hard to tell from the words on the page."

The 2017 draft incorporates that suggestion. "There are two leading national outsourcing firms — EmCare and TeamHealth — that collectively capture approximately 30% of the physician outsourcing market," the introduction reads.

Not all researchers agree on best practices for data use agreements. At the Brookings Institution think tank, giving the company the power to suggest changes is a step too far, according to Loren Adler, the associate director of the USC-Brookings Schaeffer Initiative for Health Policy. "Suggesting what you should say in the paper, I would say that's not normal," Adler said. "You can't stop the data provider from writing you an email, but generally, in the data use agreement language, we are very careful to put language that the data provider has no say over what the meat of the paper is."

[Email screenshot:]

From: Richard, Daryl P [___@uhg.com]
Sent: 5/20/2016 7:05:08 AM
To: Rosenthal, Daniel I [___@uhc.com]
CC: Abbate, Megan [___@uhc.com]
Subject: Yale/HCCI OON Study
Attachments: MRA - Yale (OON Study) Study Addendum No 2 Overview (4.4.16).docx

Dan – do you have 15 min. in the next couple of days to chat about this Yale/HCCI study on out of network billing at in-network hospitals? Have some thoughts and ideas I want to discuss. Thx.

From: Perez, Brenda [Communications]
Sent: Thursday, May 19, 2016 6:59 PM
To: Mason, Tyler

The first meeting I attended on this was this afternoon and it was quite preliminary.

**MEANWHILE, UNITED EXECUTIVES** were adamant about keeping their participation in the study quiet. In one email communications employee Brenda Perez sent to communications vice president Tyler Mason in May 2016, seven months before the first paper's publication, Perez warned of the pressure that United's connection to the study could put on the insurer:

> Submitted that, unless how our data is portrayed in the study findings merits revision, the company will be referred to in the piece simply as 'a large carrier.' As was the case with the HCCI piece, our support of [Yale researcher] Zack is expected to remain 'behind-the-scenes.' With that said, Bob pointed out that this time around, outside of the HCCI context, it will be easier to deduct [sic] that we are behind the study. Since findings will bring up what's been happening in the clinician world under a less-than-positive light, we'll have to look into the possibility of further distancing ourselves from the piece and messaging in anticipation of media inquiries.

United's commitment to anonymity — which was stipulated by its data use agreement with the Yale researchers — remained steadfast as the researchers communicated with New York Times reporters, who had expressed interest in an exclusive on the study and a partnership with their data-and-analysis section, The Upshot.

"The NYTimes will not report on the source of the data any where in the reporting and it will not be named in the paper," Zack Cooper, a Yale professor and the director of Health Policy at the Yale University Institution for Social and Policy Studies, assured Prospect in 2017. "My strategy will mirror the approach I took last time, which is to discuss the paper for what it is, which is science using good data to study a big problem."

By "last time," Cooper was likely referring to the 2016 paper, which had found that surprise billing was a major problem affecting about a fifth of Americans who visited an emergency room in their insurance network. But the earlier paper named no culprits: The notion that surprise billing was the result of a predatory business tactic had yet to emerge, and no specific companies were found responsible.

This time, the Times was interested in an exclusive on the study — but only if the newspaper could name the staffing companies that were supposedly inflating the cost of out-of-network emergency care, Cooper told Prospect. United had originally planned not to name the firms, and an executive characterized their disclosure as "unnecessarily poking the bear."

"My question is – what benefit is there from specifically identifying them?" Rosenthal asked.

"Public shaming comes to mind," the company's general counsel advised. "That said, with costs on the rise, throwing heat and light on them might not be a bad thing. Ultimately, it's a business decision."



The Times coverage presented a worthwhile opportunity. United's adversaries were named in the paper.

Margot Sanger-Katz, a reporter for the New York Times who broke the news of both studies, said she and her co-authors felt confident enough in the data to leave out United's involvement.

"When we reported our story, we knew that Prof. Cooper had a data use agreement with the insurer that prevented him from disclosing its identity," she told The Intercept. "The Times was not involved in that arrangement. We felt reassured through our reporting that the dataset was large and representative enough to be useful in answering the questions asked in the paper. No one outside of our newsroom had any input in our story."

The 2017 Times article on the study and subsequent public outcry blamed EmCare — and, to a lesser degree, TeamHealth — for surprise billing. The staffing companies, however, have argued that they were forced to issue surprise bills because the insurers' out-of-network reimbursements were unsustainably low. United's narrative dominated.

