**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **ENVISION HEALTHCARE** ) | |
| **CORPORATION** ) | |
| ) | **Civil Action No. 3:22-cv-693** |
| ) | |
| **Plaintiff,** ) | |
| ) | **Judge Eli J. Richardson** |
| ) | **Magistrate Judge Alistair Newbern** |
| ) | |
| **v.** ) | **JURY TRIAL DEMANDED** |
| ) | |
| **UNITED HEALTHCARE SERVICES,** ) | |
| **INC., UNITED HEALTHCARE** ) | |
| **INSURANCE COMPANY** ) | |
| ) | |
| **Defendants.** ) | |

---

## AMENDED COMPLAINT

---

Envision Healthcare Corporation ("Envision") brings this Amended Complaint against United HealthCare Services, Inc., and UnitedHealthcare Insurance Company (collectively, "United" or "Defendants") and further alleges as follows:

### I. NATURE AND STATUTORY BASIS OF ACTION

This case is about the world's largest insurer, United, which continuously demonstrates by its actions that it will stop at nothing to refuse payment to front-line medical care providers to enrich its overflowing coffers and drive up its stock price. United is a profit hungry organization and the less United pays to medical providers, the more it makes. For decades, United has intentionally acted wrongfully to withhold reimbursement due to medical providers, attempted to coerce providers like Envision into participation agreements with unconscionably low reimbursement rates, and even employed shadow public relations campaigns designed to paint

1

Envision and other medical providers in a false light. United has gone so far as to secretly stage an academic study designed to smear an Envision affiliate, and to pass off that study to an unwitting media and even to the United States Congress, in service of its business interests.

Envision participated in United's provider networks until January 2021, when the in-network contract between the Parties expired after Envision refused to accede to United's unconscionable reimbursement rates. As soon as Envision took that stand and went "out-of-network," United punished Envision by systematically withholding reimbursement payments without justification, literally paying Envision's emergency medical providers nothing for services the clinicians provided to high acuity emergency room patients—those with the most serious medical problems. This systematic and fraudulent scheme, employed in part through United's Emergency Management policy, is designed to spike United's profits by improperly withholding payment on legitimate claims from the very front-line providers that treated its member patients. This fraudulent scheme employed by United to financially strangle providers such as Envision serves United's economic interests in at least three ways: (1) each dollar that United does not pay to medical providers goes to its bottom-line profits and, ultimately, to its stock price and executive compensation; (2) each time United withholds reimbursement payments it punishes Envision in an effort to coerce it back to the negotiating table, where United is offering unconscionably low in-network reimbursement rates; and (3) it furthers the interests of United's subsidiary, Optum, Inc. ("Optum"), which owns certain medical practices that compete with Envision, who United sees as a threat to Optum's business. These are the tactics of a multi-billion-dollar, multi-national corporation that cares about one thing only—juicing their return to shareholders even if it involves defrauding America's front line healthcare workers.

United's systematic and unjustified denial of claims for high acuity patients evidences a long-running practice of racketeering and civil conspiracy among United, UMR, Inc. ("UMR"), and Optum to line United's pockets at the cost and expense of providers across the country, including Envision, which ultimately drives up the cost of healthcare services nationwide. This conduct is fraudulent, is in violation of Tennessee's Unfair Trade Practices and Unfair Claims Settlement Act of 2009, is a breach of an implied-in-fact contract, and unjustly enriches United.

## II. PARTIES

1.      Plaintiff Envision Healthcare Corporation is a corporation organized and existing under the laws of Delaware, with its principal place of business at 1A Burton Hills Boulevard, Nashville, Tennessee 37215. It offers healthcare-related staffing and services to consumers, hospitals, healthcare systems, health plans, and local, state, and federal governmental entities. Envision's practice areas include anesthesiology, critical care medicine, hospital medicine, radiology, surgical services, women's and children's medicine, and emergency medicine.

2.      Defendant United HealthCare Services, Inc. is a corporation organized under the laws of the State of Minnesota, with its principal place of business in the State of Minnesota. United HealthCare Services, Inc. is a claim administrator for health plans offered by employers.

3.      Defendant UnitedHealthcare Insurance Company is a corporation organized under the laws of the State of Connecticut, with its principal place of business in the State of Connecticut. UnitedHealthcare Insurance Company is a subsidiary of United HealthCare Services, Inc. that insures and administers health plans for employers and is responsible for administering and/or paying for certain emergency medical services at issue in the litigation.

3

### III.  JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under federal law—specifically, Envision brings claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *et seq*. The Court further has subject matter jurisdiction over Envision's state and common law claims under 28 U.S.C. § 1367, as those claims are so related to the federal claim that they form part of the same case or controversy.

5.      This Court also has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity among the parties and the matter in controversy exceeds the sum or value of $75,000, excluding interest and costs.

6.      This Court has personal jurisdiction over each of the Defendants and the claims asserted in the Complaint pursuant to Defendants' continuous and systematic contacts with the State of Tennessee, including the systematic denial of claims for health care services provided in the State of Tennessee, which claims arise out of and relate to such contacts.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

### IV.  FACTUAL BACKGROUND

**A.  United's History of Improper and Unlawful Conduct to Drive Up Profits at All Costs**

8.      United is the largest health insurance company in the world. It has more than 300,000 employees and insures more than 45 million people worldwide. It is currently ranked 5th in the 2022 Fortune 500 list.

9.      In 2019, United had record profits of more than $14 billion. In the second quarter of 2020, during the height of the COVID-19 pandemic—while Envision's ER physicians were

4

working on the front lines to save lives—United recorded its then-highest-ever quarterly profits. United's year-over-year increase in profits continues to this day.

10. The United conglomerate also reaps record profits from its subsidiary, Optum. In 2019, Optum's revenues surpassed $100 billion for the first time, which contributed to more than half of United's 2020 earnings.[1]

11. In 2021—the critical time frame for this action—Optum's full year revenues grew to $155.6 billion.[2]

12. In 2021, United achieved $17.3 billion in profits—more than double that of the next-most-profitable health insurer.

13. United generates these enormous profits through corrupt and unethical schemes that deny fair and timely reimbursement to the medical providers who render medical services to its covered patients ("Patients").

14. United's profits do not translate into reduced premiums or other benefits for the Patients. Rather, those record profits benefit its executives and shareholders.

15. Since 2010, the stock of United's parent company, UnitedHealth Group Inc., has increased by approximately 1,000%.

16. United's recently departed CEO, David Wichmann, received more than *$142 million* as compensation in his final year as CEO.[3]

---

[1] *See Optum to Provide More than Half of UnitedHealth's 2020 profits,* Forbes, *available at* https://www.forbes.com/sites/brucejapsen/2019/12/03/optum-to-provide-more-than-half-of-unitedhealths-2020-profits/?sh=ed9e0f449598 (last accessed November 21, 2022).

[2] *See* Securities and Exchange Commission News Release, *available at https://www.sec.gov/Archives/edgar/data/731766/000073176622000004/a2021q4exhibit991.htm#:~:text=Optum%2 0full%20year%20revenues%20of,compared%20to%20the%20previous%20year.&text=Optum%20Health%20serve d%20100%20million,98%20million%20a%20year%20ago.* (last accessed November 21, 2022).

[3] *See Former UnitedHealth CEO made $142.2M last year*, StarTribune, *available at* https://www.startribune.com/former-unitedhealth-ceo-made-142-2m-last-year/600171979/?refresh=true (last accessed September 7, 2022). (*See* Docket Entry "D.E." 1-2).

17.     United has a long-running, public history of scheming to engage in improper and unlawful conduct aimed at maximizing its profits at the expense of physicians and patients. For example,

    a.  In 2009, United agreed to pay $350 million to patients and physicians to settle claims that it systematically underpaid "usual and customary" charges.[4]

    b.  In May 2015, United agreed to pay $11.5 million to settle claims relating to its scheme to deprive providers in North Carolina, Tennessee, Connecticut, and New York millions in reimbursement using software and other processes aimed to reduce, deny, and impede claims.[5]

    c.  In September 2015, United agreed to pay $9.5 million to settle claims alleging that it systematically underpaid California medical providers.[6]

    d.  Within the last year, in November 2021, a Nevada jury found by clear and convincing evidence that United was guilty of oppression, fraud, and malice in systematically denying and down coding claims submitted by TeamHealth and its affiliates—highly similar to the claims alleged herein. As a result, the jury awarded the Plaintiffs compensatory damages, and punitive damages in the amount of $60 million.

---

[4] *See United agreed to pay $350 million, scrap system that undercut fees,* American Medical News, *available at* https://amednews.com/article/20090126/business/301269997/1/ (last accessed September 7, 2022). (*See* D.E. 1-3).

[5] *See UnitedHealth Group agrees to $11.5 million settlement,* MDedge, *available at* https://www.mdedge.com/chestphysician/article/99718/practice-management/unitedhealth-group-agrees-115-million-settlement* (last accessed September 7, 2022).(*See* D.E. 1-4).

[6] *See UHG to Pay California ASCs $9.5M for ERISA Violations*, American Academy of Professional Coders, *available at* https://www.aapc.com/blog/32122-uhg-to-pay-california-ascs-9-5m-for-erisa-violations/ (last accessed September 7, 2022). (*See* D.E. 1-5).

18.    In recent years, United's improper and unlawful conduct has been specifically aimed at Envision.

19.    Envision is a leading national medical group that delivers physician and advanced practice provider staffing and services, primarily in the areas of emergency and hospitalist medicine, anesthesiology, radiology/teleradiology, and neonatology, to more than 1,800 clinical departments in healthcare facilities in 45 states and the District of Columbia.

20.    Envision provides these services through affiliates including an emergency medicine practice group that has staffed emergency rooms in Tennessee hospitals for many years.

**B.  United's Targeting of Envision Through its Concealed Involvement of the Yale Study**

21.    In furtherance of its decades-long scheme to maximize profits through improper and unlawful conduct, beginning in or about May 2016, United embarked on a pressure campaign to force Envision and providers like it into participation agreements that contain unconscionably low reimbursement rates.

22.    A key element of United's pressure campaign was its negotiation of an agreement with Yale University (the "Research Agreement") whereby United would disclose certain claims data for use in a research study (the "Yale Study") and, in exchange, United was granted editorial control and authority to review, revise, and even veto altogether public disclosure if it disapproved of the outcome of that study.[7]

23.    The focus of the Yale Study was so-called "balance" or "surprise" billing, which may result when a patient receives emergency room care by a physician who does not have a participation agreement with the patient's insurer; that is, an "out-of-network" physician. While in

---

[7] *See Study Addendum No. 2 to Master Research Agreement*, *available at https://www.documentcloud.org/documents/21040014-ys_oon_paper-* at Bates No. DEF102980-82 (last accessed September 7, 2022).  (*See* D.E. 1-6).

