IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ENVISION HEALTHCARE<br>OPERATING, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff/Counter-defendant, | ) | No. 3:22-cv-00693 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| UNITED HEALTHCARE SERVICES,<br>INC., ET AL., | ) | |
| | ) | |
| | ) | |
| Defendants/Counter-plaintiffs. | ) | |
| | ) | |
| _____ | ) | |
| | | |
| UNITED HEALTHCARE INSURANCE<br>COMPANY, ET AL., | ) | |
| | ) | |
| | ) | |
| Counter-plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ENVISION HEALTHCARE<br>OPERATING, INC., ET AL., | ) | |
| | ) | |
| Counter-defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## **MEMORANDUM OPINION**

In this consolidated action, pending before the Court is the motion to dismiss (Doc. No. 42,

"Motion") of both Defendants, United Healthcare Services, Inc. and United Healthcare Insurance

Company (collectively "Defendants" or "United").[1] Via the Motion, Defendants seek dismissal of all claims set forth against them in the amended complaint (Doc. No. 29, "Amended Complaint") of the plaintiff which originally was Envision Healthcare Corporation but now is Envision Healthcare Operating, Inc. ("Plaintiff" or "Envision").[2] Defendants filed a memorandum (Doc. No. 43) in support of the Motion. Plaintiff filed a response in opposition (Doc. No. 45, "Response") to the Motion, and Defendants filed a reply (Doc. No. 49, "Reply") to the Response.[3]

For the reasons discussed herein, the Court will grant the Motion with respect to all counts in Plaintiff's Amended Complaint except for Count VII.

FACTUAL ALLEGATIONS[4]

This case arises out of a dispute between Plaintiff, one of the country's largest providers of emergency medical services, and Defendants. Defendant United Healthcare Services, Inc. is a

---

[1] Defendants are two of the three claimants with respect to the claims brought against Plaintiff (and numerous other legal entities) in the action (Case No. 3:22-cv-000697) that was consolidated under the case number (3:22-cv-000693) listed in the above caption, wherein Envision Healthcare Operating, Inc. is the sole Plaintiff. In other words, the Court is aware that the Defendants (as the Court uses that term herein) are now counter-plaintiffs on various claims now within the scope of the captioned consolidated action, and that Plaintiff is one of the counter-defendants as to those claims.

[2] Envision Healthcare Corporation filed the Amended Complaint but—subsequent to the filing of the Amended Complaint and the filing of the Motion—was replaced as Plaintiff by Envision Healthcare Operating, Inc. (Doc. No. 74).

[3] Herein, when citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. At times, the Court will cite one or more *paragraphs* in the Amended Complaint, and when it does so such a citation will take the following format: (Doc. No. 29 at ¶ _). At other times, the Court will cite one or more *pages* of the Amended Complaint. When the Court does so, the citation will take the following format: (Doc. No. 29 at _).

[4] The facts herein are taken from the Amended Complaint. For purposes of the instant Motion, the facts in the Amended Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

claim administrator for health plans offered by employers (Doc. No. 29 at 3); its subsidiary, Defendant United Healthcare Insurance Company, is a corporation that insures and administers health plans for employers and is responsible for administering and/or paying for certain emergency medical services at issue in this case. (*Id.* at 3).

Plaintiff alleges that Defendants engaged in systematic and fraudulent practices to deny or reduce payment for emergency medical services provided to Defendants' insureds, purportedly as part of a coercive campaign to force Envision to accept unfavorable contract terms and to suppress Plaintiff's business in favor of Defendants' subsidiary, Optum, Inc. ("Optum"), a non-party in this case. (*Id.* at 1-3, *passim*).

Plaintiff provides emergency healthcare services nationwide, operating through a network of affiliated medical groups. For years—until January 2021—Envision participated in Defendants' network of providers under agreements that governed reimbursement rates for services rendered to Defendants' insureds. (*Id.* at 1-2). These "in-network" agreements expired on December 31, 2020, after which Plaintiff became an "out-of-network" provider. (*Id.* at 12-13).

Plaintiff claims that after the expiration of the parties' in-network agreement, Defendants launched an intentional campaign of reimbursement withholding. (*Id.* at 13-32). This campaign allegedly sought to force Plaintiff to accept dramatically lower reimbursement rates to regain in-network status while enriching Defendants and their affiliate, Optum, by disadvantaging Plaintiff. (*Id.*).

Defendants implemented several specific strategies to achieve their goals, including pre-payment review practices, claim denials and adjustments, and extended delays in claim processing. These actions are detailed below:

Defendants began systematically flagging Plaintiff's reimbursement claims—particularly those associated with higher-acuity services billed under CPT code 99285—for pre-payment review. (*Id.* at 20-21, 24, 26). Defendants justified these actions by requesting medical records to verify the necessity and complexity of the services provided. (*Id.* at 21). However, these requests served as a facade, with Defendants (allegedly) having no genuine intention of reviewing the submitted medical records. (*Id.* at 21-24). Instead, Defendants used these pre-payment review procedures as a mechanism to delay payments and ultimately, deny reimbursement. (*Id.*).

Defendants frequently denied or adjusted claims improperly—and, Plaintiff alleges, in violation of federal law. (*Id.* at 16). Plaintiff cites, as a representative example, the case of a two-month-old infant, Patient 2, who was treated for severe and life-threatening symptoms at an Envision-affiliated emergency department. (*Id.* at 28). Despite the comprehensive nature of the evaluation, diagnosis, and treatment—including the admission of the patient to a pediatric intensive care unit—Defendants denied reimbursement for the claim, asserting that the submitted documentation did not support the level of service billed. (*Id.* at 29-30). Plaintiff maintains that this denial was factually baseless and emblematic of Defendants' broader practices.

Defendants engaged in (allegedly) systematic delays in processing claims, with processing times allegedly exceeding the maximum timeframes established by law or industry standards. (*Id.* at 23). These delays compounded the financial strain on Plaintiff's operations and were part of a strategy to pressure Envision into accepting reduced reimbursement rates. (*Id.* at 24).

Even when Defendants chose to adjust rather than outright deny claims, Plaintiff alleges that they did so improperly. For example, high-acuity claims submitted under CPT code 99285 were frequently downgraded to a lower-acuity code. (*Id.* at 24). Despite these downgrades,

Defendants often withheld payment altogether, even at the reduced rate, further exacerbating Plaintiff's financial losses. (*Id.*).

To illustrate Defendants' practices, Plaintiff provides a detailed account of several representative cases. These include instances in which claims for emergency services provided to critically ill patients were flagged, delayed, or denied without justification. For example, in the aforementioned case of Patient 2—a two-month-old infant who presented with severe symptoms such as unexplained vomiting, choking, and cyanosis—Plaintiff submitted a claim for reimbursement under coding—namely code 99285—consistent with the complexity and urgency of the care provided. (*Id.* at 29). Defendants denied the claim, asserting that the documentation did not support the billed level of service. (*Id.*). This denial was based not on an actual review of the medical records, but on Defendants' allegedly systematic approach to suppress high-acuity claims. (*Id.*).

Defendants' actions were driven by three primary motives: (1) to deprive Plaintiff of revenue lawfully owed for services rendered to Defendants' insureds; (2) to exert financial and operational pressure on Plaintiff, forcing it to accept in-network terms with reimbursement rates far below industry standards; and (3) to suppress Plaintiff's business operations in favor of Optum, Defendants' wholly-owned subsidiary that competes directly with Plaintiff in the emergency healthcare market. (*Id.* at 26, 53).

Plaintiff claims that these objectives were pursued through a coordinated scheme involving the misuse of internal algorithms, such as the Emergency Department Claim ("EDC") Analyzer software, to flag and deny high-acuity claims systematically. (*Id.* at 16).

Plaintiff's claims against Defendants are set forth in eight counts. Two are brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and

a third is brought under a state so-called "prompt pay" statute. Plaintiff's non-statutory claims include various state-law causes of action. Regarding its RICO claims (Count I and Count II), Plaintiff alleges that Defendants' practices constitute predicate acts of mail and wire fraud, forming a pattern of racketeering activity that was intended to and did harm Plaintiff and benefit Defendants and Optum. (*Id.* at 32-43). In a fraud claim (Count III), Plaintiff alleges that Defendants made false representations about its pre-payment review practices and the basis for its claim denials, causing financial harm to Plaintiff. (*Id.* at 43-49). Plaintiff also brings a claim (Count IV) pursuant to a Tennessee prompt pay statute—namely, the Timely Reimbursement of Health Insurance Claims Act Tenn. Code Ann. § 56–7–109, *et seq.* ("Tennessee Prompt Pay Act"). (Doc. No. 29 at 49-50). Plaintiff also brings claims for civil conspiracy (Count V), unjust enrichment (Count VI), breach of implied-in-fact contract (Count VII) and quantum meruit (Count VIII). (Doc. No. 29 at 50-59).[5]

Via the Motion, Defendants request that this Court dismiss Plaintiff's Amended Complaint in its entirety, arguing that the allegations fail to meet the requisite pleading standards. With respect to Counts I and II, Defendants contend—among other things—that Plaintiff has not adequately alleged, as required, the existence of a distinct RICO enterprise,[6] (Doc. No. 43 at 13-15), predicate acts of racketeering, (*id.* at 15-19), or a direct causal connection between Defendants' actions and

---

[5] As the Court explains below, there is essentially no difference between a cause of action for unjust enrichment and a cause of action for quantum meruit.

[6] As correctly noted by one district court in this circuit:

> [T]o successfully plead a RICO claim, there must be both (1) the "person" against whom the claim is asserted, *and* (2) the "enterprise" that forms one of the elements of the RICO claim. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S. Ct. 2087, 150 L.Ed.2d 198 (2001). The two cannot be the same. *Id.* Rather, there is a "separateness" requirement. *Id.* "[A] corporation cannot become an enterprise distinct from itself for RICO purposes." *Shields v. UnumProvident Corp.*, 415 F. App'x 686, 691 (6th Cir. 2011).

*Compound Prop. Mgmt., LLC v. Build Realty, Inc.*, 462 F. Supp. 3d 839, 856 (S.D. Ohio 2020).

Plaintiff's purported injuries. (*Id.* at 19-21). Additionally, Defendants argue that Plaintiff's state law claims are preempted by federal law or otherwise fail as a matter of law. (*Id.* at 22-33).