The direction of public outrage was to United's benefit, since it pressured TeamHealth and EmCare to bring down their high out-of-network costs and bring their providers into an insurance company's network. To amplify the paper's findings for maximum impact, United executives communicated with the researchers about media opportunities.

"It wasn't clear during today's call whether [UnitedHealth senior vice president for policy and strategy] Jeanne de Sa will be assisting with putting Zack in contact with policy circles' point people, speaking circuits, etc., which she did for last year's paper," Perez wrote.

United cited the study frequently in its own press releases, appearing optimistic about its ability to shape national legislation. Prospect told another executive he'd ask Cooper to seek media coverage of a 2016 Florida law banning surprise billing.

> The direction of public outrage was to United's benefit.

"The Congressman from Texas (who was quoted in the NY Times article) reached out to Zack Cooper (Yale professor) asking for his help to propose new legislation on this issue," Prospect wrote to Rosenthal and Chief Medical Officer Sam Ho. "In summary, we have made tremendous progress in terms of highlighting and bringing credibility to this key issue of surprise out of network emergency room physician charges at in network hospitals. We're in a great place to build on this momentum by continuing to support more research to help policymakers gain a deeper understanding of the issues, possible fixes, and to introduce broader legislation particularly in problem areas such as Texas."

In a statement to The Intercept, TeamHealth said the study was part of a United scheme to decrease out-of-network reimbursement. "The study is much more than the 'academic faux pas' United called it in court — it's yet another attempt to gain financially at the expense of patients," a TeamHealth spokesperson said. EmCare agreed in its own statement, adding that

United "apparently convinced a reputable academic institution to justify their predatory behavior with a narrow set of data from the UnitedHealthcare leadership team."

United said the staffing companies were just trying to deflect blame.

"TeamHealth appears to be trying to downplay their unethical billing practices, in which patients can be stuck with surprise medical bills, by attacking an independent study in which we had no editorial control," a spokesperson told The Intercept. "UnitedHealth Group routinely makes its data available to clinical, economic, and other academic researchers without editorial control because the truth matters."

Cooper declined to comment, but a spokesperson for Yale said the study was free of United's influence.

"Yale's researchers have an obligation to do work on important social issues. When that work requires access to large private data sets, Yale negotiates strong data use agreements that explicitly protect its research and researchers from outside influence," said Yale spokesperson Karen Peart. "Peer review prior to publication adds an additional layer of assurance that the conclusions of Yale researchers are scientifically valid."

While scientific validity is crucial, it is not the only factor that drives public influence. Corporate interests loom large over academic research, shaping public opinion and informing legislation as they go.

---

**WAIT! BEFORE YOU GO** on about your day, ask yourself: How likely is it that the story you just read would have been produced by a different news outlet if The Intercept hadn't done it?

Consider what the world of media would look like without The Intercept. Who would hold party elites accountable to the values they proclaim to have? How many covert wars, miscarriages of justice, and dystopian technologies would remain hidden if our reporters weren't on the beat?

The kind of reporting we do is essential to democracy, but it is not easy, cheap, or profitable. The Intercept is an independent nonprofit news outlet. We don't have ads, so we depend on our members to help us hold the powerful to account. Joining is simple and doesn't need to cost a lot: You can become a sustaining member for as little as $3 or $5 a month. That's all it takes to support the journalism you rely on.

**We're independent of corporate interests. Will you help us?**

| $5 | $8 | **$10** | $15 |

| ONE-TIME | **MONTHLY** |

Become a Member →

---

**CONTACT THE AUTHOR:**



Rose Adams
✉ rose.adams@theintercept.com
🐦 @rose_n_adams

---

**RELATED**



Effort to Take On Surprise Medical Billing in Coronavirus Stimulus Collapses



Buttigieg Blames Private Equity Firms for Surprise Billing. One of His Bundlers, a Blackstone Exec, Is Linked to the Problem.

**LATEST STORIES**

JOIN THE CONVERSATION

# Join Our Newsletter

Case 3:22-cv-00693   Document 1-12   Filed 09/08/22   Page 9 of 10 PageID #: 83

## Original reporting. Fearless journalism. Delivered to you.

Enter your email address

I'm in →

By signing up, I agree to receive emails from The Intercept and to the Privacy Policy and Terms of Use.

Fetching more