7

the past insurers may have covered such treatment as an "in-network" benefit, insurers like United have over time reduced out-of-network coverage to unsustainably low levels to reduce their costs and increase profits. In that scenario, the patient may have received a bill from the provider for the denied portion, or "balance," of the bill and often would seek recourse with the insurer.

24.     United, prior to granting its approval, worked hand-in-glove with Yale researchers to dictate content and conclusions of the Yale Study, and to falsely paint Envision as the culprit in the balance billing issue, in furtherance of United's own economic interests and to Envision's detriment, to wit:

     a.  On February 13, 2017, Dan Rosenthal, then President of UnitedHealthcare Networks, reviewed a "Confidential" draft of the study and informed his staff "I'd like to see some solutions in addition to the problem – like maybe suggest that hospitals should bundle their hospital based physicians into their contracts with insurers."[8] Consistent with the Research Agreement, a 2018 version of the Yale Study concluded with a policy proposal "to require that hospitals to sell an 'ED package' to insurers that include both physician and hospital services" that would compel staffing companies and hospitals to "bundle" services in their contracts with insurers.[9]

     b.  On March 9, 2017, Sam Ho, M.D., UnitedHealthcare's Executive VP and Chief Medical Officer authorized his staff to inform Yale to identify by name "EmCare" (an Envision affiliate), and TeamHealth (another provider group), which were then

---

[8]     *See* February 13, 2017, email from Dan Rosenthal, *available at* https://www.documentcloud.org/documents/21039505-ys_oon_paper-copy-3 at Bates No. DEF108734 (last accessed September 7, 2022).   (*See* D.E. 1-7).

[9] *See SURPRISE! OUT-OF-NETWORK BILLING FOR EMERGENCY CARE IN THE UNITED STATES* at p. 37, NBER Working Paper Series, Working Paper 23623, July 2017 (Revised January 2018) *available at* https://www.nber.org/system/files/working_papers/w23623/w23623.pdf (last accessed September 7, 2022).

labeled in the draft study as "Firm 1 and 2."[10] On March 20, 2017, Rosenthal asked his staff, "I wonder if the report could include a table of the largest firms to create a logic flow to why firm 1 & 2 are highlighted in this report. I assume they were because there are the two largest firms in the space, representing at least x% of the market. . . . ."[11] Consistent with the Research Agreement, the researchers added Ho's and Rosenthal's revisions, and changed the introduction of the Yale Study to implicate Envision affiliate EmCare, and another provider, TeamHealth, as follows: "[t]here are two leading national outsourcing firm – EmCare and TeamHealth – that collectively capture approximately 30% of the physician outsourcing market."[12]

c. In a March 13, 2017, email, United's Deputy General Counsel, Andrea M. Boado, Esq., in considering the benefits to United of publicly implicating EmCare as a culprit in the balance billing issue, stated "public shaming comes to mind," and "with costs on the rise, throwing heat and light on them may not be a bad thing," but that, "[u]ltimately, it's a business decision."[13] Upon information and belief, Boado was referring to using the Yale Study to "public[ly] shame" and "cast heat" on Envision and another provider as a "business decision" to help United drive its own costs still lower, and its profits still higher.

---

[10] *See* March 9, 2017, email from Sam Ho, M.D., available at https://www.documentcloud.org/documents/21039505-ys_oon_paper-copy-3 at Bates No. DEF108732-33 (last accessed September 7, 2022). (*See* D.E. 1-8).

[11] *See* March 20, 2017, email from Dan Rosenthal, *available at* https://www.documentcloud.org/documents/21039505-ys_oon_paper-copy-3 at Bates No. DEF108730 (last accessed September 7, 2022). (*See* D.E. 1-9).

[12] *See Surprise! Out-of-Network Billing for Emergency Care in the United States*, Yale Institution for Social and Policy Studies, July 2017, *available at* https://isps.yale.edu/sites/default/files/publication/2017/07/surpriseoutofnetwrokbilling_isps17-22.pdf (last accessed September 7, 2022).

[13] *See* March 13, 2017 email from Andrea Boado, *available at* https://www.documentcloud.org/documents/21039505-ys_oon_paper-copy-3 at Bates No. DEF108731 (last accessed September 7, 2022). (*See* D.E. 1-10).

25.     At the same time, United executives actively concealed its involvement in the Yale Study to its own economic benefit, and to Envision's detriment, to wit:

    a.  On May 19, 2016, Brenda Perez, a United communications employee, stated in an email to United VP Tyler Mason that "we have been providing data to Yale since March [2016]," and that the Yale Study was expected to result in publications by the New York Times and the *New England Journal of Medicine*.[14] Perez assured that United "will be referred to in the piece simply as 'a large carrier.'" and that "our support of [the lead Yale researcher] is expected to remain 'behind-the-scenes.'"[15] Perez warned, however, that "we'll have to look into the possibility of further distancing ourselves from the piece and messaging in anticipation of media inquiries."[16]

    b.  On March 9, 2017, Sam Ho, M.D., sent an email that, while endorsing that public naming of providers such as Envision in the Yale Study, specifically directed his staff to conceal United's involvement in the Yale Study, stating that United "should not be identified as the data source."[17] Upon information and belief, United was the sole source of data for the Yale Study.

**C. United Shops the Yale Study**

26.     After United approved the release of the Yale Study, Yale released a version of the study in July 2017, but neither the fact nor the extent of United's influence and editorial control over the content of that study was disclosed. News outlets, including The New York Times, NBC

---

[14] *See* May 19, 2016, email from Brenda Perez *available at* https://www.documentcloud.org/documents/21040014-ys_oon_paper- at Bates No. DEF102978 (last accessed September 7, 2022). (*See* D.E. 1-11).

[15] *Id.*

[16] *Id.*

[17] *See* D.E. 1-8.

10

Nightly News, The Wall Street Journal, The Washington Post, NPR, ABC World News, and others reported on the Yale Study under the false pretense that it was prepared without economic bias and within academic norms, rather than one reviewed, revised, and approved—essentially bought and paid-for—by a large, publicly-traded insurance company to drive profits.

27. Beyond media outlets, United also passed off the Yale Study as an independent study free from corporate influence to the United States Congress, which relied on the study in the closing days of 2020 when it enacted, and the President signed into law, the "No Surprises Act." Envision fully supported and continues to support the No Surprises Act's important patient protections. Upon information and belief, however, United has used those protections to position itself as the sole payment source for medical treatment that providers like Envision are legally required to provide, and then United has systematically and wrongfully withheld payment for such treatment to increase its own profits.

28. United's concealed involvement in the Yale Study broke[18] on or about August 10, 2021, after a Clark County, Nevada judge, in a case captioned *Fremont Emergency Services (Mandavia), Ltd., et al. v. United Healthcare Insurance Co.* ("*Fremont*")—a case brought by TeamHealth asserting fraudulent billing practices claims against United like those that Envision asserts here—ordered United to produce certain emails related to its involvement in the Yale Study.

29. Based in part on evidence of United's concealed influence over the Yale Study, the jury in *Fremont* found "clear and convincing evidence" that United were guilty of oppression, fraud, and malice in unfairly denying claims submitted by TeamHealth (the other provider named

---

[18] *See Unitedhealthcare Guided Yale's Groundbreaking Surprise Billing Study*, *available at* https://theintercept.com/2021/08/10/unitedhealthcare-yale-surprise-billing-study/ (last accessed September 7, 2022). (*See* D.E. 1-12).

of the Yale Study) and its affiliates.[19] For its malicious, fraudulent, and oppressive denial of claims in that case, the jury awarded TeamHealth $60 million in punitive damages.[20]

### D. Envision's Recent Contractual Turmoil with United

30.　　Envision worked hard to remain part of United's national network until January 2021 when its two-year contract with United expired after Envision refused to accede to the latest round of United's unconscionable take-it-or-leave-it reimbursement offer. Historically, United's tortious behavior would intensify around the time of the negotiation of Envision's biennial participation agreement. For example:

    a.　**The Contract Ending December 31, 2018.** In anticipation of negotiating Envision's agreement that expired December 31, 2018, United engaged in a rash of improper, unlawful, and knowingly tortious acts aimed at Envision and its affiliates and designed to gain an unfair advantage in the negotiations, including dispatching its wholly-owned subsidiary, Optum, to obtain commercially sensitive confidential information, under the pretext of a bogus overture to purchase an Envision business line, that United could leak to its advantage in ongoing negotiations of Envision's in-network agreement. United also sent false, disparaging, communications to the public and to Envision's hospital clients, in violation of a non-disclosure agreement, to gain leverage in its in-network agreement negotiations.

    b.　**The Contract Ending December 31, 2020.** In a virtual repeat of its 2018 tactics, United again defamed Envision and violated an existing NDA to gain advantage in

---

[19] *See* Special Verdict Form, *Fremont Emerg. Servs. (Mandavia) Ltd. v. United Healthcare Ins. Co.,* No. A-19-792978-B (Nev. Dist. Ct., Clark Co. Nov. 29, 2021). (*See* D.E. 1-13).

[20] *See* Special Verdict Form, *Fremont Emerg. Servs. (Mandavia) Ltd. v. United Healthcare Ins. Co.,* No. A-19-792978-B (Nev. Dist. Ct., Clark Co. Dec. 7, 2021).  (*See* D.E. 1-14).

its negotiations. For example, on November 20, 2020, United issued a letter to Envision's health care facility partners falsely stating, *inter alia*, that Envision "expects to be paid nearly double the median rate [United] pay[s] other anesthesiologists and more than triple the median rate [United] pay[s] other ER physicians at participating hospitals"; and that Envision would engage in "surprise" balance billing if the parties were unable to reach an agreement on a new in-network contract, despite the fact that Envision had implemented a policy prohibiting balance billing, and states such as New Jersey and New York had enacted legislation to prevent "surprise" billing. United further refused to negotiate a new in-network agreement unless Envision agreed to forfeit its $100 million+ in legitimate claims for damages that Envision sustained by United that are currently pending in an AAA Arbitration.