<u>LEGAL STANDARD</u>

For purposes of a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must take all the factual allegations in the complaint as true, as it has done above. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As *Iqbal* explains:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . .Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . .When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 678-79 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), cited in *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish plausibility of entitlement to relief even if it supports the possibility of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief, including any "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at

681. The question is whether the remaining allegations—factual allegations, i.e., allegations of factual matter—plausibly suggest an entitlement to relief.[7] *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus, must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

DISCUSSION

I.    RICO Claims (Counts I and II)

In Counts I and II, Plaintiff brings claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* RICO provides a private cause of action for "'[a]ny person injured in his business or property by reason of a violation of Section 1962 of this chapter.' 18 U. S. C. § 1964(c). Section 1962, in turn, contains RICO's criminal provisions." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 6 (2010). More specifically, Section 1962 contains four different criminal provisions, each in a separate subsection. In 18 U.S.C. § 1962(a), 18 U.S.C. § 1962(b), and 18 U.S.C. § 1962(c), RICO declares unlawful the conduct described in each of these three respective subsections. And in 18 U.S.C. § 1962(d), RICO declares it unlawful to conspire to commit a substantive RICO violation, i.e. a violation of 18 U.S.C. § 1962(a), 18 U.S.C. § 1962(b), or 18 U.S.C. § 1962(c).[8]

---

[7] It is worth noting that to the extent that an allegation reflects a mere verbal characterization, it need not be taken as true. For example, an allegation that Defendants "systematically delayed" processing claims— even if deemed factual with respect to the allegation that Defendants "delayed" processing claims—is fairly deemed non-factual (and thus not entitled to the presumption of truth) to the extent that it alleges that such "delay[ing]" was done "systematically," which appropriately can be viewed as a mere verbal characterization of the "delay[ing]" that occurred. The point is that a term that is a mere semantic label is not a fact. The Court understands, though, that the line often is blurry between an allegation of a fact and an allegation that serves as a mere verbal characterization.

[8] A civil cause of action based on an alleged violation of Section 1962(a), (b) or (c) is commonly called a "substantive RICO" claim (i.e., a claim based on a violation of one of the so-called "substantive" provisions of RICO, which are 18 U.S.C. § 1962(a), (b), and/or (c)). And a civil cause of action based on a violation of 18 U.S.C. § 1962(d) is commonly called a "RICO conspiracy" claim, meaning a claim based on a conspiracy to violate the substantive provisions of RICO.

RICO is primarily a criminal statute, enforceable by the United States Department of Justice. But as indicated above, RICO also provides a civil remedy for private parties injured by a violation of Section 1962, i.e., either a substantive RICO violation or a RICO conspiracy.[9] Envision asserts a substantive RICO claim in Count I and a RICO conspiracy claim in Count II.

As for Count I, Plaintiff alleges only one kind of substantive RICO violation, i.e., a violation of Section 1962(c). (Doc. No. 29 at 32). As the Supreme Court has explained:

> Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of [an] unlawful debt." The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4).

*United States v. Turkette*, 452 U.S. 576, 580 (1981).[10] As just indicated, § 1962(c) can be violated only by a "person" who conducts the affairs of an "enterprise" through a pattern of racketeering activity,[11] and *not* by the enterprise itself. It follows that the "[t]he enterprise itself is not liable for RICO violations; rather, the 'persons' who conduct the affairs of the enterprise through a pattern

---

[9] By definition, a conspiracy is an agreement, and a RICO conspiracy is an agreement to commit a substantive RICO violation. That raises the question of what it means to be "injured" via a RICO conspiracy; in particular, is it either sufficient or required for the plaintiff to show that it has suffered an injury from the *agreement* itself? The answer is no; it is irrelevant whether the plaintiff can be said to have been injured by the agreement *per se*. The Supreme Court has made clear that to be "injured" by a RICO conspiracy is to be injured either by an overt act in furtherance of the conspiracy that is either an act of racketeering or an act that is otherwise unlawful under RICO. *See Beck v. Prupis*, 529 U.S. 494, 507 (2000).

[10] The language regarding "collection of an unlawful debt" is not implicated by the Amended Complaint. For the sake of simplicity, the Court herein discusses 18 U.S.C. § 1962(c) as if that language were not included in the subsection.

[11] At times herein, the Court places "person" and "enterprise" (also commonly known in this context, for obvious reasons, as a "RICO enterprise") in quotation marks because they are defined terms. *See* 18 U.S.C. § 1961(3)-(5) (defining "person," "enterprise," and "pattern of racketeering activity," respectively).

of racketeering activity are liable." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 490 (6th Cir. 2013).[12]

"To state a RICO claim [based on a violation of Section 1962(c)], a plaintiff must plead the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Ouwinga v. Benistar 419 Plan Servs., Inc.,* 694 F.3d 783, 791 (6th Cir. 2012) (quoting *Moon v. Harrison Piping Supply,* 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985))).

In Count I, Plaintiff brings against each Defendant a substantive RICO claim based on each Defendant's alleged violation of 18 U.S.C. § 1962(c). Plaintiff claims that each Defendant is liable under § 1962(c) because (according to Plaintiff) each is a "person" that conducted the affairs of an enterprise through a pattern of racketeering activity, including acts of mail and wire fraud. ( Doc. No. 29 at ¶¶ 147, 162, 163).

In Count II, Plaintiff brings against each Defendant a RICO conspiracy claim based on each Defendant's alleged violation of 18 U.S.C. § 1962(d). Specifically, Plaintiff alleges that each Defendant is liable to it because each one conspired with others to violate § 1962(c), i.e., conspired to conduct the affairs of the alleged enterprise through a pattern of racketeering activity. (Doc. No. 29 at¶ 170).

Defendants argue that Plaintiff fails to plead the existence of a distinct enterprise. (Doc. No. 43 at 13-15). Among other things, Defendants argue that the allegations of the Amended Complaint are insufficient to show how the four companies—namely Defendants, Optum, and

---

[12] For some reason, Plaintiff alleges not only that Defendants are "persons," but also that Optum and UMR are "persons." (Doc. No. 29 at ¶ 147). It seems to the undersigned that such an allegation is superfluous (not to say inappropriate) unless Plaintiff is seeking hold Optum and UMR liable, which it is not (at least at this point) inasmuch as it has not named Optum or UMR as Defendants.

UMR, Inc. ("UMR")[13]—that allegedly comprise the association-in-fact enterprise operated as a functioning unit. (*Id.* at 15).

The Court agrees, albeit with an analysis that is substantially more in-depth than the one Defendants provided. As set forth below with respect to both of the RICO counts, these allegations fail to meet applicable requirements for pleading a RICO enterprise.

As noted in *Turkette*, an "enterprise" for purposes of RICO ("RICO enterprise") is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4).

Here, Plaintiff alleges an enterprise in the form of an "association," known as an "association-in-fact" enterprise. (Doc. No. 29 at ¶ 148). The Sixth Circuit's 2012 discussion of this kind of enterprise is instructive:

> The Supreme Court recently clarified what is required to show an association-in-fact enterprise in *Boyle v. United States,* 556 U.S. 938, 129 S. Ct. 2237, 173 L.Ed.2d 1265 (2009). The Court stated that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946, 129 S. Ct. 2237. An association-in-fact enterprise "require[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach." *VanDenBroeck v. CommonPoint Mortg. Co.,* 210 F.3d 696, 699 (6th Cir. 2000), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 128 S. Ct. 2131, 170 L.Ed.2d 1012 (2008). The Supreme Court clarified that this organizational structure need not be hierarchical, can make decisions on an ad hoc basis, and does not require the members to have fixed roles. *Boyle,* 556 U.S. at 948, 129 S. Ct. 2237. Put another way, a plaintiff must show "simply a continuing unit that functions with a common purpose." *Id.; see also id.* at 949, 129 S. Ct. 2237 (emphasizing "the breadth of the 'enterprise' concept").

---

[13] UMR is a wholly owned subsidiary of United Healthcare Services Inc., (Doc. No. 43 at 14), and was not named as a defendant in the Amended Complaint (though is a plaintiff in Case No. 3:22-cv-00697, which was consolidated under the case number (3:22-cv-000693) listed in the above caption). UMR is discussed more fulsomely in a footnote below.

*Ouwinga*, 694 F.3d at 794. It is worth noting that *Boyle* (the Supreme Court case discussed by the Sixth Circuit in the quote above) states not the requirements for a group to be an association-in-fact, but rather the requirements for a group to be an association-in-fact *enterprise. See generally Boyle*, 556 U.S. 938.[14]

Without question, *Boyle* refused to impose narrow requirements for proving (or, for that matter, pleading) an association-in-fact enterprise. *See id.* at 944. Importantly for this action—involving as it does various corporate entities— the statutory definition of "enterprise" (which is framed in inclusive rather than exclusive terms) has been construed by courts to include not only groups of individuals but also groups of legal entities. *Trollinger v. Tyson Foods, Inc.,* No. 402-CV-23, 2007 WL 1574275, at *9 (E.D. Tenn. May 29, 2007) (collecting cases); *Turkette*, 452 U.S. at 581-583.

Nevertheless, Plaintiff's RICO claims fail because it has not asserted non-conclusory factual matter plausibly alleging the existence of an association-in-fact enterprise. To see why, it is necessary to look closely at what Plaintiff alleges regarding the supposed association-in-fact enterprise.

Plaintiff alleges that "United HealthCare Services, Inc., United Healthcare Insurance Company, and nonparties UMR and Optum entered into an association-in-fact enterprise (the

---

[14] This distinction can be crucial because, among other reasons, a complaint certainly can contain factual matter plausibly suggesting that a particular association-in-fact existed (i.e., that particular individuals and/or companies in fact associated with one another) without plausibly suggesting that the association-in-fact had the three attributes that, according to *Boyle*, are necessary for an association-in-fact to be a RICO enterprise. Notably, a group can constitute an association-in-fact enterprise as defined by *Boyle* even if its activities do not implicate or affect interstate commerce, but like any enterprise, such an enterprise cannot serve as a basis for a person's liability under RICO unless it is either engaged in interstate or foreign commerce or its activities affect interstate or foreign commerce. *See* 18 U.S.C. § 1962 (a)-(d).

"Enterprise") within the meaning of 18 U.S.C. § 1961(4)."[15] (Doc. No. 29 at ¶ 148). That is, Plaintiff alleges that the enterprise whose affairs the two Defendants conducted (and conspired to conduct) in violation of 18 U.S.C. § 1962(c) is an association-in-fact enterprise comprised specifically of both Defendants, non-defendant UMR, and non-defendant Optum. The Court thus assesses whether the Amended Complaint adequately alleges an association-in-fact enterprise with *this* particular composition—meaning these four companies, no more and no less.

Standing alone, Plaintiff's above-quoted allegation is merely conclusory. The question is whether the Amended Complaint sets forth *factual matter* (as opposed to additional conclusory allegations) sufficient to support the allegation that such an association-in-fact enterprise actually existed. This is because, as suggested above, a plaintiff cannot rely on conclusory allegations to take an assertion of a defendant's liability on a claim from merely possible to *plausible*.