31.     As a result, Envision could not agree to United's demands to remain in-network and, as of December 31, 2020, Envision medical groups were out-of-network *vis-a-vis* United. The Parties have yet to reach a new in-network agreement.

32.     As a result, Envision and United formed an implied-in-fact contract that Envision would be reimbursed by United at reasonable out-of-network rates. Since January 1, 2021, Envision has submitted claims to United on an out-of-network basis and United has paid claims—though specifically not those that are the subject of this action—at United's customary out-of-network rates.

33.     When Envision stood up to United by not acceding to its pressure campaign to enter into a participation agreement with unconscionably low reimbursement rates, United's pressure and punishment against Envision hit a fever pitch and crossed the line into fraudulent conduct.

**C. United's Continued Targeting of Envision Through its Fraudulent Scheme and Practice of Systematically Withholding Reimbursement**

34.    United routinely publishes policies related to coding and submission of claims for the provision of emergency medical care.

35.    For example, United's Evaluation and Management ("E/M") Policy, Professional, Policy Number 2120R5007B, (the "Provider Policy") "applies to services reported using the 1500 Health Insurance Claim Form (a/k/a CMS-1500) or its electronic equivalent or its successor form."[21] Further, the policy "applies to all products, all network and non-network physicians and other qualified health care professionals, including, but not limited to, non-network authorized and percent of charge contract physicians and other qualified health care professionals."

36.    The claims at issue in this action were submitted using the CMS-1500 form, and as such, Policy Number 2021R5007B is applicable to those claims.

37.    The Provider Policy states that the purpose of the policy is to "ensure that you are reimbursed based on the code or codes that correctly describe the health care services provided."

38.    Each of the underlying claims in this action submitted to United for reimbursement were coded with the code(s) that correctly described the health care services provided. Accordingly, United falsely represented—indeed it "ensured"—by way of the Provider Policy that Envision would be reimbursed for the care provided to United's members.

39.    Amongst other things, the Provider Policy "explains when medical records may be requested to ensure that the appropriate level of CPT E/M code is reimbursed based on the health care services provided." According to the Provider Policy, "[m]edical records are requested when

---

[21] Policy 2120R5007B was first implemented on September 1, 2016. Reference is made to the current version of the policy which is publicly accessible. *Available at* https://www.uhcprovider.com/content/dam/provider/docs/public/policies/comm-reimbursement/COMM-Evaluation-and-Management-Policy.pdf (last accessed November 17, 2022).

the data shows a physician or other health care professional has a billing pattern that deviates significantly from their peers, or claim attributes indicate possible billing errors."

40.    The Provider Policy also states that "[t]he medical record review process takes into consideration CMS documentation guidelines." For emergency department visits, the Provider Policy instructs that providers "must use CPT codes 99281-99285."

41.    The Provider Policy further states that "Providers may experience adjustments to, or denials of the office visit or other outpatient E/M code or emergency department E/M code reported if the documentation does not support the E/M level submitted."

42.    Thus, so long as the underlying documentation supports the E/M level submitted, United has represented that providers will not experience adjustments to, or denials of, office visit or other emergency department E/M claims.

43.    But, despite the representations within its Provider Policy, United has systematically "pended" legitimate requests for reimbursement while making sham requests for medical records, ultimately wrongfully withholding and/or denying payment for thousands of claims submitted by Envision after January 1, 2021. United's conduct is fraudulent and in direct contradiction of the representations it made in the Provider Policy.

44.    Immediately after the expiration of Envision's network contract on December 31, 2020, United acted contrary to the representations made in its own policies and began to routinely and systematically deny claims related to emergency room treatment for its highest acuity Patients.

45.    In short, United's systematic and wrongful scheme includes the following conduct:

   a.    After health care services are provided to a patient, Envision submits a claim for reimbursement, through facilities in interstate commerce, on the CMS 1500.

15

b.  United then fails to timely adjudicate Envision's claims for emergency services within 30 days as required by federal law.[22] Envision accomplishes this goal by "pending" the request for reimbursement and requesting medical records under false pretenses and for the sole purpose of delaying payment—contrary to its representations made in the Provider Policy.

c.  After wrongfully delaying adjudication through a sham records review process—whereby, upon information and belief, the medical records are not actually reviewed—United withholds reimbursement and makes no payment on claims for emergency services, though it does not actually dispute the services were provided and payable emergency services.

d.  Rather, United bases its denials, on information and belief, on an initial algorithmic review of the claim forms—utilizing Optum's EDC Analyzer tool and/or an additional "Optum proprietary scoring tool"—whereby an algorithm flags Envision's claims based on the diagnosis codes on the claim form—again, in violation of federal law.

  (The foregoing conduct is identified herein as the "Scheme").

46.  United's Scheme is not something Envision's providers can avoid by refusing to treat United's members. Rather, Envision's providers are required by federal law to examine and provide stabilizing treatment to all individuals who present at the emergency departments they staff, regardless of those individuals' insurance coverage or ability to pay for medical care.

---

[22] As will be further pled herein, the failure to adjudicate within 30 days likewise results in violation of Tennessee's Timely Reimbursement of Health Insurance Claims Act which requires the payment of clean, electronically submitted, claims within 21 days. *See* Tenn. Code Ann. § 56-7-109(b)(1)(B).

16

47.     The federal Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §§ 1395dd(a), *et seq.*, imposes a duty upon hospitals and physicians to "provide for an appropriate medical screening examination" when an individual comes to the emergency department.  If "the individual has an emergency medical condition," they are required to "stabilize the medical condition" without inquiry into "the individual's method of payment or insurance status." *Id.*

48.     Consistent with EMTALA, clinicians within Envision physician network treat patients on the front lines of healthcare every day, regardless of their insurance status. Apart from EMTALA's physician requirements, Envision itself relied upon the representations within United's Provider Policy in undertaking emergency medicine staffing and services to facilities throughout the U.S., including the representations that United would provide coverage for legitimate reimbursement claims, that reimbursement claims would not be subjected to time-consuming and costly medical records requests absent billing irregularities, and that reimbursement claims would not be subject to undue reimbursement adjustments where medical indications justify the treatment provided and medical documentation justifies the E/M level submitted. As discussed herein, United's representations were false when made.

49.     Envision, as a for-profit company, enters new practice areas and develops its business plans, and specifically here its emergency medicine business line, in reliance upon the payment policies of several insureds, including those representations made in United's Provider Policy, to structure its business in a profitable manner. Regarding emergency medicine, Envision undertakes that line of business based upon the reasonable expectation, in reliance on the Provider Policy, that it will be timely and accurately reimbursed for legitimately supported and submitted claims. But, United's Scheme leaves Envision holding the bag while United pads its own pockets.

17

50.     Indeed, United is obligated to provide coverage for the emergency care without requiring any prior approval for the care.

51.     United must provide such coverage regardless of whether or not the emergency provider participates in United's network. *See* 42 U.S.C. § 300gg-19a(b)(1); 42 U.S.C. § 18022.

52.     And, as the Provider Policy itself makes clear, in-network and out-of-network claims are to be submitted and treated in the same manner.

   **i.     The Claims Process and Coding**

53.     After Envision's providers render services to Patients, Envision electronically submits a claim to United for reimbursement for those services, with data compliant with the industry standard CMS 1500 claim form.

54.     Envision is neither required nor expected to submit medical records with their claims.

55.     United confirms this fact in the Provider Policy's FAQ question stating "No." in response to the frequently asked question of whether "UnitedHealthcare require[s] medical records for all reported E/M services." Instead, United may request records only for legitimate purposes to assist in claim adjudication. This representation, too, was false as alleged herein.

56.     The CMS 1500 claim form contains all the information United needs to process and pay Envision's claims.

57.     Envision completes the CMS 1500 claim form in accordance with the instructions set forth by the National Uniform Claim Committee ("NUCC"), which developed the CMS 1500.

58.     The NUCC instructions and United's Provider Policies require Envision to identify the services rendered by listing the corresponding code found in the Current Procedural Terminology ("CPT") codebook, published by the American Medical Association ("AMA"). The

18

services Envision's providers render in an emergency department typically constitute E/M services.

59.     The corresponding CPT codes for E/M services in the emergency department generally range from 99281 to 99285.

60.     CPT codes 99281 through 99285 correspond to Emergency Department "Levels" 1-5, in ascending order of the complexity of the decision-making required and the extensiveness of the physician's history and physical examination.

61.     Given that higher CPT codes correspond with higher acuity patients, it follows that insurers like United reimburse providers for services utilizing CPT codes 99285 and 99284 at higher rates than those utilizing CPT codes 99281 through 99283.

62.     CPT codes 99285 and 99284 denote treatment of serious presentation, typically requiring the physician's immediate attention.

63.     The American Medical Association (the "AMA") provides the following definition of CPT Code 99285:

> Emergency department visit for the evaluation and management of a patient, which requires these 3 key components within the constraints imposed by the urgency of the patient's clinical condition and/or mental status: A comprehensive history; A comprehensive examination; and Medical decision making of high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

64.     The AMA provides the following definition of CPT Code 99284:

> Emergency department visit for the evaluation and management of a patient, which requires these 3 key components: A detailed history; A detailed examination; and Medical decision making of moderate complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of high severity, and require

19

urgent evaluation by the physician, or other qualified health care professionals but do not pose an immediate significant threat to life or physiologic function.

65. Despite meeting the above criteria and the representations made in the Provider Policy for claims submitted to United, United has routinely and systematically delayed and withheld reimbursement on claims submitted by Envision.

66. At all times material to this Complaint, the claims Envision submitted to United for reimbursement for emergency medical services provided to Patients were submitted in a manner consistent with applicable law, United's Provider Policy, and governing industry standards.

67. United may not deny claims solely based on diagnosis codes. Nor may United, as an insurer, wade into medical decision-making, or elevate cost over care.

### ii. United's Systematic Withholding of Reimbursement as Part of the Scheme.

68. Under the Scheme, United consistently and routinely fails to either (a) make an initial payment or (b) deny Envision's claims within 30 days of their receipt for the highest acuity patients.

69. Rather, on information and belief, United improperly uses an algorithm that is owned, operated, and/or provided by Optum and list of diagnosis codes, including CPT Code 99285, to improperly target Envision's claims and delay or deny payment.

70. Specifically, upon information and belief, when claims are submitted to United for reimbursement, they are first run through Optum's Emergency Department Claim Analyzer (the "EDC Analyzer") and/or an additional "Optum proprietary scoring tool" as referenced in the Provider Policy.