The Court concludes at the outset that the Amended Complaint sets forth factual matter sufficient to plausibly suggest that these four companies comprised an association-in-fact, i.e., in fact associated with one another.[16] But as discussed below, the Court finds that the Amended Complaint does not set forth factual matter plausibly suggesting that these four companies comprised an association-in-fact *enterprise* as defined by *Boyle*, i.e., that it was an association-in-

---

[15] "UMR" is "UMR, Inc." The Amended Complaint is long on (conclusory) allegations that UMR was somehow engaged in wrongdoing together with Defendants and Optum, but short on allegations about what UMR does and how it is related to Defendants and Optum. The Amended Complaint provides only very general allegations about the business line and business activities of UMR; it says only that "United HealthCare Insurance Company and UMR served as administrators of certain healthcare plans responsible for paying claims at issue in this litigation, including handling the claims administration for certain of the claims at issue in this litigation," (Doc. No. 29 at ¶ 234(b)), before alleging here (as it does elsewhere throughout the Amended Complaint) that UMR, in doing whatever it was doing, was doing it in an unlawful manner as a co-conspirator of defendants and Optum.

[16] Even this assumption may be questionable at least with respect to UMR's inclusion, because although the Amended Complaint speaks repeatedly in terse (and conclusory) language about UMR doing bad things together with Defendants and Optum, it alleges virtually no factual matter about what UMR's relationship is with anybody, other than to call UMR a "sister compan[y]" of Optum and United Healthcare Insurance Company. (Doc. No. 29 at ¶ 235).

fact that had a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.

In what is clearly an attempt to satisfy (or appear to satisfy) *Boyle*, the Amended Complaint alleges, "The Enterprise was an ongoing organization that functioned as a continuing unit. The Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity, and the Enterprise had the common purpose of doing the same." (Doc. No 29 at ¶ 148). Elsewhere, the Amended Complaint describes a different purpose for the alleged association-in-fact enterprise: "to reap windfall profits in part through a [s]cheme of systematically refusing to reimburse the highest acuity claims for emergency medical care." (*Id.* at ¶ 150).

But by itself, this allegation is wholly conclusory. The Amended Complaint must set forth *factual matter* to support the conclusory allegation that there was a purpose for *this association-in-fact* (so as for this association-in-fact to in fact be an *enterprise*), as opposed to merely separate purposes for *each of the respective members of the association-in-fact.* And one of the alleged purposes of the alleged enterprise (namely, to commit a pattern of racketeering activity)—even accepting as true the rather conclusory allegation that such purpose existed at all—just as easily could have been a company-specific objective of one or more of the four *individual* members of the association-in-fact, rather than a common (collective)[17] purpose of the association-in-fact as required by *Boyle*. As for the other alleged purpose (to reap windfall profits from improper declination of provider reimbursement requests), it likewise just as easily could have been a company-specific objective of one or more of the four companies rather than a collective purpose.

---

[17] *Boyle* states the requirement as a "common purpose," *Boyle*, 556 U.S. at 950, which, in context, seems to be synonymous with what the Court deems to be the more precise term applicable here, i.e., "collective purpose."

In other words, the Amended Complaint fails to allege sufficient factual matter to plausibly suggest, as required by *Boyle*, that the asserted purposes were actually those of the association-in-fact. Even construing the Amended Complaint in Plaintiff's favor—as the Court must do at this stage—the Court discerns no factual allegations supporting the notion that the alleged purposes were "common" purposes of an alleged association-in-fact enterprise comprised of these four companies, rather than the company-specific purposes of the four respective companies. Instead, the Court perceives that the notion of a common purpose was asserted only in conclusory fashion. One possible rejoinder from Plaintiff to this perception is that Plaintiff should be credited with having done enough because, at least prior to discovery, it lacked access to the inside information (regarding, *inter alia*, inter-company communications) necessary to show the commonality (collectivity) of purpose. But although this plea initially seems reasonable enough, *Iqbal* provides an answer to it: Although Federal Rule of Civil Procedure 8 makes pleading standards more lenient towards plaintiffs than pleading standards historically have been, "it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. And here, the Court concludes that the Amended Complaint sets forth only conclusory assertions—rather than factual allegations—that the companies shared a collective purpose and functioned together to achieve that collective purpose.

Therefore, and consistent with the analysis in *Shields v. UnumProvident Corp.,* 415 F. App'x 686 (6th Cir. 2011),[18] the Court finds that the allegation that the four companies operated as a continuing unit in pursuit of those common objectives is conclusory and unsupported by

---

[18] In *Shields,* the Sixth Circuit held that the plaintiff there "fail[ed] to adequately plead the existence of an 'association in fact' [] enterprise," in part because "[t]he complaint [was] devoid of facts suggesting that the behavior of the listed entities is 'coordinated in such a way that they function as a continuing unit.'" *Shields*, 415 F. App'x at 691 (quoting *Begala v. PNC Bank, Ohio,* 214 F.3d 776, 781 (6th Cir.2000)).

factual matter that makes the allegation plausible rather than merely possible. Among other things, the Amended Complaint shows at most merely that it is possible, as opposed to plausible, that this is how the companies operated, instead of operating either: (i) as a "continuing unit" (whatever that somewhat subjective and ambiguous term means) in some sense, but not in common pursuit of the alleged collective purpose; or (ii) not as a "continuing unit" at all. And importantly, *Shields* implies that the Court cannot infer from the mere fact that the alleged association-in-fact enterprise members are related companies (parents, subsidiaries, and the like) that they operated as a continuing unit to pursue the alleged nefarious goals of the enterprise.[19]

The Court must insist on more from a plaintiff. Next, the Court explains why.

As the Court stated above in a footnote when first raising herein the distinctiveness requirement:

> [T]o successfully plead a RICO claim, there must be both (1) the "person" against whom the claim is asserted, *and* (2) the "enterprise" that forms one of the elements of the RICO claim. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S. Ct. 2087, 150 L.Ed.2d 198 (2001). The two cannot be the same. *Id.* Rather, there is a "separateness" requirement. *Id.* "[A] corporation cannot become an enterprise distinct from itself for RICO purposes."

---

[19] The Court does not wish to draw too close of a comparison between the instant issue and the issues in *Twombly*, because *Twombly* had unique (alleged) facts, involved the Sherman Act rather than RICO, and involved the question of whether multiple companies were co-conspirators rather than whether multiple companies comprised an association-in-fact. But a key observation of *Twombly* is applicable here:

> It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.

*Twombly*, 550 U.S. at 556–57. Likewise, without more, parallel conduct (between companies) does not suggest a common purpose (among those companies), and a conclusory allegation of common purpose is not adequate to show an association-in-fact enterprise. Along the same lines, as relevant to the discussion below, parallel conduct (between companies) does not suggest that any one or more of those companies was conducting the affairs of an association-in-fact enterprise comprised of those companies rather than merely its own affairs, and a conclusory allegation that this is what the companies were doing is insufficient to plausibly suggest that this is what they were doing.

*Compound Prop. Mgmt., LLC v. Build Realty, Inc.*, 462 F. Supp. 3d 839, 856 (S.D. Ohio 2020) (quoting *Shields*, 415 F. App'x at 691). Notably, the distinctiveness requirement applies even if the corporation is itself culpable and not merely a passive victim of the racketeering activity through which its affairs are conducted. *See Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 345 (2d Cir. 1994), *abrogated on other grounds, Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 159 (2001)).

Naturally, any plaintiff will want the "person(s)"—the ones potentially liable—to be financially able to pay a big judgment in the form of an award of treble damages available in a RICO case. In a typical alleged fact pattern in a RICO case, what the plaintiff really complains about is that (allegedly) the affairs of (a hypothetical) Company X (or perhaps an association-in-fact enterprise comprised of Company X and one or more companies affiliated with Company X)[20] are being conducted through a pattern of racketeering activity by various *individuals* associated with Company X; the plaintiff is not actually complaining that Company X is conducting the affairs of *some other enterprise* that is distinguishable from Company X itself—for example, a combination of Company X and Company X's subsidiaries. So, what the plaintiff really should be doing is pointing to *those individuals* as the "persons" allegedly liable for conducting the affairs of Company X, which is (by Plaintiff's own reckoning) the *enterprise* whose affairs are being conducted through a pattern of racketeering. That is, if the plaintiff was being forthright, (a) the "persons" should be the individuals, and (b) the enterprise should be Company X.

This approach, however, typically poses three problems for our hypothetical plaintiff. The first is that the plaintiff does not know who the responsible individuals might be. The plaintiff

---

[20] For simplicity of discussion, the Court (with limited exceptions) will speak in terms of the situation where the plaintiff's true contention is that it is a single company (rather than an association-in-fact of multiple companies) whose affairs have been conducted through a pattern of racketeering activity.

contends that something very wrong/illegal is happening at the company but does not know who is responsible and thus cannot name any particular individual as a potentially liable "person." The second problem is that the "deep pocket" is the company and not the individual(s), and this deep pocket is accessible only if the company is held liable as a "person." And the third problem, which can exist in the eyes of a plaintiff more upset with the company as an entity than with whatever individuals are conducting the affairs of the company, is that labeling the company as the enterprise and not as the person can unsatisfyingly suggest that the company as an entity is not necessarily a wrongdoer at all—and may instead be something of an innocent bystander to, or even a victim of, whatever nefarious things are being done by *individuals* in the conduct of the company's affairs.

These problems, separately and together, are superficially solvable by the simple expedient of making *the company* the "person." In this manner, (i) the plaintiff's complaint is able to name a particular "person" (as required, obviously, for a RICO claim)—i.e., the company—even though plaintiff cannot yet identify any *individual(s)* as a "person," (ii) that "person" has a deeper pocket than any individual likely would have had, and (iii) the company, being the "person," is identified for all to see as a wrongdoer. But this ostensible solution runs headlong into the distinctiveness requirement; if Company X is the "person" (or at least "a" person), then Company X cannot be the enterprise, and vice versa.[21] So what is the fix for this quandary? If Company X is the sole "person," the fix is to assert that the enterprise is not just Company X (even if the upshot of what the plaintiff truly contends is that the affairs that are being conducted unlawfully are those only of

---

[21] True, if the plaintiff were to couch the enterprise as an association-in-fact enterprise comprised of Company X and one or more other companies, then the distinctiveness requirement could be satisfied if some subset of the companies (for example, if *only* Company X) was/were identified as the "person(s)." But a plaintiff might prefer to name all companies as "persons," in order to have all companies potentially available as the deep pocket and have all companies under suspicion of being wrongdoers in their own right as entities.

Company X), but actually an association-in-fact enterprise comprised of Company X and one or more other companies. And if the plaintiff wants Company X and, say, Company Y to be "persons," then the solution is to assert that the enterprise is not actually Company X alone or Company Y alone, or an association-in-fact enterprise comprised solely of Company X and Company Y, but rather an association-in-fact enterprise that includes members *in addition to* Company X and Company Y[22]—even if the plaintiff has no subjective belief, let alone an objective basis for believing, that the latter is true.