20

71. Optum represents that the EDC Analyzer's goal "is to achieve fair and consistent evaluation and management coding and reimbursement."[23]

72. Optum also represents that "The methodology used by the EDC Analyzer is based on Optum's Lynx tool, which is used by 1,500 facilities nationwide to code outpatient emergency department claims."

73. Further, Optum represents that use of the EDC Analyzer "promote[s] transparency in the coding and reimbursement process."

74. Envision relied upon United's policies and the representation of "fair and consistent . . . reimbursement" when submitting its claims to United, with the expectation that claims would be timely and accurately paid.

75. Despite these representations of fairness and transparency, United and Optum conceal that the EDC Analyzer is a manipulable tool, and that they can calibrate the algorithm to place additional, and in this case unwarranted, scrutiny upon claims of certain providers that United has deemed—in this case wrongfully—"egregious billers."

76. Upon information and belief, United and Optum activated the "egregious biller" switch within Optum's algorithm to wrongfully target and flag Envision-submitted claims that were justifiably submitted using CPT codes 99285 to demand additional records and, ultimately, to deny those claims.

77. United undertook to target Envision's claims not based upon actual suitability of the CPT designation but rather out of retaliation and punishment for Envision's refusal to accede to United's unconscionably low in-network reimbursement rates, and to gain advantage for Optum, Envision's competitor.

---

[23] *See* https://edcanalyzer.com/ (last accessed November 18, 2022).

78.     After being flagged by the algorithm, and in furtherance of the Scheme, United requests medical records under the false pretense and representation that the records were requested out of legitimate billing integrity concerns to conduct a pre-payment audit of the claims.

79.     For example, as part of the Scheme, United would routinely send a letter through the mail to the provider stating that it was "requesting medical records to complete a pre-payment review for a claim submitted for [patient], for services provided beginning on [date]. The information from the review will . . . help ensure that claim processing is accurate."

80.     Envision relied on this false pretense and misrepresentation in undertaking the time-consuming and costly task of assembling and submitting medical records for tens of thousands of claims.

81.     This aspect of United's Scheme forces Envision to file additional documentation starting a pseudo-appellate process with United.

82.     For each claim at issue in this case, Envision complied with United's request and provided detailed medical records supporting the underlying claim.

83.     But, providing United with the requested documentation which supports Envision's claims makes no difference, as the request for medical records is not made by United for the purpose of completing a pre-payment review and ensuring claim processing is accurate.

84.     Upon information and belief, no such pre-payment review is conducted.

85.     United's systematic and widespread targeting of Envision's claims for the sickest emergency patients resulted in substantial administrative burden and cost to Envision, and ultimately served United's goal of delaying and then denying appropriately submitted claims.

86. Rather than actually conduct a pre-payment review, United "pends" adjudication of the claims—often well past the maximum 30-day timeframe—even though the claim forms contain all the information necessary for United to adjudicate the claim upon receipt.

87. United's sham request for medical records, through use of mail and interstate wires, furthered United's Scheme by inducing Envision's belief that an appropriate adjudication process was underway. This lulled Envision into a false sense of security that the rightful payments would be forthcoming, postponing inquiries and complaints by Envision and making United's sham claims process appear less suspect by concealing it behind the veil of a legitimate audit request. This had the effect of further prolonging the Scheme and drawing out the harm to Envision.

88. Moreover, under its Scheme, after wrongfully delaying the adjudication of Envision's claims, United then consistently withholds payment on Envision's claims for emergency services even when United does not actually dispute that the services were performed and are payable emergency services.

89. United effectuates its denial by sending, via mail and interstate wires, an "ERA 5010 EOB Detail Report" stating, without explanation: "Payer deems the information submitted does not support this level of service" and that "charges cannot be considered because documentation does not support the level of service billed." These communications purporting to state reasons for United's denial of a particular claim were false when made.

90. These statements are additional misrepresentations, as the documentation submitted by Envision fully supported the submitted claims, but United did not actually review and assess the documentation provided when making the denials. Instead, United used these false explanations for withholding payment to create the appearance of having conducted a thorough review that would withstand scrutiny. In reality, however, this was just another tactic used by

United to further its Scheme to delay and deny payment for the purpose of lining its own pockets, punishing Envision, and buoying the business of Envision's competitor, and United's affiliate, Optum.

91.     What is more, United does not pay the portion of the claims that United does not dispute. For example, even if United deemed the information submitted to support a CPT code 99824 rather than 99285, it withholds payment even at the lower 99284 rate.

92.     Formally appealing the claims is futile, as United's decisions do not change. Instead, United compels Envision to guess whether United considers a claim payable and then to submit a new claim at a Level that Envision hypothesizes United might agree is appropriate.

93.     This creates a punishing claims experience designed to deter clinicians from pursuing their right to payment, and leaving United in possession of the money legally and rightfully owed to the clinician.

94.     Faced with significant administrative burdens and impeded cash flow, clinicians, under duress, must choose between receiving no reimbursement at all and re-submitting legitimate Level 5 claims under duress and under protest as lower-level claims.

95.     Indeed, United's systematic zero-pay policy for an exceedingly high percentage of high-acuity claims—those using CPT code 99285, which garner the highest reimbursement—has forced Envision to re-submit those legitimate claims under a lower reimbursement level under a reservation of rights to seek legal redress for United's unlawful and fraudulent refusal to appropriately pay the claims.

96.     United's Scheme is the vessel for its overall strategy to pad its own pockets, wrongfully create year over year record profits which result in nine figure executive salaries and

1000% stock price increases for its owners, and wrongfully obtain a competitive advantage for Optum, which competes directly with Envision.

97. Upon information and belief, United has also implemented the Scheme in an effort to coerce and force Envision to accept unconscionable terms to be in-network and to send a message to the medical provider community at large that one must "play ball" with United or suffer the consequences.

98. Indeed, the rapid spike in denials began in January 2021, immediately after Envision's in-network contract with United expired.

99. From January 2020 through October 2020, United initially withheld payment on approximately 18-20% of claims submitted by Envision.

100. That number began to rise in October 2020 as the negotiations between the Parties began to break down, upon information and belief, as a tactic to force Envision to accept unfavorable terms and remain in-network such that the denial percentage would decline, and therefore Envision would receive more of the funds it was owed.

101. On December 31, 2020, the in-network contract between Envision and United terminated.

102. Immediately, the denials began to spike. In January 2021 the United denial rate rose to approximately 42% for all claims submitted by Envision, regardless of CPT level.

103. By November 2021 that number rose to approximately 48% of all submitted claims, regardless of CPT level.

104. The following line graph comparing United (shown in orange) to all other commercial payors (shown in blue) clearly shows the spike in denials which perfectly corresponds with Envision's exit from the United network:



Initial Denial Rate by Service Month - Commercial Product

105.    The denial of Level 5 claims—those using CPT code 99285 which garner the highest reimbursement—spiked even higher, to a 60% denial rate.

106.    United's spike of denials in January 2021 is unique to United—upon information and belief, no other insurer billed by Envision exercised the same behavior.

107.    United's motive is clear—increase denials and refuse payment so that Envision will agree to unconscionable in-network rates so that it would recoup *something* over *nothing.*

108.    United also employs its predatory and anticompetitive tactics to, upon information and belief, stifle Envision, which is a direct competitor to certain affiliates of the United, including Optum, that act, in various circumstances, not only as an insurer and third-party administrator, but also as a provider of medical services in competition with Envision.

109.    For these reasons, United has withheld payments to Envision without any meaningful explanation.

110. At a basic level, United made false representations and operated under the false pretense that it would make payment to providers for medically necessary treatment provided to its Patients.

111. Contrary to such false representations and pretenses, United employs the Scheme to deny the highest acuity claims systematically and wrongfully for the sole purpose of its own enrichment.

112. These false representations and pretenses were false when made, as United has employed a Scheme and practice of systematically withholding payment for the highest acuity patients, upon information and belief, based not on any meaningful review of medical records that United required and that Envision provided, but rather on an algorithmic review.

### iii. Representative Examples of United' Egregious Denials Under the Scheme.

113. United applied the unlawful Scheme to claims Envision submitted with respect to each of the Patients below (the "Patients"), as well as others similarly situated.

114. **Patient 1**, a 31-year-old man presented at the emergency department at Tristar Summit Medical Center in Hermitage, Tennessee on March 1, 2021, complaining of severe abdominal pain and vomiting.

115. Following a comprehensive history and physical exam, a CT scan revealed the patient was suffering from acute appendicitis and he was immediately transferred from the emergency department to surgery.

116. Acute appendicitis is a condition, which, if left untreated, often results in death.

117. After submitting the claim (Claim ID Number 210694035832) for payment under CPT code 99285, United initially pended the claim and requested production of medical records on May 27, 2021, so that it could allegedly conduct a pre-payment review. Envision produced the

relevant records which, upon information and belief, were either not reviewed by United or formed no basis in United's reimbursement decision. United communicated to Envision on August 25, 2021, that it would not pay because, according to it, the "information submitted does not support the level of service."

118. This case meets the AMA's criteria for a Level 5 acuity patient that the treatment consisted of an emergency department visit that included (1) a comprehensive history; (2) a comprehensive examination; (3) medical decision making of high complexity; (4) counseling and/or coordination of care with other physicians (the surgical team); and (5) that the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

119. On information and belief, the claim was initially flagged based on an algorithmic review using Optum's EDC Analyzer, or a variation thereof, of the diagnoses on the claim form.

120. On information and belief, United's denial of the claim was not based on any meaningful review of the medical records that United required and that Envision provided, but rather on United's systematic and fraudulent denial of Envisions highest acuity claims to enhance its bottom line.

121. In direct violation of its Policies, United did not pay a penny for the emergency treatment provided to Patient 1 by Envision.

122. **Patient 2** (the "Baby") is a 2-month-old baby who was brought to an Envision emergency department by her parents on January 31, 2021, due to several unexplained episodes of vomiting, choking, and turning blue.

123. The Baby was born 11-weeks prematurely, was in the NICU for an extended period following birth and had surgically corrected spina bifida.

28

124.    The clinician performed a comprehensive history and physical exam. The Baby was ultimately admitted from the emergency department to the pediatric intensive care unit for further evaluation and treatment.

125.    After submitting the claim (Claim ID Number 210414045618) for payment under CPT code 99285, United initially pended the claim and requested production of medical records on April 26, 2021, so that it could allegedly conduct a pre-payment review. Envision produced the relevant records which, upon information and belief, were either not reviewed by United or formed no basis in United's reimbursement decision. United communicated to Envision on August 17, 2021, that it would not pay because, according to it, the "medical records submitted don't support medical decision making of high complexity."