For these reasons, there is in some cases a great incentive for the plaintiff to make unsupported (and in some cases disingenuous) allegations about (i) who or what is/are the "person(s)" and (ii) what is the enterprise, and, if the enterprise is an association-in-fact enterprise, who are its members. And when the allegation is that a corporation is a "person" and also part of an association-in-fact enterprise, courts often have been displeased. *See Robinson v. Standard Mortg. Corp.*, 191 F. Supp. 3d 630, 639 (E.D. La. 2016) ("[T]o get around having a corporation named as both a RICO defendant and a RICO enterprise, many plaintiffs have charged the corporation as being part of an association-in-fact enterprise and also as a RICO defendant. *Courts have roundly criticized this formulation*." (quoting *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 n. 16 (5th Cir.2000)).

---

[22] As explained in a footnote below, some (though not all) courts maintain that it is improper—i.e., violative of the distinctiveness requirement— to name multiple corporations as the sole "persons" if the alleged enterprise is an association-in-fact enterprise comprised solely of those same corporations. As one court put it 17 years ago, "there is substantial confusion in this circuit (and in others) about whether a complete overlap between the enterprise and the defendants is fatal to a RICO claim." *State Farm Mut. Auto. Ins. Co. v. Lincow*, No. CV 05-5368, 2009 WL 10684910, at *1 (E.D. Pa. Feb. 6, 2009). So far as the undersigned is aware, this question still has not been resolved nationwide nor even within the Sixth Circuit.

That is not to say that plaintiffs and their counsel would always give in to the temptation to make unsupported allegations in these cases. It is likewise not to deny that in any particular case, allegations regarding who is/are the person(s) and what is (or who comprises) the enterprise may be entirely appropriate even if they assert that the "persons" are one or more deep-pocket companies and that the enterprise is an association-in-fact that includes members other than those companies. Nor is it to say that a company should go unnamed as a person just because it is a deep pocket. Nor is it to deny that if a company conducts the affairs of a *distinct* enterprise through a pattern of racketeering activity, it should be liable for so doing, even if it has a deep pocket.

But it is to say that the incentive to make unsupported allegations on this point (whether consciously or subconsciously) is potentially so substantial that the undersigned believes that he would be entirely remiss if he did not make doubly sure that the allegations on these matters are: (i) supported by non-conclusory factual matter; and (ii) not inconsistent with the plaintiff's allegations as a whole as to whose affairs are being conducted, and by whom, through a pattern of racketeering activity. All of which is to say that the undersigned flatly declines to accept allegations on this point just because the plaintiff, at the point in the complaint where it is time to identify the "person(s)" and the enterprise, made those allegations. Instead, such allegations are especially appropriate for what is required in any event under *Iqbal* and *Twombly*: scrutiny into whether the factual matter alleged in the complaint makes the existence of the alleged association-in-fact enterprise not merely possible, but plausible. Absent real scrutiny into this question, plaintiffs can far too easily, among other things, get around the distinctiveness requirement, so as to make a particular company a defendant (i.e., a "person") as desired *even when* the gist of the plaintiff's complaint is that the company is the enterprise—one whose affairs are conducted through a pattern

of racketeering activity by individuals—and *not* that the company is conducting the affairs of some enterprise that transcends the company itself.

In short, a plaintiff may not allege the existence of a particular association-in-fact enterprise (i.e., an enterprise that is an association-in-fact with a particular membership) merely because the plaintiff finds it convenient or advantageous to do so. Rather, under Rule 11(b)(3) of the Federal Rules of Civil Procedure, a complaint's assertion of the existence of a particular association-in-fact enterprise must at least be likely to have "evidentiary support after a reasonable opportunity for further investigation or discovery" and generally needs to have evidentiary support already.[23] And under *Iqbal* and *Twombly*, such an assertion must be supported by factual matter that makes the assertion both non-conclusory and plausible (and not merely possible). And the need for such an assertion to comply with these standards is, if anything, especially important for a civil RICO

---

[23] To be clear, the Court is not suggesting that in alleging the existence of the particular association-in-fact enterprise that they did, Plaintiff's counsel violated Rule 11 (or, for that matter, were consciously being disingenuous). Rather, the Court's point as to Plaintiff in particular is, ultimately, only that its assertion of the particular association-in-fact enterprise that it asserted was wholly conclusory and thus not entitled to the presumption of truth on the instant Motion, thereby dooming Plaintiff's RICO claims.

On the other hand, Plaintiff clearly was fully aware that alleging an association-in-fact that transcended Defendants themselves, was a means of pursuing RICO liability against Defendants as the alleged "persons." (*See* Doc. No. 29 ¶ 149 ("United HealthCare Services, Inc., United Healthcare Insurance Company, and [non-defendants] UMR and Optum are each 'persons' distinct from the Enterprise.")). Indeed, whether Plaintiff knew it or not, Plaintiff could not pursue a RICO claim against a Defendant if that Defendant was itself the enterprise. Likewise, Plaintiff arguably could not pursue a RICO claim against *either* Defendant if *both* Defendants were the sole members of the association-in-fact. *See, e.g.*, *Bailey v. Atl. Auto. Corp.*, 992 F. Supp. 2d 560, 582 (D. Md. 2014) ("distinctiveness may be . . . lacking where the parent and its wholly owned subsidiaries are both the "alleged persons" and the sole members of the association-in-fact enterprise." (citing *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.,* 826 F.Supp.2d 1180, 1202 (C.D. Cal. 2011))). *But see, e.g.*, *Perlberger v. Perlberger*, No. Civ. A. 97–4105, 1999 WL 79503, at *2 (E.D. Pa. Feb. 12, 1999) ("Consistent with the Court's previous ruling on the distinctiveness requirement, a complete overlap between the defendant persons and the members of an association-in-fact enterprise does not defeat the distinctiveness requirement.")

It is incumbent upon the Court to ensure that the Amended Complaint sets forth factual matter sufficient to justify allowing Plaintiff to pursue its clear goal of asserting liability specifically of Defendants (as "persons") based on the theory that there was an association-in-fact that transcended Defendants.

claim. Why? Because, unlike most civil claims, a civil RICO claim necessarily asserts that the defendant-person(s) engaged in *criminal conduct*—a public assertion that should never be made too casually.

It bears emphasizing that "[t]he existence of an enterprise at all times remains a separate element which must be proved [to establish a substantive RICO violation under § 1962(c)]." *Turkette*, 452 U.S. at 583. Likewise, because (as Plaintiff seems to fully recognize), a RICO conspiracy is an agreement to commit at least one substantive RICO violation (which in this case would be a violation of § 1962(c)), the existence of an enterprise[24] is required to establish a RICO conspiracy. *See, e.g., United States v. Tripp*, 782 F.2d 38, 41 *(*6th Cir. 1986) (noting that "an agreement to commit a substantive RICO violation is sufficient" to establish a RICO conspiracy in violation of § 1962(d) sufficient to sustain a conviction in a criminal case). Because the existence of an enterprise must be proven, it must be adequately alleged. And here, it has not been. This dooms Counts I and II.

There is a somewhat related but distinguishable alternative basis for finding a lack of alleged factual matter to plausibly suggest RICO liability. A person's liability under RICO "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). The Amended Complaint fails to contain factual matter plausibly showing this. True, Plaintiff does allege that Defendants, UMR, and Optum "participated in the affairs of the Enterprise through a

---

[24] A qualification is appropriate here. Like any conspiracy offense, RICO conspiracy is an inchoate offense. The existence of the enterprise actually could either be (i) *realized,* such that the enterprise was actually established, *or* (ii) merely *contemplated* by the conspirators. That is, RICO conspiracy could be established if the conspirators contemplated forming an enterprise even if the contemplated enterprise for whatever reason never actually came into existence. But this truism is beside the point in the instant case because Plaintiff has not alleged or suggested in any way the existence of a merely *contemplated* enterprise.

pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity)" (Doc. No. 29 at ¶ 161). But consistent with the discussion above, the Court finds that the Amended Complaint sets forth no factual matter supporting the conclusory allegation that each Defendant was participating in (or conspiring to participate in) the affairs *of the alleged association-in-fact enterprise*, rather than merely participating in its *own* affairs. That conclusory allegation is not supported by the Amended Complaint's factual matter suggesting that each Defendant did bad things contemporaneously and in parallel. The suggestion that each Defendant did bad things contemporaneously and in parallel may be *consistent* with the notion that Defendants were doing these things as part of the affairs of some association-in-fact enterprise comprised of all of them, but it does not make *plausible* that this is what the Defendants were doing; the suggestion does absolutely nothing to exclude the possibility (or even the likelihood) that each Defendant was conducting merely its *own* affairs rather than conducting the affairs of something (the alleged enterprise) that transcended itself.

For all of these reasons, the Motion will be granted with respect to the RICO claims, Count I and Count II.

II. <u>Fraud (Count III)</u>

Defendants contend that Plaintiff's fraud claim must be dismissed because it fails to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). (Doc. No. 43 at 22-23). Rule 9(b) requires that a plaintiff "state with particularity the circumstances constituting fraud," which the Sixth Circuit has interpreted to mean that the plaintiff, at a minimum, must "allege the time, place, and content of the alleged misrepresentation . . . ; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty.*

*Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)).

Here, Plaintiff fails to plead fraud with the required particularity. In the Amended Complaint Plaintiff alleges generally that Defendants made false statements to third parties, but it does not—with respect to any particular statement—identify the speaker, the specific statements made, when or where those statements were made, or how Plaintiff relied on them to its detriment. (Doc. No. 29 at ¶¶ 177-215). Such omissions are fatal under Rule 9(b).