126.    It strains credulity to suggest that a two-month-old unexplainably choking, vomiting, and turning blue—who was ultimately admitted to the pediatric ICU—is not a case that supports "medical decision making of high complexity."

127.    Moreover, the case meets the AMA's criteria for a Level 5 acuity patient that the treatment consisted of an emergency department visit that included (1) a comprehensive history; (2) a comprehensive examination (3) medical decision making of high complexity; (4) counseling and/or coordination of care with other physicians (the pediatric NICU) and (5) that the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

128.    On information and belief, the claim was initially flagged based on an algorithmic review using Optum's EDC Analyzer, or a variation thereof, of the diagnoses on the claim form.

129.    On information and belief, United's denial of the claim was not based on any meaningful review of the medical records that United required and that Envision provided, but

rather on United's systematic and fraudulent denial of Envisions highest acuity claims to enhance its bottom line.

130.     In direct violation of its Policies, United did not pay a penny for the emergency treatment provided to the Baby by Envision.

131.     **Patient 3**, a 17-year-old boy came to an Envision emergency department on May 29, 2021, complaining of severe abdominal pain, high fever, nausea, and headache.

132.     Following a comprehensive history and physical exam, a CT scan revealed the patient was suffering from acute appendicitis and he was immediately transferred from the emergency department to surgery.

133.     After submitting the claim (Claim ID Number 211544007926) for payment under CPT code 99285, United initially pended the claim and requested production of medical records on June 28, 2021, so that it could allegedly conduct a pre-payment review. Envision produced the relevant records which, upon information and belief, were either not reviewed by United or formed no basis in United's reimbursement decision. United communicated to Envision on November 11, 2021, that it would not pay because, according to it, the "medical records submitted don't support medical decision making of high complexity."

134.     Again, this case meets the AMA's criteria for a Level 5 acuity patient that the treatment consisted of an emergency department visit that included (1) a comprehensive history; (2) a comprehensive examination (3) medical decision making of high complexity; (4) counseling and/or coordination of care with other physicians (the surgical team) and (5) that the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

135. On information and belief, the claim was initially flagged on an algorithmic review using Optum's EDC Analyzer, or a variation thereof, of the diagnoses on the claim form.

136. On information and belief, United's denial of the claim was not based on any meaningful review of the medical records that United required and that Envision provided, but rather on United's systematic and fraudulent denial of Envisions highest acuity claims to enhance its bottom line.

137. In direct violation of its Policies, United did not pay a penny for the emergency treatment provided to Patient 3 by Envision.

138. **Patient 4**, a 20-year-old man came to an Envision emergency department on July 27, 2021, a week after a tonsillectomy, complaining of heavy bleeding in his throat.

139. The clinician performed a comprehensive history and physical exam and determined that the patient would need to be immediately transferred to surgery.

140. Post-tonsillectomy bleeding can be severe enough to result in death if left untreated.[24]

141. After submitting the claim (Claim ID Number 212164064591) for payment under CPT code 99285, United initially pended the claim and requested production of medical records on October 15, 2021, so that it could allegedly conduct a pre-payment review. Envision produced the relevant records which, upon information and belief, were either not reviewed by United or formed no basis in United's reimbursement decision. United communicated to Envision on December 17, 2021, that it would not pay because, according to it, the "medical records submitted don't support medical decision making of high complexity."

---

[24] *See Tonsillectomy Bleed Rates across the CHEER Practice Research Network: Pursuing Guideline Adherence and Quality Improvement*, National Library of Medicine, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5322801/#R4 (last accessed September 5, 2022) (stating that "Although rare, post-tonsillectomy bleeding can be severe enough to result in death"). (*See* D.E. 1-15).

142.    This case, like the others, meets the AMA's criteria for a Level 5 acuity patient that the treatment consisted of an emergency department visit that included (1) a comprehensive history; (2) a comprehensive examination (3) medical decision making of high complexity; (4) counseling and/or coordination of care with other physicians (the surgical team) and (5) that the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

143.    On information and belief, the claim was initially flagged based on an algorithmic review using Optum's EDC Analyzer, or a variation thereof, of the diagnoses on the claim form.

144.    On information and belief, United's denial of the claim was not based on any meaningful review of the medical records that United required and that Envision provided, but rather on United's systematic and fraudulent denial of Envisions highest acuity claims to enhance its bottom line.

145.    In direct violation of its Policies, United did not pay a penny for the emergency treatment provided to Patient 4 by Envision.

## COUNT I - VIOLATION OF CIVIL RICO, 18 U.S.C. § 1962(c)

146.    Envision incorporates each of the foregoing paragraphs as if fully restated herein.

147.    United HealthCare Services, Inc., UnitedHealthcare Insurance Company, and nonparties UMR and Optum are "persons" within the meaning of 18 U.S.C. § 1961(3) that conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

148.    United HealthCare Services, Inc., UnitedHealthcare Insurance Company, and nonparties UMR and Optum entered into an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4). The Enterprise was an ongoing organization that functioned

as a continuing unit. The Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity, and the Enterprise had the common purpose of doing the same.

149.   United HealthCare Services, Inc., UnitedHealthcare Insurance Company, and nonparties UMR and Optum are each "persons" distinct from the Enterprise.

150.   United HealthCare Services, Inc., UnitedHealthcare Insurance Company, and nonparties UMR and Optum established the Enterprise to reap windfall profits in part through a Scheme of systematically refusing to reimburse the highest acuity claims for emergency medical care. The Enterprise systematically withheld payment without basis—padding its own pockets as a result—through use of the wires or by mail.

151.   Each participant in the Enterprise played a distinct and indispensable role, and the participants joined as a group to execute the scheme and further the Enterprise's goals. United HealthCare Services, Inc. and its subsidiaries, UnitedHealthcare Insurance Company, UMR, and Optum, schemed to delay and ultimately withhold payment on high acuity claims without basis.

152.   For example, upon information and belief, United HealthCare Services, Inc., issued policies as described herein that contained materially false statements of fact that were false when made and were designed to, and did, induce market participants such as Envision to undertake to provide emergency medicine staffing and services to facilities throughout the United States, only to be subject to the unlawful claims practices carried out through the Scheme contrary to those representations; and then caused its subsidiaries, including Optum, UMR, and United HealthCare Insurance Company, to take material steps in carrying out the Scheme of delaying and ultimately withholding payment for legitimate claims, as described herein.

153.   Upon information and belief United HealthCare Insurance Company and UMR— under the direct and indirect control of United HealthCare Services, Inc., and in combination with

Optum—furthered the Scheme by serving as administrators of certain healthcare plans responsible for paying claims at issue in this litigation, including handling the claims administration for certain of the claims at issue in this litigation, in a manner that wrongfully targeted Envision claims—most often EM level 5 claims—through, *inter alia*, the use of Optum's EDC Analyzer, or a variation thereof, "pended" such claims so as to delay their adjudication, issued requests for medical records under the false pretenses that such requests were made for legitimate audit integrity purposes, and ultimately withholding payment for legitimate Envision claims without justification with the fraudulent intent of targeting, delaying, and withholding payment for legitimate Envision reimbursement claims without justification, all in furtherance of the Scheme as alleged herein.

154. Upon information and belief, Optum—under the direct and indirect control of United HealthCare Services, Inc., and in combination with UMR and United HealthCare Insurance Company—participated in and furthered the Scheme by, *inter alia*, developing, providing, furnishing, using and facilitating the use of Optum's EDC Analyzer, or a variation thereof, for the purpose of targeting Envision reimbursement claims—most often EM level 5 claims—without justification. This enabled UMR and United HealthCare Insurance Company to engage in the wrongful delay and, ultimately, the withholding of payment for such claims under false pretenses; and requesting from Envision medical records, including by sending communications and causing communications to be sent in Optum's name through the mails and interstate wires, under the false pretenses and representations that such request was in furtherance of legitimate claims integrity auditing practices when in fact such requests were made for the purpose of defrauding Envision, coercing Envision to accept United's unconscionably low in-network reimbursement rates, and gaining an unlawful competitive advantage for Optum, which operates as a competitor of Envision.

34

155.     All members of the Enterprise benefitted financially from the Enterprise. United HealthCare Services, Inc., United HealthCare Insurance Company and its parent, United Health Group, Inc., were the ultimate beneficiaries of the Scheme perpetrated by United HealthCare Services, Inc., United Health Insurance Company, Optum, and UMR, by way of the systematic denials and withholding of payment, and retained money that was due and owing to Envision as a result of the provision of emergency medical care to Patients and, on information and belief, passed some of the proceeds among each other and to their affiliates. Optum also benefited by the unlawful competitive advantage visited upon Envision, Optum's competitor, through the targeting, delay, and withholding of payment on legitimate claims visited by the Scheme and, concomitantly, Optum's parent companies United HealthCare Services Inc. and United Health Group, Inc. also benefitted from such competitive advantage of Optum.

156.     The Enterprise could not have succeeded, and its members could not have enjoyed the substantial financial benefits described above, absent their coordinated efforts. The members of the Enterprise functioned as a unit in pursuit of their common purpose.

157.     The relationships between the members of the Enterprise extended beyond the unlawful predicate acts at issue in this case. In particular, some portion of the claims Envision— particularly those for lower acuity patients—submitted to United were accepted and paid.

158.     The illegal scheme at issue in this litigation was and is distinct from any legitimate business activities undertaken by the members of the Enterprise. For example, United's fraudulent conduct was not in furtherance of its corporate undertaking of insuring and providing claims administration services for certain plans, but rather for the purpose stifling Envision's business to the advantage of Optum, which owns certain medical practices that compete with Envision, and who United sees as a threat to that highly-profitable business and to punish Envision and coerce it

35

into accepting United's unconscionably low in-network reimbursement rates, both of which are outside of United's legitimate business activities, and single corporate conscience, of providing medical insurance and administering claims on behalf of certain plans.

159.    Each participant in the Enterprise, and in particular United HealthCare Services, Inc., UnitedHealthcare Insurance Company, UMR and Optum acted with the specific intent to defraud Envision and other providers.

160.    The Enterprise engaged in and affected interstate commerce because, among other things, it systematically denied reimbursement claims arising out of emergency medical services provided to Patients nationwide to support its scheme, and the defendants sent, and caused to be sent, mailings and interstate wires in furtherance of the Scheme.