Additionally, to state a fraud claim under Tennessee law, Plaintiff must allege: (1) an intentional misrepresentation of a material fact; (2) knowledge of the representation's falsity; (3) an injury caused by reasonable reliance on the misrepresentation; and (4) resulting damages. *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis,* PLLC, 491 F.3d 522, 526 (6th Cir. 2007) (citing *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 40 (Tenn. Ct. App. 2006)). Plaintiff's allegations are deficient on multiple elements, particularly reliance and damages. Notably, Plaintiff makes conclusory allegations that "Envision relied on [the] false pretense[s] and misrepresentation[s]" of Defendants (Doc. No. 29 at ¶ 194) and that "Envision justifiably relied upon the representations made by [Defendants] and the expectation that reimbursement payments would be made by [Defendants] when submitting claims for reimbursement for emergency medical services provided to Patients." (*Id.* at ¶ 211).[25] Yet these conclusory allegations are not supported by *factual matter* in the Amended Complaint showing that there was reliance, let alone

---

[25] This allegation seems to suggest that Plaintiff is alleging that Defendants' (alleged) misrepresentations might have induced Plaintiff to submit claims (as contrasted with inducing Plaintiff to provide emergency services). To the extent that Plaintiff intended for this to be an alternative theory of reliance to support its fraud claim, the Court can find no factual matter to support this theory in the allegations in the Amended Complaint, and the Court discerns that Plaintiff at most alludes to this theory only in passing.

a reasonable reliance, on Defendants' alleged misrepresentations.[26] Likewise, as to damages, Plaintiff merely alleges—again unsupported by factual matter in the Amended Complaint—that "Envision has been damaged as a result of [Defendant's] fraudulent Scheme, as [Defendant] has withheld significant sums of money owed to Envision in an amount to be proven at trial, but in excess of $1,000,000." (*Id.* at ¶ 215). Put another way, although Plaintiff has made conclusory allegations as to the third element (injury caused by reasonable reliance) and fourth element (damages) of a Tennessee state law fraud claim, it has provided no factual matter in the Amended Complaint to support these conclusory allegations. This will not do, and even if Plaintiff had somehow satisfied Rule 9(b)'s heightened pleading requirements for fraud, Plaintiff has failed to allege a claim for fraud under Tennessee state law in nonconclusory terms to as to meet the pleading standards set by *Iqbal* and *Twombly.*

Accordingly, Count III fails to satisfy both Rule 9(b)'s heightened pleading requirements and the elements of fraud under Tennessee law, and it should be and accordingly will be dismissed.

---

[26] Additionally, it is difficult for the Court to see what Plaintiff allegedly did that it would not have done absent the alleged misrepresentations by Defendants so that Plaintiff can actually be said to have *relied* on Defendants' alleged misrepresentations. Indeed, it seems that Plaintiff certainly would have continued to provide emergency medical services and submit claims for reimbursements in connection with those emergency medical services irrespective of whatever alleged misrepresentations Defendant may have made.

Moreover, the Court notes that based on the allegations in the Amended Complaint it seems that at a certain point—even if Plaintiff can be said to have actually relied on Defendants' alleged misrepresentations—any reliance on Defendants' alleged misrepresentation regarding reimbursements would have become *unreasonable* given that the existence and effect alleged reimbursement scheme seems to have been—according to the Amended Complaint's allegations—quite visible to Plaintiff. The Court's observations in this paragraph suggest that Plaintiff's allegation of reasonable reliance is plausibly suggested, at most, only with respect to the beginning of the alleged period in which Defendants' scheme supposedly was ongoing.

Each of these points further buttresses the Court's conclusion that Plaintiff's fraud claim (Count III) must be dismissed.

Plaintiff alleges that Defendants violated the Tennessee Prompt Pay Act, Tenn. Code Ann.

§ 56-7-109, by delaying or denying reimbursement of claims for emergency medical services. As

one district court explained:

> The Tennessee Prompt Pay Act requires health insurers to "comply with certain timeliness and notification requirements for payment submitted by health care providers." *Productive MD,* [*LLC v. Aetna Health, Inc.*,  969 F. Supp. 2d 901, 938 (M.D. Tenn. 2013)] (citing Tenn. Code Ann. § 56-7-109). Section 109 requires that within 21 days after receiving an electronic claim from a health provider, the insurer must pay the total covered amount of the claim, pay the amount not in dispute, notify the health services provider why certain portions will not be paid, and notify the provider why the "claim is not clean and will not be paid and what substantiating documentation or information is required to adjudicate the claim." Tenn. Code Ann. § 56-7-109(b)(1)(B). The Prompt Pay Act imposes a 1% interest penalty on the improperly denied balance for each month it remains unpaid. *See* Tenn. Code Ann. § 56-7-109(b)(4).

*Select Specialty Hosp.-Memphis, Inc. v. Trs. of Langston Companies, Inc.*, No. 2:19-CV-2654-

JPM-TMP, 2020 WL 4275264, at *14 (W.D. Tenn. July 24, 2020).[27]

---

[27] The Court notes that in citing cases herein to identify or explain its view as to what Tennessee law is on a particular topic or issue, the Court is mindful of the so-called *Erie* doctrine, whereby the Court should not necessarily accept that a court's prior statement of Tennessee law accurately reflects current Tennessee law. (Notably, at times the Court cites cases that purport to state Tennessee law, but does so for some purpose other than to identify or explain *the Court's view* as to what current Tennessee law is—for example, in order to note a particular view of some aspect of Tennessee law that is held by some courts but not necessarily by other courts and not necessarily by the undersigned judge of this Court).

The *Erie* doctrine was announced in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). "Under the *Erie* doctrine, a federal court sitting in diversity applies 'the substantive law of the forum state and federal procedural law.'" *Bonasera v. New River Elec. Corp.*, 518 F. Supp. 3d 1136, 1151 (S.D. Ohio 2021) (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)).

The Sixth Circuit has explained:

> In diversity cases such as this, [the *Erie* doctrine requires that] we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise."

Plaintiff asserts that the Tennessee Prompt Pay Act provides a private right of action for healthcare providers to recover unpaid claims. The Court disagrees.

The Tennessee Prompt Pay Act was enacted to ensure the timely payment of claims submitted to health insurance providers. Although the statute sets deadlines for processing and paying claims, that does not mean that a remedy for a blown deadline is a private right of action. Defendants argue that the Tennessee Prompt Pay Act provides no explicit or implied right for healthcare providers to sue insurers directly. (Doc. No. 43 at 23-25). Defendants emphasize that the statute delegates enforcement authority to the Tennessee Department of Commerce and Insurance, and contains no language delegating any enforcement authority to private parties. Plaintiff does not dispute the absence of explicit authorizing language in the statute but contends that a private cause of action can be inferred because healthcare providers are the intended beneficiaries of the Tennessee Prompt Pay Act. (Doc. No. 45 at 24-25).

---

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citations and footnote omitted). Putting things somewhat differently, the Sixth Circuit recently has said:

> When applying state law, we must follow the controlling decision of the highest state court. If no such decision controls, we follow a decision of the state appellate court, published or unpublished, unless we are convinced that the highest court of the state would decide otherwise.

*Boyd v. N. Biomedical Rsch., Inc.*, 165 F.4th 424, 435 (6th Cir. 2026) (citations, quotation marks, and ellipsis omitted).

Herein, with one exception, when the Court cites a decision of the Tennessee Court of Appeals (or, for that matter, a decision of the Tennessee Supreme Court or a federal court) stating a purported proposition of Tennessee law, it does so with confidence that the Tennessee Supreme Court today would not decide differently with respect to the statement. (The exception is that the Court below cites decisions of Tennessee appellate courts that have stated a three-element test for a claim of unjust enrichment or quantum meruit, before noting that the Court is inclined instead to recognize a five-element test for such claims that has been used by other Tennessee appellate courts).

The Court disagrees with Plaintiff. Unsurprisingly, under Tennessee law, "determining whether a statute creates a private right of action is a matter of statutory construction." *Brown v. Tennessee Title Loans, Inc.*, 328 S.W.3d 850, 855 (Tenn. 2010). Again unsurprisingly, the interpreting court first asks whether the statute expressly creates a private right of action. *See id.* Here, the statute plainly does not do so. So the court next must ask whether the legislature, in the statute, indicated an intention to imply a private right of action. *Id.* In answering this question:

> [Courts should] look to the statutory structure and legislative history. Appropriate factors to consider include (1) whether the party bringing the cause of action is an intended beneficiary within the protection of the statute, (2) whether there is any indication of legislative intent, express or implied, to create or deny the private right of action, and (3) whether implying such a remedy is consistent with the underlying purposes of the legislation. The burden ultimately falls on the plaintiff to establish that a private right of action exists under the statute.

*Id.* at 855–56 (Tenn. 2010) (citations and footnote omitted). And as is relevant here, Tennessee courts generally "have refused to imply a private right of action in regulatory statutes enforced through governmental remedies." *Id.* at 860.

Relatedly, the Court goes back to something it mentioned earlier. The overarching question is whether "the legislature [despite not having expressly provided a private right of action] indicated an intention to imply" a private right of action. *Id.* at 855. In the Court's view, it should always be hesitant to find that the legislature "intended" to "imply" a private right of action. Why? Because, it seems to the Court, that a legislature would almost *never* "intend" to merely "imply" a private right of action; instead, if the legislature intended to create a private right of action, it would have provided for it *expressly*, rather than (for who knows what reason) leave it to courts to "imply" such a right of action and hope that courts will actually do so. In short, under Tennessee law, the question here is whether the legislature intended to imply a private right of action, and such intent

seems very unlikely when the legislature chose not to do what a legislature bent on a private right of action would have done: provide for it expressly.

Unhelpfully for its argument, Plaintiff does not acknowledge the factors in *Brown*, let alone address all of them specifically. But Plaintiff's argument nevertheless does touch on all three factors. Plaintiff also relies on the part of Tenn. Code Ann. § 56-7-109 that provides, "Any health insurance entity that does not comply with subdivision (b)(1) shall pay one percent (1%) interest per month, accruing from the day after the payment was due, on that amount of the claim that remains unpaid." Tenn. Code Ann. § 56-7-109(b)(4). Plaintiff notes, "[t]hat[the] interest payment [contemplated by § 56-7-109(b)(4)] is made to the provider along with the underlying balance." (Doc. No. 45 at 24). True enough. But the interest payment is a *remedy* for a statutory violation, and the remedy can be afforded the provider even if: (a) the provider's statutory right to the remedy is established by means other than a private law suit by the provider (here, by an enforcement action by the Commissioner of the Tennessee Department of Commerce and Insurance); and (b) the order to the insurance company to provide the remedy is the result of an enforcement action by the Commissioner rather than of a private lawsuit brought by the provider.

Plaintiff notes that Defendants themselves have cited cases in which the court entertained a private cause of action under Tenn. Code Ann. § 56-7-109. (Doc. No. 45 at 24 (citing Doc. No. 43 at 33 n.9)). But the Court does not perceive that any of these cases actually addressed the argument that there is no private cause of action under Tenn. Code Ann. § 56-7-109. So, ultimately these cases—although tending to suggest that the notion of a private right of action under Tenn. Code Ann. § 56-7-109 is far from absurd— are not helpful in resolving that argument.

Ultimately, the Court finds as a matter of law that there is no private right of action under the Tennessee Prompt Pay Act, and so Count IV will be dismissed.

IV.    <u>Civil Conspiracy (Count V)</u>

Via Count V, Plaintiff alleges that Defendants engaged in a civil conspiracy, in violation of Tennessee law, to harm its business by systematically denying or delaying reimbursement claims for emergency medical services. (Doc. No. 29 at ¶ 231). Plaintiff asserts that Defendants conspired with subsidiaries and affiliates, including Optum, to suppress its business operations and to defraud Envision "and other providers out of substantial sums of money by deceiving them into believing that treatment of Patients would result in reimbursement as represented by United and as required by State and Federal law." (*Id.* at ¶ 241). However, Plaintiff's civil conspiracy claim fails as a matter of law for several reasons, as outlined below.