161.    United HealthCare Services, Inc., UnitedHealthcare Insurance Company, UMR and Optum conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity).

162.    Predicate acts of racketeering that United HealthCare Services, Inc., UnitedHealthcare Insurance Company, UMR and Optum engaged in include, but are not limited to:

a.    The use of wires and facilities in interstate commerce and mails to systematically and improperly deny clean reimbursement claims for high acuity patients treated at emergency departments operated by Envision and other providers. Specifically,

i.    As part of the Scheme, and in violation of the Provider Policy, United would routinely send a letter through the mail to the provider stating that it was "requesting medical records to complete a pre-payment review for

36

a claim submitted for [patient], for services provided beginning on [date]. The information from the review will…help ensure that claim processing is accurate."

ii.  Follow up and additional records requests were made both by mail and through the use of interstate wires.

iii.  Envision relied on this false pretense and misrepresentation in assembling and submitting medical records for tens of thousands of claims.

iv.  This forces Envision to file additional documentation starting a pseudo-appellate process with United. For each claim at issue in this case, Envision complied with United's request and provided detailed medical records supporting the underlying claim.

v.  But, providing United with the requested documentation which supports Envision's claims makes no difference, as the request for medical records is not made by United for the purpose of completing a pre-payment review and ensuring claim processing is accurate. Upon information and belief, no such pre-payment review is conducted.

vi.  United's sham request for medical records, through use of the mail and wires, was used for the sole purpose of lulling Envision into believing that the proper adjudication process was being undertaken and to lull Envision into a false sense of security that the rightful payments would be forthcoming, postponing inquiries and complaints, and making the claims process appear less suspect in furtherance of the fraudulent Scheme. This

37

had the effect of further prolonging the Scheme and drawing out the harm to Envision.

vii. Moreover, under its Scheme, after wrongfully delaying the adjudication of Envision's claims, United then consistently withholds payment on Envision's claims for emergency services even when United does not actually dispute that the services were performed and are payable emergency services.

viii. United effectuates its denial by sending, via mail and interstate wires, an "ERA 5010 EOB Detail Report" stating, without explanation: "Payer deems the information submitted does not support this level of service" and that "charges cannot be considered because documentation does not support the level of service billed."

ix. These statements are additional misrepresentations, as the documentation submitted by Envision fully supported the submitted claims, but United did not actually review and assess the documentation provided when making the denials. Instead, United used these false explanations for withholding payment to create the appearance of having conducted a thorough review that would withstand scrutiny. In reality, however, this was just another tactic used by United to further its Scheme and punish Envision.

b. The use of wires and facilities in interstate commerce and mails to coordinate the unlawful activities of the Enterprise, including the dissemination of relevant

38

policies and the transmission of information to coding and payment staff necessary to carry out the payment denials and withholdings. Specifically,

i. The Provider Policy is both transmitted through interstate wires and is available through the internet. The Provider Policy "explains when medical records may be requested to ensure that the appropriate level of CPT E/M code is reimbursed based on the health care services provided." According to the Provider Policy, "[m]edical records are requested when the data shows a physician or other health care professional has a billing pattern that deviates significantly from their peers, or claim attributes indicate possible billing errors."

ii. The Provider Policy also states that "Providers may experience adjustments to, or denials of the office visit or other outpatient E/M code or emergency department E/M code reported if the documentation does not support the E/M level submitted."

iii. Thus, so long as the underlying documentation supports the E/M level submitted, United has represented that providers will not experience adjustments to or denials or office visit or other emergency department E/M claims.

iv. Envision relied upon United's representations about claim processing in the Provider Policy in coding and submitting its claims, which were all justified and supported by the underlying documentation.

v. But, the false representations made in the Provider Policy served the sole purpose of lulling Envision into believing that the proper adjudication

39

process was being undertaken and to lull Envision into a false sense of security that the rightful payments would be forthcoming, postponing inquiries and complaints, and making the claims process appear less suspect in furtherance of the fraudulent Scheme. This had the effect of further prolonging the Scheme and drawing out the harm to Envision.

c. The use of the wires and facilities in interstate commerce and mails to systematically withhold payment due and owing to Envision and thereafter distribute the windfall resulting from the implementation of the Scheme amongst each other and their interested affiliates. Envision incorporates Paragraphs 162(a)(i)-(ix) and 162(b)(i)-(v) as if fully restated herein.

163. The above-described acts reveal a sustained pattern of racketeering activity, in addition to the threat of continued racketeering activity.

a. The racketeering activity at issue commenced, at the latest, on January 1, 2021, and has continued to the present. As discussed above, Envision experienced a dramatic spike in denied and unpaid claims beginning in January 2021 when Envision refused to meet United's unconscionable rate demands and became an out-of-network provider. There is further substantial evidence that the Enterprise commenced its unlawful conduct as to other providers much earlier, including the November 2021 jury verdict and punitive damages award from a jury convened in Clark County, Nevada based on the same pattern and Scheme of systematically denying high acuity claims. During this period, the Enterprise has operated continuously, systematically denying claims daily.

40

b. The pattern and policy of systematically withholding payment for high acuity claims for emergency services has become the regular manner in which United HealthCare Services, Inc., UnitedHealthcare Insurance Company, UMR and Optum conduct their business, and this unlawful behavior will continue indefinitely.

164. The purpose and effect of the Enterprise's racketeering activity was to defraud Envision and other providers out of substantial sums of money by deceiving them into believing that United would reimburse Envision for treatment of Patients in accordance with the implied-in-fact contract between Envision and United, industry standard, and as required by State and Federal law. The Enterprise caused this result by implementing false reimbursement policies, making false records requests to lull Envision into a sense of security, and ultimately systematically denying and refusing to pay claims for emergency room services for treatment provided to Patients that were medically necessary and appropriately billed and coded.

165. Envision suffered injuries when it was refused reimbursement after providing emergency medical services to Patients, losing millions of dollars as a result of the Enterprise's racketeering activity.

166. Envision's injuries were directly and proximately caused by the racketeering activities as described above.

167. By virtue of these violations of 18 U.S.C. § 1962(c), United HealthCare Services, Inc. and UnitedHealthcare Insurance Company are jointly and severally liable to Envision for three times the damages Envision has sustained in an amount to be determined at trial, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT II - CONSPIRACY TO VIOLATE CIVIL RICO, 18 U.S.C. § 1962(d)

168.    Envision incorporates each of the foregoing paragraphs as if fully restated herein.

169.    18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

170.    United HealthCare Services, Inc., UnitedHealthcare Insurance Company, have violated 18 U.S.C. § 1962(d) by conspiring with each other and with non-parties UMR and Optum to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise described herein through a pattern of racketeering activity.

171.    United HealthCare Services, Inc., UnitedHealthcare Insurance Company, UMR and Optum have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy.

172.    The nature of the above acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also that they were aware that their ongoing acts have been and are part of an overall pattern of racketeering activity.

173.    Envision has been injured in its business and property as set forth more fully above as a direct and proximate result of United HealthCare Services, Inc., UnitedHealthcare Insurance Company, UMR and Optum's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

174.    The purpose and effect of the conspiracy was to defraud Envision and other providers out of substantial sums of money by deceiving them into believing United would

42

reimburse Envision for treatment of Patients in accordance with the implied-in-fact contract between Envision and United, industry standard, and as required by State and Federal law. The Enterprise caused this result by implementing false reimbursement policies; making false records requests to lull Envision into a sense of security, postpone inquiry and complaint, and delay adjudication of claims; and ultimately systematically refusing to pay claims for emergency room services for treatment provided to Patients that were medically necessary and appropriately billed and coded.

175.    Envision suffered injuries as a result of United's improper denial of, and refusal to pay, claims for emergency room services.

176.    By virtue of these violations of 18 U.S.C. § 1962(d), United HealthCare Services, Inc. and UnitedHealthcare Insurance Company are jointly and severally liable to Envision for three times the damages Envision has sustained in an amount to be determined at trial, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT III – FRAUD

177.    Envision incorporates each of the foregoing paragraphs as if fully restated herein.

178.    United's deliberate and systematic denial of high acuity claims by implementation of the Scheme evidences its longstanding fraudulent reimbursement and payment practices.

179.    At a basic level, United made false representations and operated under the false pretense that it would make payment to providers for medically necessary treatment provided to its Patients.

180.    Specifically, the Provider Policy "explains when medical records may be requested to ensure that the appropriate level of CPT E/M code is reimbursed based on the health care services provided." According to the Provider Policy, "[m]edical records are requested when the

43

data shows a physician or other health care professional has a billing pattern that deviates significantly from their peers, or claim attributes indicate possible billing errors."

181. The Provider Policy also states that "Providers may experience adjustments to, or denials of the office visit or other outpatient E/M code or emergency department E/M code reported if the documentation does not support the E/M level submitted."

182. Thus, so long as the underlying documentation supports the E/M level submitted, United has represented that providers will not experience adjustments to or denials or office visit or other emergency department E/M claims.

183. Envision relied upon United's representations about claim processing in the Provider Policy in coding and submitting its claims, which were all justified and supported by the underlying documentation.

184. Further, upon information and belief, United utilizes Optum's EDC Analyzer" and/or an additional "Optum proprietary scoring tool" to systematically target claims submitted by Envision.

185. Optum represents that the EDC Analyzer's goal "is to achieve fair and consistent evaluation and management coding and reimbursement."

186. Further, Optum represents that use of the EDC Analyzer "promote[s] transparency in the coding and reimbursement process."

187. By use and implementation of the EDC Analyzer in the claims administration process, United adopts the representations made by Optum about the goals and intent behind use of the EDC Analyzer.

44

188. Envision relied upon United's and Optum's representations including, but not limited to, the representations of "fair and consistent … reimbursement," when submitting its claims to United, with the expectation that claims would be timely and accurately paid.

189. Despite these representations of fairness and transparency, United and Optum conceal that the EDC Analyzer is a manipulable tool, and that they can calibrate the algorithm to place additional, and in this case unwarranted, scrutiny upon claims of certain providers that United has deemed—in this case wrongfully—"egregious billers."

190. Upon information and belief, United and Optum activated the "egregious biller" switch within Optum's algorithm to wrongfully target and flag Envision-submitted claims that were justifiably submitted using CPT codes 99285 to demand additional records and, ultimately, to deny those claims.