For starters, under Tennessee law, there is no such thing as a cause of action for civil conspiracy. *E.g. Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir. 2010); *Stanfill v. Hardney*, No. M2004-02768-COA-R3-CV, 2007 WL 2827498, at *7-8 (Tenn. Ct. App. Sept. 27, 2007); *Levy v. Franks*, 159 S.W.3d 66, 82 (Tenn. Ct. App. 2004).

Rather than function as a separate cause of action, civil conspiracy constitutes a *theory* for extending the tort liability of one co-conspirator to the other co-conspirators.[28] The value of a civil conspiracy theory is that it can render a defendant liable for a tort even if the plaintiff cannot prove that the defendant itself actually committed the tort; under a valid civil conspiracy theory, a defendant can be liable for a tort committed within the scope of the conspiracy just as if it had committed the tort even if it did not. So, to the extent that Plaintiff has adequately asserted a civil conspiracy theory, Plaintiff may proceed under the theory that each Defendant is fully liable in damages for the (alleged) torts of its (alleged) co-conspirators—meaning the other Defendant,

---

[28] Below, the Court refers at time to civil conspiracy as a "claim" (rather than as a theory of extending to a defendant liability on some other cause of action against some other defendant) because the parties herein and courts in general do so. But it bears emphasis that civil conspiracy is *not* a claim in the sense of being a stand-alone cause of action.

Optum, and UMR—committed within the scope of the conspiracy, even if that Defendant did not personally commit those torts. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002) ("Upon a finding of conspiracy, each conspirator is liable for the damages resulting from the wrongful acts of all co-conspirators in carrying out the common scheme.").

So, Count V fails to the extent that it claims to assert a separate cause of action, and Count V will be dismissed to that extent. Below, the Court next assesses whether Plaintiff's alleged civil conspiracy fails as a theory for imposing liability on the respective Defendants for *someone else's* tort(s). The Court answers that question in the affirmative, for multiple alternative reasons.

a.   Failure to allege an actionable underlying tort

Under Tennessee law, a civil conspiracy claim requires: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) resulting injury to the plaintiff. *See Hagen v. U-Haul Co. of Tenn.*, 613 F. Supp. 2d 986, 996 (W.D. Tenn. 2009) (quoting *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006)). Additionally, consistent with the above discussion, a civil conspiracy theory must be predicated on an actionable underlying tort. *See Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010). Otherwise, there is no liability to which a civil conspiracy theory can attach so as to extend that liability (to co-conspirators who may not otherwise be liable). So, in essence, an underlying actionable tort serves as a fifth element of the theory.

Defendants argue that Plaintiff's civil conspiracy claim fails because the underlying tort claims—which Defendant identifies, (Doc. No. 43 at 26), from paragraph 239 of the Amended Complaint as fraud (Count III) and violation of the Tennessee Prompt Pay Act (Count IV)—are deficient and cannot support a conspiracy claim. (Doc. No. 43 at 25–26). In response, Plaintiff

contends that its underlying claims (which Plaintiff identifies as being only fraud) are adequately pled and provide a sufficient foundation for its conspiracy claim. (Doc. No. 45 at 26). However, as detailed above, Plaintiff has failed to adequately plead an underlying fraud claim (or a claim under the Tennessee Prompt Pay Act, for that matter). Without a viable predicate tort claim, Plaintiff's civil conspiracy claim must fail. *See Lane*, 334 S.W.3d at 763.

      b.   Conclusory assertions unsupported by factual matter

Defendants argue that the civil conspiracy claim fails because Plaintiff has not, as required by the intracorporate conspiracy immunity doctrine,[29] alleged a conspiracy between Defendants and "some outside third party." (Doc. No. 43 at 26 (quoting *Shipwash v. United Airlines, Inc.*, 28 F. Supp. 3d 740, 749 (E.D. Tenn. 2014))).. Defendant argues that "[w]ithout any allegations that [Defendants] conspired with any outside third party, Plaintiff's conspiracy claim must be dismissed." (*Id.* at 27 (citation and internal quotation marks omitted)). For present purposes, the Court declines to apply the intercorporate conspiracy immunity doctrine[30] and assumes *arguendo* that the doctrine does not apply in the instant case. The Court instead proceeds to address whether Plaintiff has adequately alleged that Defendants conspired with anyone or anything (irrespective of whether it is someone or something within the scope of the intracorporate conspiracy immunity doctrine). As set forth below, the Court finds that Plaintiff has not adequately alleged this, because the Amended Complaint has provided only conclusory assertions and formulaic recitations—

---

[29] "[Under the] intracorporate conspiracy immunity doctrine, proof of the existence of a conspiracy must be found, if at all, in conduct between defendant[s] and some outside third party." *Shipwash v. United Airlines*, Inc., 28 F. Supp. 3d 740, 749 (E.D. Tenn. 2014).

[30] The Court so declines for two reasons. First, application of this doctrine is not necessary for Defendants to prevail on this count anyway. Second and relatedly, it would be a poor use of judicial resources to determine whether the Amended Complaint (when construed in Plaintiff's favor as required) contains factual matter that plausibly suggests an agreement with at least one non-party (conceivably Optum or UMR, for example) that is sufficiently distinguishable from Defendants as to constitute an "outside third party" for purposes of this doctrine.

devoid of factual enhancement— of the existence of a conspiracy (whomever that conspiracy may involve, whether or not someone or something within the scope of the intracorporate conspiracy immunity doctrine). So the Court agrees with Defendants' assertion that Plaintiff lacks adequate allegations that Defendants conspired with any outside third party—or, indeed, anyone else.

Plaintiff's Amended Complaint describes a broad scheme involving Defendants, UMR, and Optum but does not provide facts (not even relatively general ones and not even mere examples) about the alleged conspiracy, such as the manner in which the conspiracy was formed (whether tacitly or expressly), the identities of participating individuals acting on behalf of alleged conspirators in forming and/or carrying out the conspiracy, the timing and location of in-person meetings in furtherance of the conspiracy, the timing and nature of remote communications in furtherance of the conspiracy, or particular actions taken in furtherance of the conspiracy. A complaint need not contain *detailed* factual allegations, but it does need to contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 556. The Court finds an absence of such.

In summary, because a civil conspiracy claim can serve *only* to the extend liability on underlying torts to co-conspirators of the direct tortfeasors, Count V fails as an independent cause of action. And Count V also fails at extending liability to Defendants based on the acts of their alleged co-conspirators, both because there is no actionable underlying tort and because Plaintiff has failed to set forth factual matter plausibly suggesting the existence of a conspiracy. Accordingly, Count V of the Amended Complaint will be dismissed in its entirety.

V. <u>Unjust Enrichment and Quantum Meruit (Counts VI and VIII)</u>

In Counts VI and VIII, Plaintiff asserts claims for unjust enrichment and quantum meruit, respectively.

As an initial matter, the Court notes that there is essentially no difference between these two kinds of causes of action:

"A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another[.]" *Swafford v. Harris*, 967 S.W.2d 319, 324 (Tenn. 1998). This quasi-contract action is sometimes referred to as an action for unjust enrichment. See *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966) ("Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same."). In order to prevail on a claim for quantum meruit, Plaintiff is required to prove the following elements:

> (1) there must be no existing, enforceable contract between the parties covering the same subject matter,
>
> (2) the party seeking recovery must prove that it provided valuable goods and services,
>
> (3) the party to be charged must have received the goods and services,
>
> (4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, and
>
> (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

*ICG Link, Inc. v. Steen*, 363 S.W.3d 533, 546 (Tenn. Ct. App. 2011) (quoting *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 227 (Tenn. Ct. App. 2009)).

*Johnson v. Lefeve*, No. M2024-01484-COA-R3-CV, 2026 WL 523193, at *14 (Tenn. Ct. App. Feb. 25, 2026).[31] Other courts have used a three-element test instead of the above quoted five-element test and have stated that "the elements of unjust enrichment are (1) 'a benefit conferred upon the defendant by the plaintiff'; (2) 'appreciation by the defendant of such benefit'; and (3) 'acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.'" *Haney v. Charter Foods N., LLC*, 747 F. Supp. 3d 1093, 1113 (E.D. Tenn. 2024) (quoting *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005)). The three-element test seems to leave out elements (1) and (4) from the former, five-element test, but since (as indicated elsewhere herein) the first element of the five-element test is required under the law anyway, in effect the only difference is that the fourth element of the five-element test is not reflected in the three-element test. To the extent that it makes a difference, the Court is inclined to recognize the five-element test—which the Tennessee Supreme articulated (in *Harris* in 1998) long after it articulated the three-element test (in *Paschall's, Inc.*, in 1966)— as the precise applicable test that the Tennessee Supreme Court would choose if asked today to choose between the two.

---

[31] The quoted language refers to a contract implied in *law*, which is something different from what Plaintiff alleges in Count VII, i.e., a contract implied in *fact*. "In a contract implied in fact, the conduct of the parties and the surrounding circumstances show mutual assent to the terms of the contract. In contrast, contracts implied in law are created by law without the assent of the party bound, on the basis that they are dictated by reason and justice." *Edward Jackson Younger Fam. Irrevocable Tr. by & through Younger v. Ross*, No. E2024-01338-COA-R3-CV, 2025 WL 3158820, at *17 (Tenn. Ct. App. Nov. 12, 2025) (citation and internal quotation marks omitted), *appeal denied* (Mar. 30, 2026). To be clear, under *Pachall*, *Inc.* (and its progeny), unjust enrichment and quantum meruit both fall under the rubric of contracts implied in law (what undersigned prefers to call *"obligations* implied at law"), not contracts implied in fact. *See Patterson v. Patterson*, No. M201600886COAR3CV, 2017 WL 1433310, at *9 n. 9 (Tenn. Ct. App. Apr. 20, 2017). *See also Young v. H & H Testing, LLC*, No. M202000145COAR3CV, 2021 WL 1942371, at *6 (Tenn. Ct. App. May 14, 2021) (noting that "a contract implied in law [is] also referred to as quantum meruit or unjust enrichment" (citing *Swafford*, 967 S.W.2d at 324)).