191. United undertook to target Envision's claims not based upon actual suitability of the CPT designation but rather out of retaliation and punishment for Envision's refusal to accede to United's unconscionably low in-network reimbursement rates, and to gain advantage for Optum, Envision's competitor.

192. After being flagged by the algorithm, and in furtherance of the Scheme, United requests medical records under the false pretense that the records will be used to conduct a pre-payment audit of the claims.

193. For example, as part of the Scheme, United would routinely send a letter through the mail to the provider stating that it was "requesting medical records to complete a pre-payment review for a claim submitted for [patient], for services provided beginning on [date]. The information from the review will…help ensure that claim processing is accurate."

45

194.    Envision relied on this false pretense and misrepresentation in assembling and submitting medical records for tens of thousands of claims.

195.    This forces Envision to file additional documentation starting a pseudo-appellate process with United.

196.    For each claim at issue in this case, Envision complied with United's request and provided detailed medical records supporting the underlying claim.

197.    But, providing United with the requested documentation which supports Envision's claims makes no difference, as the request for medical records is not made by United for the purpose of completing a pre-payment review and ensuring claim processing is accurate.

198.    Upon information and belief, no such pre-payment review is conducted.

199.    United's sham request for medical records was used for the sole purpose of lulling Envision into believing that the proper adjudication process was being undertaken. This lulled Envision into a false sense of security that the rightful payments would be forthcoming, postponing inquiries and complaints, and making the claims process appear less suspect in furtherance of the fraudulent Scheme. This had the effect of further prolonging the Scheme and drawing out the harm to Envision.

200.    Moreover, under its Scheme, after wrongfully delaying the adjudication of Envision's claims, United then consistently withholds payment on Envision's claims for emergency services even when United does not actually dispute that the services were performed and are payable emergency services.

201.    United effectuates its denial by sending an "ERA 5010 EOB Detail Report" stating, without explanation: "Payer deems the information submitted does not support this level of

46

service" and that "charges cannot be considered because documentation does not support the level of service billed."

202.    These statements are additional misrepresentations, as the documentation submitted by Envision fully supported the submitted claims, but United did not actually review and assess the documentation provided when making the denials. Instead, United used these false explanations for withholding payment to create the appearance of having conducted a thorough review that would withstand scrutiny. In reality, however, this was just another tactic used by United to further its Scheme and punish Envision.

203.    Contrary to the several representations listed above, United employs the Scheme to systematically and wrongfully deny the highest acuity claims for the sole purpose of its own enrichment.

204.    United's representations and policies were false when made, as United has employed a Scheme and practice of systematically withholding payment for the highest acuity patients, upon information and belief, based not on any meaningful review of medical records that United required and that Envision provided, but rather on an algorithmic review.

205.    United further falsely certifies each time that it denies a claim and withholds payment that it has conducted a good faith review of the claim and that the denial is made in good faith.

206.    Yet, United systematically and continually relies on denials of Level 5 claims stating that the "medical records submitted don't support medical decision making of high complexity."

207.    But, upon information and belief, United conducted no meaningful review of the medical records that it required and that Envision provided, and did not base the withholding of

payment on such a review. Instead, upon information and belief, United denies the highest acuity claims for the sole purpose of punishing Envision, gaining unfair competitive advantage for Optum, and padding its bottom line.

208.    In each representative case included herein, and those similarly situated which will be further disclosed once a HIPAA-complaint protective order is entered, each of the Level 5 codes were appropriately applied.

209.    United knew and intended for Envision to rely upon the representations that it would pay properly submitted reimbursement claims for treatment provided to its Patients.

210.    United further knew and intended for Envision to rely upon the requests for medical records associated with certain high acuity claims that the provision of records justifying the use of CPT code 99285 would result in prompt payment of the claim.

211.    Envision justifiably relied upon the representations made by United and the expectation that reimbursement payments would be made by United when submitting claims for reimbursement for emergency medical services provided to Patients.

212.    But, instead, United has implemented the fraudulent Scheme to systematically deny high acuity claims and withhold payment to further bolster its profit margin.

213.    United's intentional conduct, by implementation of the Scheme, defrauds providers like Envision, and leaves the providers holding the proverbial bag for the costs associated with treatment of Patients.

214.    Alternatively, United acted recklessly in failing to properly review, approve, and make payment for appropriately coded claims.

215.     Envision has been damaged as a result of United's fraudulent Scheme, as United has withheld significant sums of money owed to Envision in an amount to be proven at trial, but in excess of $1,000,000.

## COUNT IV – VIOLATION OF TENNESSEE'S TIMELY REIMBURSEMENT OF HEALTH INSURANCE CLAIMS ACT

216.     Envision incorporates each of the foregoing paragraphs as if fully restated herein.

217.     Tennessee's Timely Reimbursement of Health Insurance Claims Act (the "Prompt Pay Act") is intended to guarantee the prompt and accurate payment of *all provider claims* for covered services delivered to eligible health insured patients.

218.     Pursuant to Tenn. Code Ann. § 56-7-109(b)(1), "clean claims" submitted in paper form must be paid within 30 days, and electronic claims must be paid within 21 days.

219.     Any health insurance entity that does not comply with subdivision (b)(1) shall pay one percent (1%) interest per month, accruing from the day after the payment was due, on that amount of the claim that remains unpaid.

220.     Since January 1, 2021, Envision has routinely submitted high acuity claims to United for reimbursement related to emergency medical services provided to Patients.

221.     Envision submits its claims to United electronically.

222.     In each representative case included herein, and those similarly situated which will be further disclosed once a HIPAA-complaint protective order is entered, each of the Level 5 codes were appropriately applied and the claims were "clean" as that term is defined under the Prompt Pay Act.

223.     Yet, United has implemented a Scheme of systematic denial of, and withholding payment for, high acuity claims submitted by Envision.

224.     What is more, United does not pay the portion of the claims that it does not dispute.

49

225. Since January 2021, United has denied and refused to make payment on 60% of the Level 5 claims—those using CPT code 99285 which garner the highest reimbursement—without justification.

226. United's implementation of the Scheme to systematically withhold reimbursement for high acuity claims without justification is in violation of the Prompt Pay Act, as payments have not been made to Envision within 21 days of their submission.

227. As a result, United is liable to Envision for the amount of the unpaid claims and 1% interest per month on each unpaid claims pursuant to the Prompt Pay Act.

## COUNT V - CIVIL CONSPIRACY

228. Envision incorporates each of the foregoing paragraphs as if fully restated herein.

229. The elements of a civil conspiracy are: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) resulting injury. *B&L Mgmt. Grp., LLC v. Adair*, No. 17-2197, 2019 WL 3459244, at *10 (W.D. Tenn. July 31, 2019) (citing *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006)).

230. United HealthCare Services, Inc., United HealthCare Insurance Company, and nonparties UMR, and Optum are "persons" for the purpose of a civil conspiracy claim under Tennessee law.

231. United HealthCare Services, Inc., United HealthCare Insurance Company, and nonparties UMR, and Optum agreed to implement the Scheme which systematically denies and withholds reimbursement for high acuity claims without justification. The purpose of the Scheme is to drive up profits for those involved in the conspiracy by reducing the amounts paid to providers such as Envision.

50

232. United HealthCare Services, Inc., United HealthCare Insurance Company, and nonparties UMR, and Optum knew at the time they agreed to implement the Scheme that the Scheme and its systematic denials of properly coded claims was fraudulent. Yet, the fraudulent nature of the Scheme was of no concern to United, as its sole purpose and goal was to inflate its profits.

233. United HealthCare Services, Inc., United HealthCare Insurance Company, and nonparties UMR, and Optum took overt acts to further their conspiracy to defraud providers such as Envision including establishing and implementing the Scheme to reap windfall profits by systematically denying and not paying the highest acuity claims for emergency medical care. Through the Scheme, United systematically withheld reimbursement without basis—padding their own pockets as a result.

234. Each participant in the conspiracy played a distinct and indispensable role, and the participants joined as a group to execute the scheme and further the conspiracy's goals, to wit:

    a. United HealthCare Services, Inc. implemented the Provider Policy containing numerous false representations that was designed to, and did, induce market participants such as Envision to undertake to provide EM staffing and services.

    b. United HealthCare Insurance Company and UMR served as administrators of certain healthcare plans responsible for paying claims at issue in this litigation, including handling the claims administration for certain of the claims at issue in this litigation, in a manner that wrongfully targeted Envision claims—most often EM level 5 claims, and delayed and ultimately allowed the withholding of payment on such legitimate claims.

51

c. Optum participated developed, provided, furnished, used and facilitated the use of its EDC Analyzer, or a variation thereof, for the purpose of targeting Envision reimbursement claims—most often EM level 5 claims—without justification thereby enabling UMR and United HealthCare Insurance Company to engage in the wrongful delay and, ultimately, the withholding of payment for such claims under false pretenses, and requested from Envision medical records under the false pretenses and representations that such request was in furtherance of legitimate claims integrity auditing practices.

235.    Each of United HealthCare Services, Inc., United HealthCare Insurance Company, and nonparties UMR, and Optum have distinct corporate forms, carry out distinct corporate roles, and are capable of, and did, conspire with each other to carry out the intentional tortious conduct described herein. While United HealthCare Services Inc. is a parent of Optum, and an indirect parent of United HealthCare Insurance Company and UMR, the sister companies of Optum, United HealthCare Insurance Company and UMR combined and conspired with each other, as well as with United HealthCare Services, Inc., to achieve the tortious goal of the conspiracy through, *inter alia*, the use of an algorithm to flag, delay, and later withhold payment on claims without any meaningful review of medical records provided by Envision.

236.    All members of the conspiracy benefitted financially from the conspiracy. United HealthCare Services, Inc., UnitedHealthcare Insurance Company, UMR, and Optum by way of the systematic denials, retained money that was due and owing to Envision as a result of the provision of emergency medical care to Patients and on information and belief, passed some of the proceeds among each other and to their interested affiliates. In addition, Optum, and thus United Healthcare

Services, Inc., as its parent corporation, benefitted by the unlawful competitive advantage that it gained by visiting harm upon Envision through the conspiracy and Scheme described herein.

237.    The conspiracy could not have succeeded, and its members could not have enjoyed the substantial financial benefits described above, absent their coordinated efforts. While distinct in their corporate forms and roles in the conspiracy, the members of the conspiracy shared a common wrongful purpose in carrying out the conspiracy to tortiously retain and deprive Envision of the moneys it is owed.