As noted above, "actions brought upon theories of *unjust enrichment*, quasi contract, contracts implied in law, and *quantum meruit* are essentially the same." *Paschall's, Inc.*, 407 S.W.2d at 154 (emphasis added). Whatever name is used for the theory, an action on such theory is considered an "equitable" claim, *Swafford*, 967 S.W.2d at 324 and relief thereunder is considered an equitable remedy.[32] *See Blue Cross-Blue Shield of Tennessee v. City of Lawrenceburg*, No. 01A01-9611-CV-00526, 1997 WL 195468, at *2 (Tenn. Ct. App. Apr. 23, 1997) ("Courts frequently employ the various terminology [of *unjust enrichment*, quasi contract, contracts implied in law, and *quantum meruit*] interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties, regardless of their assent thereto." (quoting *Paschall's, Inc.*, 407 S.W.2d at 154-55)). It is the kind of obligation that Plaintiff has asserted, redundantly (albeit under different monikers), in both Count VI and Count VIII. If a single term is to be used for this kind of obligation, it strikes the Court that "contract implied in law"[33] is the best choice, though obviously cases at times use the other terms for what amounts to the same thing under Tennessee law. A claim on a contract-implied-in-law theory (meaning, here, Counts VI and VIII) is to be contrasted with a claim for breach of implied-in-fact contract (here, Count VII, which is discussed further below).

Here, Defendants challenge one (and only one) element of Plaintiffs' contract-implied-in-law theories. The element is Defendants' receipt of a benefit from Plaintiff, which essentially is

---

[32] The Court makes this observation despite understanding that sometimes calling something "equitable"—as contrasted, presumably, with "legal"—in nature is not consequential. Here, though, the observation may be of some consequence, as the Court's discussion at one point indicates.

[33] It strikes the Court as appropriate to think of this kind of cause of action as one for "breach of *obligations* implied in law." The undersigned finds this term less confusing and therefore preferable to "breach of *contract* implied in law" because the term "contract" is a misnomer here; a "contract' (as that term is almost always used) essentially by definition requires mutual assent, where as a so-called "contract implied at law" does *not* involve mutual assent and instead refers to an *obligation* that exists despite the lack of mutual assent. Nevertheless, the Court herein will use the established term, "contract implied in law."

the third element of the five-element test and the first element of the three-element test. Defendants contend that "the only benefit conferred by [Plaintiff] was to [Defendants'] insureds, as opposed to [Defendant] itself." (Doc. 43 at 30). In support of this contention, Defendants note that the Amended Complaint refers to the benefit that Defendant received only in conclusory fashion: "United has recognized a benefit—whether direct or indirect." (Doc. No. 43 at 28 (quoting Doc. No. 29 at ¶¶ 252, 280)). Defendants also note that the Amended Complaint makes clear that it was Plaintiff's *patients* who received a benefit, i.e., emergency medical services). (*Id.* (quoting Doc. No. 29 at ¶ 258)). And Defendants cite case law (albeit none of it precedential for this Court) holding that for purposes of this kind of claim, the provision of medical services to an insurer's *insureds* does not count as a conferral of a benefit on the *insurer*. (Doc. No. 43 at 28-30).

In response, Plaintiff claims, "Under Tennessee law, an unjust enrichment claim may be brought where the plaintiff confers an indirect benefit to the defendant which the defendant accepts without adequate compensation." (Doc. No. 45 at 28 (citing, *inter alia*, *United State ex rel. Goodman v. Arriva Med., LLC*, 2020 WL 1433861, at *8 (M.D. Tenn. Mar. 24, 2020))). Plaintiff next purports to explain its theory for why it adequately pled a benefit (direct or indirect) to Defendants:

> Here, [Plaintiff] has pled it provided a direct or indirect benefit to [Defendants] by treating [Defendants'] patients at [Plaintiff]-staffed emergency departments and that [Defendants] [have] been unjustly enriched by retaining money rightfully due and owing to [Plaintiff] for the provision of that care. (See D.E. 29 at ¶ 252). The provision of services to [Defendants'] insureds allows [Defendants] to discharge [their] duty to cover medically necessary emergency healthcare services, thus creating an indirect benefit to [Defendants] and giving rise to an actionable claim under Tennessee law. See *River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43, 58-59 (Tenn. Ct. App. 2002) (affirming finding that BlueCross was unjustly enriched by the provision of emergency medical services to BlueCross's insured enrollees); *N.Y. City Health & Hosps. Corp. v. Wellcare of N. Y., Inc.*, 937 N.Y.S.2d 540, 541, 546 (2011) (analyzing and adopting holding in *River Park Hosp., Inc.* in holding that out of network hospital's

unjust enrichment claim for systematic underpayment for emergency services by MCO should not be dismissed).

(Doc. No. 45 at 28-29). Next, Plaintiff points out that "Defendants "fail[ ] to cite a single case applying Tennessee law, and only one within the Sixth Circuit whatsoever" and claim that Defendants' cited cases are distinguishable (Doc. No. 45 at 29).

In their Reply, Defendants reiterate their view that they received no benefit (not even an indirect one), and assert that what they received instead was only a "ripened obligation to pay money"— "which hardly can be called a benefit." (Doc. No. 49 at 11 (quoting *Patel v. Aetna*, Case No. 17 cv-78, 2018 WL 6574734, at \*4 (S.D. Ohio Dec. 12, 2018))). Defendants also assert that the two cases on which Plaintiff relies—namely *River Park Hospi., Inc.*, and *Wellcare of N.Y.* (which the Court has referenced above in its quotation of a portion of Plaintiff's Response)—are distinguishable on their facts because they involved "Medicare Advantage . . . organization[s] that had contracted with the Federal Centers for Medicare & Medicaid Services to provide services to Medicare enrollees" and the decisions were "premised upon application of specific federal laws and regulations covering the provision of medical services to Medicare enrollees." (*Id.* at 11-12 (quoting *Sasson Plastic Surgery, LLC v. UnitedHealthcare of New York, Inc.*, Case No. 17-cv-1674, 2021 WL 1224883, at \*15 (E.D.N.Y. March 31, 2021))).

As is axiomatic, the Court needs to look at what facts are alleged in the Amended Complaint, and not what Plaintiff says in its Response, to determine whether Plaintiff has adequately alleged the receipt by Defendant of a benefit. In undertaking this task, the Court will assume to Plaintiff's advantage that an "indirect benefit"—whatever that means—is sufficient, and of course the Court construes any allegations about the benefit (direct or indirect) in favor of Plaintiff.

In its Response (Doc. No. 45), citing paragraph 252 of the Amended Complaint, Plaintiff claims that it has alleged that "*it provided a direct or indirect benefit to [Defendants] by treating [Defendants'] patients at [Plaintiff]-staffed emergency departments* and that [Defendants] [have] been unjustly enriched by retaining money rightfully due and owing to [Plaintiff] for the provision of that care." (Doc. No. 45 at 28 (citing Doc. No. 29 at ¶ 252) (emphasis added)). Plaintiff then suggests that it is inferable from what is in paragraph 252 that "the provision of services to [Defendants'] insureds allows [Defendants] to discharge [their] duty to cover medically necessary emergency healthcare services, thus creating an indirect benefit to [Defendants] and giving rise to an actionable claim under Tennessee law." (*Id.*). The problem is that Plaintiff has misrepresented what is in paragraph 252. Paragraph 252 does *not* say that Plaintiff provided a direct or indirect benefit to Defendants by treating Defendants' patients at Plaintiff-staffed emergency departments. What it says is that "[Defendants] have recognized a benefit—whether direct or indirect—and ha[ve] been unjustly enriched by way of the Scheme by retaining money rightfully due and owing to Envision for the provision of emergency medical services to United's Patients." (Doc. No. 29 at ¶ 252). And the Court does not see where any other content in the Amended Complaint says what Plaintiff claims (falsely) that paragraph 252 says. To the contrary, other content is along the same lines of what paragraph 252 actually says: that the benefit involved was from Defendants *retaining money* [money that obviously came from sources other than Plaintiff]:

> 252. United has recognized a benefit—whether direct or indirect—and has been unjustly enriched by way of the Scheme by retaining money rightfully due and owing to Envision for the provision of emergency medical services to United's Patients.
>
> 253. As a result of retaining funds that should have been paid to Envision, United has reaped a windfall, and has retained payments rightfully owed to Envision.

254. United has retained funds rightfully owed to Envision, and it would be unjust to permit United to retain those funds. United has acted inequitably in refusing to make payments without any justification.

(Doc. No. 29 at ¶¶ 252-254). The alleged benefit here is simply not what Plaintiff now claims it is; that is to say, it is not an indirect benefit (emergency medical services to Defendants' insureds) *received by Defendants from Plaintiff.* Rather, it is a "benefit [recognized by Defendants] by retaining money," (Doc. No. 29 at ¶ 252), which to the Court means a "benefit [in the form of] retaining money" that (it is easily inferable) came from other sources.

Alternatively, even assuming *arguendo* that Plaintiff could be given credit for having alleged that Defendants received a benefit (an indirect one) in the form of Plaintiff provided emergency medical services to Defendants' insureds, that would not help Plaintiff. The reason is that this allegation, being solely conclusory on its own, would need to be supported by factual matter. The factual matter would need, in particular, to explain what it is about the relationship between Defendants that plausibly suggests that if Plaintiff provides emergency medical services to Defendants' insureds, then Defendants (given the particulars of its contractual or other legal obligations towards its insured) are properly deemed to have received a benefit. For example, what (alleged) facts support the notion—asserted by Plaintiff in briefing but not the Amended Complaint that "the provision of services to [Defendants'] insureds allows [Defendants] to discharge [their] duty to cover medically necessary emergency healthcare services"? (Doc. No. 45 at 28). What are the facts regarding the nature and extent of Defendants' duty to cover medically necessary emergency healthcare services for their insureds? And what facts suggest that Plaintiff, by providing emergency healthcare services to Defendants' insureds, "allows" Defendants to "discharge" that duty (such as it is?). How does such provision of emergency medical services "allow" such "discharge" of duty? Plaintiff does not say. All of this is a major problem for Plaintiff,

especially because Defendant is correct that there is a great deal of extant judicial skepticism about the indirect theory that Plaintiff claims (incorrectly) was asserted via paragraph 252.

In short, the sole "benefit" that Plaintiff alleged in the Amended Complaint in support of Counts VI and VIII was not one conferred by Plaintiff on Defendants as required for those counts. Plaintiff did not allege that it had provided any benefit to Defendants, direct or indirect. So there is no merit to Plaintiff's post-hoc argument for how the Amended Complaint adequately alleged that Plaintiff had provided a benefit (direct or indirect) on Defendant. And even if Plaintiff could be credited for having made that allegation, the allegation on its own at best could be viewed as wholly conclusory and not supported by adequate factual matter as required.

For these reasons, Counts VI and VIII will be dismissed.

VI.    Breach of Implied-In-Fact Contract (Count VII)

In Count VII, Plaintiff alleges that Defendants breached an implied-in-fact contract, created after Plaintiff went out of network on January 1, 2021, by failing to pay Plaintiff's claims (at applicable out-of-network rates)[34] for emergency medical services provided to Plaintiff's insureds. (Doc. No. 29 at ¶¶ 259-270). Plaintiff contends that by submitting claims for reimbursement and complying with Defendants' pre-payment review process, it entered into an implied agreement with Defendants whereby it would receive payment for those services.