238.    Each participant in the conspiracy, and in particular United HealthCare Services, Inc., UnitedHealthcare Insurance Company, UMR, and Optum acted with the specific intent to defraud Envision and other providers and to enrich United.

239.    The underlying fraud and violation of State law that United HealthCare Services, Inc., UnitedHealthcare Insurance Company, UMR, and Optum engaged in include, but are not limited to, the fraud alleged in Count III and violation of the Prompt Pay Act alleged in Count IV of this Complaint.

240.    The above-described acts reveal a sustained pattern of fraud, in addition to the threat of continued fraudulent activity.

    a.    The fraudulent activity at issue commenced, at the latest, on January 1, 2021, and has continued to the present. As discussed above, Envision experienced a dramatic spike in denied and unpaid claims beginning in January 2021 when Envision refused to meet United's unconscionable rate demands and became an out-of-network provider. There is further substantial evidence that the conspiracy commenced its unlawful conduct as to other providers much earlier, including the November 2021 jury verdict and December 2021 punitive damages award from a

jury convened in Clark County, Nevada based on the same pattern and Scheme of systematically denying high acuity claims. During this period, the conspiracy has operated continuously, systematically denying claims on a daily basis.

b. The pattern and policy of systematically withholding payment for high acuity claims for emergency services has become the regular manner in which United HealthCare Services, Inc. and UnitedHealthcare Insurance Company, among themselves and with their interested affiliates, conduct their business, and this unlawful behavior will continue indefinitely.

241. The purpose and effect of the conspiracy was to defraud Envision and other providers out of substantial sums of money by deceiving them into believing that treatment of Patients would result in reimbursement as represented by United and as required by State and Federal law.

242. The conspiracy achieved its end goal of dramatically increasing United's profits at Envision's expense by systematically denying and refusing to pay claims for emergency room services for treatment provided to Patients and that were medically necessary and appropriately billed and coded.

243. Envision suffered injuries when it provided emergency medical services to Patients and was refused reimbursement, losing millions of dollars as a result of the Enterprise's fraudulent activity.

244. As a result of the conspiracy, Envision suffered millions of dollars in damages in an amount to be proven at trial.

245. As members of the civil conspiracy, the United Defendants are jointly and severally liable for Envision's damages.

54

246.     Because United acted with reckless disregard of the wellbeing of others, punitive damages are appropriate.

## COUNT VI – UNJUST ENRICHMENT

247.     Envision incorporates each of the foregoing paragraphs as if fully restated herein.

248.     On December 31, 2020, the in-network agreement between Envision and United expired.

249.     From January 1, 2021, to present, Envision has billed United on an out-of-network basis for reimbursement for emergency medical services provided to Patients—this is, there is no operative participant contract between Envision and United.  Envision's expectation, both based on industry standard and state and federal law, is that Envision is to be reimbursed at the applicable out-of-network rate for the provision of care to United's Patients.

250.     But, United has wrongfully withheld payment on the on the highest-level claims in an effort to punish Envision for not ceding to unconscionably low reimbursement rates for in-network providers and in an effort to pad its bottom line.

251.     United knows that Envision expected to be compensated by United as a result of its provision of care to Patients.

252.     United has recognized a benefit—whether direct or indirect—and has been unjustly enriched by way of the Scheme by retaining money rightfully due and owing to Envision for the provision of emergency medical services to United's Patients.

253.     As a result of retaining funds that should have been paid to Envision, United has reaped a windfall, and has retained payments rightfully owed to Envision.

254.    United has retained funds rightfully owed to Envision, and it would be unjust to permit United to retain those funds. United has acted inequitably in refusing to make payments without any justification.

255.    Envision has been damaged as a result in an amount to be proven at trial, but no less than $1,000,000.

## COUNT VII – BREACH OF IMPLIED-IN-FACT CONTRACT

256.    Envision incorporates each of the foregoing paragraphs as if fully restated herein.

257.    At all material times, Envision was obligated under federal and Tennessee law to provide emergency medical services to all patients presenting at the emergency departments it staffs, including United Patients.

258.    At all material times, United knew that Envision's affiliates were out-of-network emergency medicine groups that provided emergency medical services to patients including United's Patients.

259.    After moving out-of-network on January 1, 2021, there was a meeting of the minds between United and Envision that Envision would submit claims, and United would reimburse claims, in according with United's policies and procedures applicable to all other out-of-network providers.

260.    As a result, an implied-in-fact contract was created that Envision would be reimbursed at the applicable out-of-network rate for the provision of care to United's Patients.

261.    From January 1, 2021, to the present, Envision has undertaken to provide emergency medical services to Patients, and United has undertaken to pay for such services provided to its Patients.

56

262. But, United has systematically refused to make payments for the highest acuity claims associated with emergency medical services rendered to United's most critically ill and/or injured Patients.

263. At all material times, United was aware that Envision was entitled to and expected to be reimbursed for all emergency medical services provided—including high acuity claims—in accordance with the standards established under Tennessee law.

264. At all material times, United has received Envision's reimbursement claims for the emergency medical services Envision has provided and continues to provide to Patients, and United has adjudicated and paid, and continues to adjudicate and pay, Envision directly for some, but not all, of the out-of-network claims submitted to it by Envision—primarily the low acuity claims.

265. Through the parties' conduct and respective undertaking of obligations concerning emergency medical services provided by Envision to Patients, the parties implicitly agreed, and Envision had a reasonable expectation and understanding, that United would reimburse Envision for out-of-network claims at rates in accordance with the standards acceptable under Tennessee law and in accordance with rates the United pays for other substantially identical claims also submitted by Envision and by other providers.

266. Under Tennessee common law United, by undertaking responsibility for payment to Envision for the services rendered to Patients, impliedly agreed to reimburse Envision at rates, at a minimum, equivalent to the reasonable value of the professional emergency medical services provided by Envision.

267. United, by undertaking responsibility for payment to Envision for the services rendered to its Patients, impliedly agreed to reimburse Envision at rates, at a minimum, equivalent

to the usual and customary rate or alternatively for the reasonable value of the professional emergency medical services provided by Envision.

268.     In breach of its implied contract with Envision, United has and continues to systemically deny Envision's highest acuity claims, thus depriving Envision of the reasonable value of the professional emergency medical services provided by Envision to Patients.

269.     Envision has performed all obligations under its implied contract with United concerning emergency medical services to be performed for Patients.

270.     At all material times, all conditions precedent have occurred that were necessary for United to perform its obligations under its implied contract to pay Envision for the out-of-network claims, at a minimum, based upon the "usual and customary fees in that locality" or the reasonable value of Envision's professional emergency medical services.

271.     Envision did not agree to provide emergency medical services to Patients without reimbursement.

272.     Envision has suffered damages in an amount to be proven at trial, but in excess of $1,000,000.

273.     Envision has been forced to retain counsel to prosecute this action and is entitled to receive its costs and attorneys' fees incurred herein.

## COUNT VIII – QUANTUM MERUIT

274.     Envision incorporates each of the foregoing paragraphs as if fully restated herein.

275.     On December 31, 2020, the in-network agreement between Envision and United expired.

276.     From January 1, 2021, to present, Envision has billed United on an out-of-network basis for reimbursement for emergency medical services provided to Patients—this is, there is no operative contract between Envision and United.

277.     Envision's expectation, both based on industry standard and state and federal law, is that Envision is to be reimbursed at the applicable out-of-network rate for the provision of care to United's Patients.

278.     United knows that Envision expected to be compensated by United as a result of its provision of care to Patients.

279.     But, United has wrongfully withheld payment on the on the highest-level claims in an effort to punish Envision for not ceding to unconscionably low reimbursement rates for in-network providers and in an effort to pad its bottom line.

280.     United has recognized a benefit—whether direct or indirect—and has been unjustly enriched by way of the Scheme by retaining money rightfully due and owing to Envision for the provision of emergency medical services to United's Patients.

281.     As a result of retaining funds that should have been paid to Envision, United has reaped a windfall, and has retained payments rightfully owed to Envision.

282.     United has retained funds rightfully owed to Envision, and it would be unjust to permit United to retain those funds. United has acted inequitably in refusing to make payments without any justification.

283.     Envision has been damaged as a result in an amount to be proven at trial, but no less than $1,000,000.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray for judgment as follows:

A. An award of actual and consequential damages in an amount to be determined at trial;

B. Equitable and injunctive relief;

C. An award of punitive damages;

D. Treble damages as permitted under RICO and any other applicable state statutes;

E. An award of prejudgment interest at the applicable rate;

F. An award of costs and reasonable attorneys' fees;

G. An award of post judgment interest at the maximum rate permitted by law; and

H. Provide such other relief as the Court deems to be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully Submitted,

Dated: November 28, 2022

s/ Kevin T. Elkins
Kevin T. Elkins (TN BPR No. 033280)
Jeremy A. Oliver (TN BPR No. 029329)
EPSTEIN BECKER & GREEN P.C.
1222 Demonbreun St., Suite 1400
Nashville, TN 37203
(615)-564-6060
kelkins@ebglaw.com
joliver@ebglaw.com

Anthony Argiropoulos (*Pro Hac Vice*)
Eric W. Moran (*Pro Hac Vice*)
EPSTEIN BECKER & GREEN P.C.
150 College Road West, Suite 301
Princeton, New Jersey 08540
(609) 455-1540 (Phone)
(609) 228-5318 (Facsimile)
AArgiropoulos@ebglaw.com
EMoran@ebglaw.com

60

## <u>CERTIFICATE OF SERVICE</u>

I certify that on date, the foregoing document was filed electronically with the Clerk of the Court using the court's CM/ECF system on November 28, 2022, which is expected to send notification of such filing to all counsel of record:

**Paine Tarwater Bickers, LLP**

Dwight E. Tarwater
Michael J. King
det@painetarwter.com
mjk@painebickers.com
900 South Gay Street, Suite 2200
Knoxville, Tennessee 37902-1821

**Robins Kaplan LLP**

Charles C. Gokey
Jeffrey S. Gleason
Jamie R. Kurtz
Nathaniel J. Moore
cgokey@robinskaplan.com
jgleason@robinskaplan.com
jkurtz@robinskaplan.com
nmoore@robinskaplan.com
2800 LaSalle Plaza, 800 LaSalle Avenue
Minneapolis, MN 55402-2015

Paul D. Weller
Gregory S. Voshell
pweller@robinskaplan.com
gvoshell@robinskaplan.com
900 Third Avenue, Suite 11900
New York, New York 10022

s/Kevin T. Elkins
*Counsel for Plaintiff*