---

[34] Plaintiff alleges that under the alleged implied-in-fact contract, they "would be reimbursed at the applicable out-of-network rate for the provision of care to United's Patients." (Doc. No. 29 at ¶ 260). Unless the undersigned is missing something, Plaintiff is saying two very different things about what the applicable rate was. The first is that the applicable rate was a rate "in accordance with the standards acceptable under Tennessee law and in accordance with rates the United pays for other substantially identical claims also submitted by Envision and by other providers." (Doc. No. 29 at ¶ 265). The second is that the rate was, "at a minimum, equivalent to the reasonable value of the professional emergency medical services provided by Envision." (Id. at ¶ 266). As far as the Court can tell, the second rate is by no means necessarily equal to the first.

A contract implied in fact exists where there are "circumstances which show mutual intent or assent to contract." in *Metro. Gov't of Nashville & Davidson Cnty. v. Cigna Healthcare of Tennessee, Inc.*, 195 S.W.3d 28, 32 (Tenn. Ct. App. 2005). Importantly, a contract implied in fact *is* a contract, plain and simple, inasmuch as "Tennessee has long recognized that a contract can be express, *implied*, written or oral." *Id.* at 34 (emphasis added). In other words, it is not *only* express contracts that are actual contracts; rather, "true contacts [include] those which are implied 'in fact' [though not] those which are implied 'in law." *Id.* at 32 (cleaned up). As indicated above, "[b]oth express contracts *and* contracts implied in fact require mutual assent of the parties." *River Park Hosp., Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 173 S.W.3d 43, 58 (Tenn. Ct. App. 2002) (emphasis added). "[T]he only material difference between a typical contract and a contract implied in fact is the lack of a memorialization of the contract." *Faber v. Ciox Health, LLC*, 331 F. Supp. 3d 767, 782 (W.D. Tenn. 2018).

Recovery on a claim based on a contract-implied-in-law theory (such as Counts VI and VIII) is precluded when there is a contract implied in fact (and *not* just when there is an *express* contract). This truism is reflected in *Metro. Gov't of Nashville & Davidson Cnty.*, where the plaintiff sought to recover both for breach of (an implied) contract and for unjust enrichment:

> A party may recover damages in equity if there exists a contract implied in law, *see Paschall's,* 407 S.W.2d at 153; however, equitable relief is not available if there exists a contract implied in fact. *See Ridgelake* [*Apts. v. Harpeth Valley Utils. Dist. of Davidson and Williamson Counties,* No. M2003–02485–COA–R3–CV, 2005 WL 831594, at *8 (Tenn. Ct. App. April 8, 2005)] (holding [that] only contracts implied in law are creatures of equity).
>
> The distinction is important to the issue at hand because equitable relief, such as that sought by Metro [on a contract-implied-in-law theory], is not available if there exists a contract implied in fact. The trial court found, and we agree, that a contract in fact exists between Cigna and Metro.[3] Because a contract implied in fact exists, Metro is precluded from recovering damages under the equitable theory of unjust enrichment.

195 S.W.3d at 32-33. Notably, Defendants could have, but did not, argue that the allegations of the Amended Complaint (taken as true) unambiguously and unconditionally establish that there was a contract in fact between the parties, and then argue that the Amended Complaint therefore establishes on its face that the two contract-implied-in law claims (Counts VI and VIII) are barred as a matter of law. Under this approach, Defendants potentially could have sacrificed their challenge to Count VII in order to make a particular kind of challenge to Counts VI and VIII. But Defendants did not do so.

Instead, they challenge Count VII on the asserted grounds that the Amended Complaint contains no nonconclusory allegation to establish the existence of an implied-in-fact contract. Defendants note—consistent with the Court's observation that an implied-in-fact contract under Tennessee law *is* a contract (just one that is not memorialized)—that "a contract implied in fact must embody all the elements of an express contract, including an actual agreement between the parties." *Conner v. Hardee's Food Systems, Inc.*, 65 F. App'x. 19, 24 (6th Cir. 2003). They argue in effect that Plaintiff has not set forth *factual matter* plausibly suggesting the existence of all elements, including an actual agreement (which encompasses the metaphorical "meeting of the minds"), consideration, and definiteness sufficient for enforcement. (Doc. No. 43 at 30-32).

In response, Plaintiff both quotes and paraphrases various allegations from the Amended Complaint that Plaintiff asserts are sufficient to satisfy the applicable pleading standard with respect to the challenged elements of Count VII. (Doc. No. 45 at 30-32). Naturally, Defendants in their Reply disagree with Plaintiff's assertion(s). (Doc. No. 49 at 12). Defendants have made some arguments that potentially could gain traction later in this case. But for now, the Court concludes that: (i) some of Defendants' arguments are based on undeveloped pro-Defendant facts or on a construal of the allegations of the Amended Complaint *against* Plaintiff (as is impermissible at the

motion to dismiss stage); (ii) some of Defendants' legal arguments are underdeveloped (perhaps understandably given the early stage of this case and page limitations on briefing) and not supported by precedent binding on this Court; and (iii) the factual matter alleged by Plaintiff, when construed in Plaintiff's favor, is enough (if just barely) to plausibly suggest the existence of the challenged elements of a claim for breach of a contract implied in law. So the Motion will be denied as to Count VII.

VII.    ERISA Preemption

Defendants also argue that Counts III through VIII are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, because (according to Defendants) those counts relate to employee benefit plans governed by ERISA. (Doc. No. 43 at 32). Notably, however, Defendant asserts that these claims are preempted by ERISA only "[t]o the extent [that] these claims are based on an assignment of benefits by an individual covered under an ERISA-governed plan." (*Id.*).

ERISA broadly preempts state laws that "relate to" employee benefit plans, including claims that seek to enforce rights under such plans. *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985) (citing ERISA section 514(a), i.e., 29 U.S.C. § 1144(a)).[35]

The possibility of ERISA preemption, particularly under 29 U.S.C. § 1144, threatens the viability of claims related to employee benefit plans. Under § 1144(a), state-law claims that relate to ERISA-covered benefit plans generally are preempted.

---

[35] Defendants incorrectly characterize 29 U.S.C. § 1144 as codifying section *504* of ERISA. (Doc. No. 43 at 33). In fact, it codifies section *514* of ERISA.

ERISA prescribes two varieties[36] of preemption of state-law claims: complete preemption under 29 U.S.C. § 1132(a) and express preemption under 29 U.S.C. § 1144. As the Sixth Circuit once noted, "Although '[o]ur prior ERISA preemption cases have not always clearly differentiated between the two concepts,' the distinction is clear[.]" *Hogan v. Jacobson*, 823 F.3d 872, 881 (6th Cir. 2016) (quoting *Loffredo v. Daimler AG,* 500 F. App'x 491, 500 (6th Cir. 2012)). Normally, the consequence of the applicability of the former concept (i.e., complete preemption) is that the suit containing the preempted claims can be removed to federal court even if it otherwise could not be; a "completely" preempted state-law claim is deemed to arise under federal law and thus vests the district court with federal-question jurisdiction. *Wright v. Gen. Motors Corp.,* 262 F.3d 610, 613-14 (6th Cir. 2001). By contrast, the consequence of the applicability of express preemption under § 1144 is that it serves as a defense; when applicable, it is grounds for dismissal, but not for removal. *Aldridge v. Regions Bank*, No. 3:21-CV-00082-DCLC-DCP, 2021 WL 4718489, at *5 (E.D. Tenn. Oct. 8, 2021) (citing *Wright*, 262 F.3d at 613), *aff'd,* 144 F.4th 828 (6th Cir. 2025)

Complete preemption under 29 U.S.C. § 1132(a) would confer federal-question jurisdiction and allow removal to federal court on that basis, but it is inapplicable here because the propriety of removal has never been at issue in this case (which was originally filed in this Court), and Defendants have made no challenge to subject-matter jurisdiction. The question is whether

---

[36] There are three other varieties of preemption (implied, field, and conflict) that have been categorized as types of so-called "ordinary preemption", meaning that they constitute a defense to state-law claims rather than grounds for removal. *See Est. of Cowan v. LP Columbia KY, LLC*, 530 F. Supp. 3d 695, 701 (W.D. Ky. 2021) ("Importantly, complete preemption supporting removal is not the same as 'ordinary preemption', which provides a federal defense. 'Ordinary preemption' denotes the classic methods of establishing federal supremacy through express, implied, conflict, or field preemption." (citation omitted)). Presumably the Supreme Court had ordinary preemption in mind when it said, "Federal pre-emption is ordinarily a federal defense to the plaintiff's suit." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987).

express preemption under § 1144 applies to Plaintiff's state law claims (i.e., Counts III through VIII).

Plaintiff contends that Defendant's argument should be rejected as simply inapplicable because "[Defendants] ask[] this Court to find [Plaintiff]'s claims preempted [only] '[t]o the extent [Plaintiff's] claims are based on an assignment of benefits by an individual covered under an ERISA-governed plan' [b]ut there is no allegation in the Complaint that any of [Plaintiff]'s claims are 'based on an assignment of benefits by an individual covered under an ERISA-governed plan[]' [and] [t]he [Amended] Complaint does not rely upon, refer, or relate to the terms of any ERISA plan." (Doc. No. 45 at 32 (citations omitted)). The parties are right to focus here on the distinction between claims that *are*, and claims that are *not*, based on an assignment of benefits by an individual covered by an ERISA-governed plan; when the claims *are* so based, the argument for preemption is definitely stronger (for reasons the Court need not set forth herein). *See Select Specialty Hosp.-Memphis, Inc.*, 2020 WL 4275264, at *15-16; *Productive MD*, 969 F. Supp. at 938.

The Court agrees with Plaintiff that none of its claims are based at all on an assignment of benefits by an individual covered under an ERISA-governed plan, and that therefore Defendants' argument for preemption of Counts III through VIII is simply inapplicable. So preemption is not a grounds for dismissal of those claims.

CONCLUSION

This case is only at the motion-to-dismiss stage, as the Court well recognizes. But to survive past that stage, a complaint has to meet certain standards under *Iqbal/Twombly*—not least with respect to RICO claims—and also needs (with respect to state-law claims) not to be preempted. For the reasons discussed herein, the Court finds that only one of Plaintiff's claims—

Count VII—accomplishes that. Accordingly, the Motion (Doc. No. 42) will be GRANTED with respect to all counts in the Amended Complaint except Count VII. Accordingly, Plaintiff's Count VII will proceed, and all other counts against Defendants will be dismissed.

An appropriate corresponding order will be entered.

IT IS SO ORDERED.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE